Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

Keith Mathews
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
603-622-8100
keith@awplegal.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS<br>on behalf of himself and all others similarly situated<br><br>        Plaintiff,<br><br>vs.<br><br>KELLER WILLIAMS REALTY, INC.,<br>MAKAI SOUTHEAST, LLC (d/b/a<br>KELLER WILLIAMS REALTY WELLINGTON),<br>EQUESTRIAN PALMS, LLC,<br><br>        Defendants. | Case No. 23-cv-81393-RLR<br><br>TCPA & RICO VIOLATIONS<br>CLASS ACTION<br><br><br>**COMPLAINT FOR DAMAGES<br>AND INJUNCTIVE RELIEF**<br><br><br>DEMAND FOR JURY TRIAL |

<u>**PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**</u>

## I.   INTRODUCTION

1. National real estate inventories are at an all-time low. This has created a dire housing situation that potentially could spill over into larger economic woes for the entire country. Florida, where Plaintiff resides, has attracted record net migration in the years following the Coronavirus outbreak. Combined, this has resulted in Florida residents like Plaintiff being the unfortunate recipients of up to thirty cold-call and text message solicitations *per month* to list their home for sale.

2. These calls are not carried out by unscrupulous rogue, independent real estate agents. Rather, they are actively encouraged and even provided technological campaign platforms to execute these violations by the largest real estate corporation in the world, Defendant Keller Williams.

3. These mass campaigns are not only an annoyance, but they are also illegal. The Telephone Consumer Protection Act and The Do-Not-Call Implementation Act of 2003 gave the FCC and private citizens the right to stop these harassing communications which, collectively, cause economic harm to the nation by reducing efficiency and tying up the communications networks.

4. This is a class action brought under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227(c) to remedy the widespread breach of the FCC's do-not-call rule perpetuated by the Defendants. It invokes RICO Telemarketing Fraud for issues arising out of the worst possible cold call, where Keller Williams relentlessly pursued their commissions with total disregard for Federal and Florida criminal statutes that protected a couple disrupted by the

Russian-Ukrainian War. It is first-to-file under TCPA with Article III standing, and first-to-file under RICO Telemarketing Fraud.

## II.   VENUE

5.  Venue in the Southern Florida District is proper because the events that transpired took place in the Southern Florida district and violated Federal Law.

6.  This Court has subject matter jurisdiction, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332 (d), because the proposed class of exceeds 100 members, the amount in controversy exceeds $5,000,000, and at least one member of the class of plaintiffs is a citizen of a state different from Defendant Keller Williams, a Texas corporation. Jurisdiction in this Court for a permanent injunction arises under 28 U.S.C. 1331.

## III.   PARTIES

7.  Plaintiff Doctor Jeff Isaacs ("Dr. Isaacs") is a United States Citizen. He is resident under Florida Homestead Laws in Homeland Equestrian Community, part of Palm Beach County.

8.  Defendant Keller Williams Realty, Inc is a Texas corporation headquartered at 1221 South Mopac Expressway Suite 400, Austin, Texas 78746. Keller Williams is the world's largest real estate franchise by agent count and has more than 1,100 offices and 191,000 agents. The Defendant is the largest real estate company in the United States as measured by units sold and total revenue volume. Per their website, Keller Williams is "a technology company." KW "provides the real estate platform that our agents' buyers and sellers prefer." Keller Williams technology offerings include tools, such as "Landvoice" that allow agents to engage in mass marketing campaigns with potential clients and homeowners. Their offerings also including training in using their proprietary platforms and compliance

regulation education. These "technology" tools and training devices are well documented

on their own website and were alleged to promote TCPA violations in the *DeShay vs. Keller*

*Williams* Class Action that settled in 2022. Both the website and the class action docket

from Indian River County Nineteenth Circuit Florida are referenced and incorporated

herein for further background.

9.  Defendant Makai Southeast, LLC d/b/a Keller Williams Realty Wellington, ( "Makai") is

a limited liability company organized under the laws of the state of Florida with a principal

address of 1400 Corporate Center Way, Second Floor, Wellington, Florida 33414 and a

registered agent, Michael A. Menchise, Esq. at the same address.

10. Defendant Equestrian Palms, LLC ("Equestrian Palms") is a Florida limited liability

corporation. Its principal address and place of business is improperly registered to Dr.

Isaacs' aforementioned Homeland residence. Equestrian Palms sole owner, Guatemala

citizen Mr. Jorge Verdugo, has declined to accept service of these claims as requested by

counsel. As such, amendment may be necessary depending upon the resolution of service

of this complaint.

## IV.    FACTUAL HISTORY

11. Introductory paragraphs preceding this paragraph are asserted herein and responsive

pleading is hereby noticed as necessary.

12. Plaintiff's Pennsylvania area code mobile telephone has been on the National Do Not Call

Registry since 2008, continuously.

13. Despite this, on August 2, 2022 Plaintiff received a text message communications from

Keller Williams:

> "Hello Jeffrey good morning, this is Nico. I have been trying to reach you, to talk about your house in homeland."

14. The messages continued through December 14, 2022:

> "The market is going down, and I think to be get it on the market, with all of my marketing strategies that I use with my team, that are very aggressive, would be very beneficial."

15. Agent Nico defined aggressive marketing strategies to include "listing your home in The New York Times National Real Estate section" and "Blasting all over high-end databases." During this time period, Plaintiff actually listed his home himself on Zillow.com, but continued to accept calls from KW and answer questions about his home.

16. On December 14, 2022, Plaintiff and Makai entered into an "Exclusive Sale" contract in which Keller Williams was granted exclusive rights to sell his Homeland property.

17. As part of the negotiations, specifically Plaintiff's concern about a litigation clause relating to unsold property, Agent Nico promised "he never went after clients." Within minutes after stating so, Agent Nico initialed and signed an "Arbitration Provision" agreeing that he, and Makai/KW Wellington, would forego any claims to litigation for disputes arising from the contract, and instead pursue binding arbitration. The contract also had a "Mediation Provision" that mediation would be attempted prior to any formal lawsuit, or in this case, arbitration, stemming from a dispute.

18. Similarly, Plaintiff and Equestrian Palms (via Mr. Font) agreed to a sale contract in February 2023. Nico had only done two showings, and never marketed the home in New York Times or other marketing databases. The sale contract had a "Mediation Provision"

requiring mediation be concluded *before* filing lawsuits. It also had a liquidated damages clause for $550,000 in damages for breach of contract.

19. Within a week of the parties agreeing to a sale contract, Equestrian Palms repudiated. Through Agent Nico, they informed Plaintiff that they "could not close" on the April closing date, as "Mr. Font would be in Europe." Plaintiff, whose home constituted a significant part of his life savings, was in disbelief. It seemed KW and the buyer were pressuring an early move out, despite their knowledge that Plaintiff had medical conditions and could not move out earlier. At that point, Plaintiff considered the contract repudiated and breached through Agent Nico's actions.

20. Defendants refused to relent on their mission to oust Plaintiff from his home as quickly as possible, in what turned out to be the cold-call Plaintiff truly never should have answered.

21. An intimidation campaign began against Plaintiff, whereby Defendants mocked his medical disabilities and filed numerous abusive lawsuits, prohibited by numerous Mediation and Arbitration clauses, with the sole intent to exploit his medical disability and oust him from his home.

22. Worse yet, Defendants started to harass Plaintiff's partner, when she became involved in the dispute, claiming there was "no war in the Ukraine amounting to a *force majeure*" She had immigrated to the US from the war zone region, and maintains a home there with Plaintiff.

23. Upon information and belief, Keller Williams has avoided federal court scrutiny and discovery of TCPA violations under purported Article III defenses. In this case, Keller Williams engaged in reprehensible treatment of a TCPA victim, with resulting damages

that invoke Article III jurisdiction.  As such this is the first-to-file class action that seeks

redress under TCPA and RICO Telemarketing Fraud statutes.

### **Putative Class Definitions**

24. Plaintiffs bring this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

25. Plaintiffs bring this action on behalf of themselves and the following nationwide classes,

for monetary and injunctive relief based on violations of TCPA or RICO:

> *- All United States persons on the National Do-Not-Call Registry who received*
> *calls and/or text messages from Keller Williams or its agents. The relevant*
> *timeframe is four years prior to filing of this Complaint through Class Certification*
> *date. (The TCPA class)*

> *- All United States persons on the National Do-Not-Call Registry who*
> *received fraudulent telemarketing calls and/or text messages from Keller Williams*
> *or its agents, or subjected to similar racketeering predicate acts pursuant to RICO.*
> *The relevant timeframe is four years prior to filing of this Complaint through Class*
> *Certification date. (The RICO Telemarketing Fraud class)*

> *- All United States persons on the National Do-Not-Call Registry who were*
> *subject to RICO predicate acts for objecting to DNC violations. The relevant*
> *timeframe is four years prior to filing of this Complaint through Class Certification*
> *date.  (The RICO Racketeering and Intimidation class)*

26. Excluded from these proposed classes is the defendant; defendant's affiliates and

subsidiaries; defendant's current or former employees, officers, directors, agents, and

representatives; and the district judge or magistrate judge to whom this case is assigned, as

well as those judges' immediate family members.

27. **Numerosity:** The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but a previous class action against Keller Williams for TCPA violations identified during discovery hundreds of millions of dollars of warranted TCPA fines and settled for $40 million. Nearly a year has transiped since that case settled, and similar numerosity is alleged to still exist, thus individual joinder in this case is impracticable.

28. **Commonality:** Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed classes. These include, but are not limited to: a. Defendants willful violations of TCPA directed at each class member; b. Defendants willful violations of RICO, including telemarketing fraud, directed at each class member, c. Defendants willful conduct against a subset class who objected to TCPA violations; d. Whether plaintiffs and members of the proposed classes are otherwise entitled to any damages, including treble damages, or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and h. Whether plaintiffs and members of the proposed classes are entitled to any damages, including treble damages, or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

29. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Defendants' liability are the same and resulted in injury to plaintiffs and all of the other members of the proposed classes.

30. **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed classes both fairly and adequately. They have retained counsel able to engage, and experienced with, complex litigation. Plaintiffs have no interests that are antagonistic

to those of the proposed classes, and their interests do not conflict with the interests of the proposed class members he seeks to represent.

31. **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the defendant. Certification of plaintiffs' proposed classes would prevent these undesirable outcomes.

32. **Injunctive and declaratory relief:** By way of its conduct described in this complaint, Keller Williams has acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

33. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## V. <u>VIOLATIONS ALLEGED</u>

### <u>COUNT I</u>
### TELEPHONE CONSUMER PROTECTION ACT, U.S.C. 227(c)

### (Defendants Keller Williams and Makai,
### On Behalf of Plaintiff and the TCPA Class)

34. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

35. Defendants Keller Williams and Makai sent unsolicited text messages to the Plaintiff to procure commercial business, despite him being on the Do-Not-Call list. Similarly, the KW defendants placed telephone calls of a similar nature to Plaintiff's 610 area code mobile telephone. The sole purpose of the calls and texts was solicitation of realtor agency fees. It was a telemarketing campaign directed at Plaintiff. Plaintiff had no prior business relationship with Agent Nico, and had never met him. To the extent Plaintiff had transacted with KW years prior, it was with a different agent and beyond the 18-month requirements of TCPA. Agent Nico had no rights to that agent's prior business relationships, under standard Realtor norms and protocols.

36. The Statutory language of the TCPA provides for a private right of action for violations:

> "A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State- (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or (C) both such actions."

> *"If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph." 47 U.S.C. § 227(b)(3).*

37. "[A]n act may be 'intentional' for purposes of civil liability even if the actor lacked actual knowledge that [their] conduct violated the law." Jerman v. Carlisle, McNellie, Rini, Kramer, 130 S. Ct. 1605, 1612 (2010). *See also* Kolstad v. American Dental Assn., 527 US 526, 549 (1999) (holding that willful violations can be found where a defendant acts with "careless" or "reckless" disregard for federally protected rights).

38. Such calls and text messages are in violation of the FCC's do-not-call list, rules that exist pursuant to the TCPA. The nature of the Defendants' conduct towards the Plaintiff implies that they have conducted these violations in a widespread manner. In fact,

39. Defendants made these calls with careless or reckless disregard that their conduct violated the law. Defendants made these calls directly, encouraged them directly, and/or were responsible under the principals of vicarious liability and *respondeat superior*.

40. A heretofore unknown number of Americans have the same or similar claims against the Defendants and are entitled to the relief provided for by Federal Law.

## <u>COUNT II</u>

## RACKETEER INFLUENCED CORRUPT ORGANIZATION ACT  - 18 U.S.C. § 1962(c)

## (Defendants Keller Williams and Makai, on behalf of Plaintiff and RICO Telemarketing and Racketeering Classes)

41. Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

42. RICO has a broad reach to prosecute civil and criminal activity that occurs within otherwise law-abiding businesses. RICO requires that 1) an enterprise 2) engage in a pattern of illegal predicate acts, 3) over a substantial period of time, 4) causing damages of an interstate nature.  The predicate acts are alleged for a time frame spanning August 2022 through October 2023, and for the Class members, over a period spanning the last four years through class certification. As a Texas corporation, Keller Williams clearly operates with franchisees on an interstate basis.

43. Defendants formed a telemarketing enterprise meant to exploit homeowners by aggressively pursuing real estate transactions in a manner that violated federal code. The enterprise specifically included all Keller Williams corporate and franchise agents who used illegal tactics to procure business.

44. These tactics violated the TCPA in many cases, but also violated traditional RICO Telemarketing Fraud and Email Fraud regulations, including 18 U.S.C. § 2325. Under Section 2326, "telemarketing or email marketing"

> "means a plan, program, promotion, or campaign that is conducted to induce—(A) purchases of goods or services; (B) participation in a contest or sweepstakes; or (C) a charitable contribution, donation, or gift of money or any other thing of value, by use of 1 or more interstate telephone calls initiated either by a person who is conducting the plan, program, promotion, or campaign or by a prospective purchaser or contest or sweepstakes participant or charitable contributor, or donor;"

45. Agent Nico's, and therefore Defendant Keller Williams text messages directed towards Plaintiff meet all criteria for "telemarketing fraud" as defined and serve as specific pleading. The messages directly promised "aggressive marketing" and "New York Times"

marketing which were false. Plaintiff relied on these false promises. Moreover, the messages were sent in an illegal fashion, violating the TCPA, which further evidences an intent to deceive and win profits illegally.

46. The messages were sent interstate from Florida to a Pennsylvania exchange. The messages were conveyed on behalf of a Texas enterprise participant who profited from said messages, and actively encouraged them.

47. The enterprise engaged in predicate acts over a significant timespan exceeding six months and violated multiple federal and Florida state laws in carrying out these predicate acts.

48. Surely Plaintiff was not the only victim of Keller Williams scheme, and others were made similar unfulfilled promises of expensive, aggressive "New York Times" marketing campaigns. Expedited discovery is hereby sought to ascertain the exact scope of the telemarketing fraud. Upon information and belief, no prior class action has studied the TCPA violations for additional telemarketing fraud infractions. The public deserves judicial investigation of the alleged widespread fraud carried out by the nation's largest realtor corporation.

49. In this case, Keller Williams recruited Equestrian Palms as an enterprise member to breach his contract with Plaintiff and pursue intimidation tactics to force a transaction. These tactics included abuse of process and violations of Florida state laws regarding disability.

50. Under Florida § 825.103, it is a Felony to engage in "exploitation of a disabled adult."

> "Knowingly .. endeavoring to obtain a disabled adult's assets, or property with the intent to temporarily or permanently deprive the disabled adult of the use, benefit, or possession of the assets, or property, or to benefit someone other than the elderly person or disabled adult, by a person who has a business relationship with the disabled adult."

51. Defendants had a business relationship with a disabled adult, Plaintiff. Defendants conduct intended to Deprive a disabled adult of his primary home. In fact, Defendants attempted to oust a disabled person additionally impacted by a war, using telemarketing fraud, as well as abusive threats of litigation that was plainly forbidden by contractual terms. This conduct, the predicate acts beyond TCPA and itself seeking to exploit a disabled person, falls under RICO's jurisdiction over state law extortion and fraud crimes.

52. Plaintiff objected to Keller Williams illegal tactics, including TCPA violations, he was met with harsh retaliatory actions by the enterprise which constitute further Obstruction of Justice predicate acts. For example, Plaintiff's physical disabilities (hearing loss) were mocked by the enterprise's agents. He was told despite his medical conditions; he would have to "suffer through" numerous lawsuits. He begged Defendants counsel to stop with the illegal lawsuits, and they replied "that isn't how this works" by email.  All of this conduct was prohibited by RICO and the underlying mediation and/or arbitration provisions. There can be no doubt a jury will determine that the enterprise spent the last six months attempting to intimidate Plaintiff as a witness to federal law violations, through illicit and unethical intimidation tactics that truly evoke "racketeering" in the traditional sense of the word.

53. Upon information and belief, it is common for TCPA victims to reply to the unwanted DNC violations and ask for restitution of the $500 minimum fine. Discovery is sought to analyze such communications; it is asserted Plaintiff is not the only class member who was threatened, intimidated, and or simply ignored when he pointed out Defendants' illegal conduct.

54. Keller Williams' actions also demonstrate a disregard for the sanctity of the Court, and as such represent an ongoing obstruction of justice predicate act. As part of the *DeShay* class action settlement, Keller Williams specifically denied violations of the TCPA. That denial contributed to settling nearly $400 million in fines for pennies on the dollar, at $40 million. As part of this settlement, it was promised to the Court that Keller Williams would take action to prevent further TCPA violations. But no sooner than the ink had dried on that settlement, KW engaged in TCPA violations with Plaintiff. Perhaps more egregiously, KW engaged in illicit lawsuits and other intimidation tactics to force a transaction with Plaintiff. All of these factors may render the *DeShay* settlement invalid. Clearly, Keller Williams (as observed by substantial media coverage of this matter) never learned and never intended to comply with TCPA. That, separate and apart from the reprehensible conduct towards Plaintiff, converts the prior TCPA classes into RICO classes.

## COUNT III
**BREACH OF CONTRACT**

***(Against Makai and Equestrian Palms)***

55. Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

56. Alternate Dispute Resolution (ADR) clauses such as Mediation and Arbitration Provisions are material components of a contract. They help streamline the judicial economy, and it is black-letter law that they must be enforced. In addition to helping maintain court docket economy, ADR serves important functions for the parties. Litigation is a stressful and expensive process, and a party might only contract if he/she is assured that unwanted litigation will be avoided in the event of a dispute. In this present case, Plaintiff negotiated for such ADR protection.

57. In short, ADR is not a trivial part of a contract. A party that files lawsuit when they have agreed to mediation and/or arbitration obligations is in material breach of the contract. This cannot be exempted by a jury or an appeal as it is black-letter law.

58. Plaintiff was married in March 2011 in a ceremony in the former USSR. The couple purchased two homes, one in the former USSR, and the other in Homeland Florida. Their intent was to spend summers in Eastern Europe and reside in Florida the remainder. Upon learning of the home sale, which did not include her signature, Plaintiff's partner objected to the sale. By early 2023, the Ukrainian war was worsening more than anyone expected. The active war zone had reached within eighty miles of their home. The area where Plaintiff and his wife's marriage ceremony (see pictured) occurred has been under heavy bombing just this month. Plaintiff's partner had a recent Turkish Airlines flight to Florida, originating from Ukraine region, cancelled due to war no-fly zones.





59. Plaintiff and Wife Post-Marriage Ceremony in Odessa, Ukraine on March 5, 2011 at Kobe restaurant http://www.kobe.od.ua/en

60. Plaintiff and Defendants' sale agreement included a "Force Majeure" clause allowing either party to exit the contract if "disrupted" by "an act of war." Plaintiff, and his partner, have been disrupted by the Ukranian-Russian war, and do not feel safe having their only remaining home within 80 miles of an active international war zone. Defendants were notified no later than April 2023 that Plaintiff had executed the "Force Majeure" clause of the contract.

61. Defendants were unwilling to accept the reality of the situation, namely, that 1) they had procured a contract illegally in violation of TCPA, 2) they had repudiated the contract with pressure on a disabled Plaintiff to abandon his home earlier than contracted, and 3) the worsening war in Russia/Ukraine disrupted the couple's life.

62. Defendants grew increasingly hostile and boasted to Plaintiff they would make his life "more disrupted" by filing lawsuits, even though they were prohibited by the Mediation

and Arbitration clauses. Plaintiff informed Defendants and their counsel in May and June 2023 that their malicious prosecution exacerbated his medical disability. Defendants and counsel responded they "didn't care" and *sarcastically mocked Plaintiff's hearing loss*, in violation of Florida Criminal Code Section 825.

63. Upon information and belief, Defendants filed multiple lawsuits in various jurisdictions, all prohibited by the Arbitration and Mediation clauses. They attempted service of Plaintiff's relatives in at least three different states, on multiple repeat occasions, after being told Plaintiff does not live with relatives, but, as they know, lives in Homeland Florida. In one particularly egregious instance, they attempted to serve a relative of Plaintiff multiple times while he was undergoing chemotherapy for terminal metastatic disease. Such reasons, of course, are why contract parties agree to ADR, and this unfortunate harassment could have been easily avoided had Defendants complied with the ADR obligation.

64. As such, not only did Defendants violate RICO law for witness harassment/intimidation, as alleged in the prior count, but they also breached the very contract they seek to relentlessly enforce.

65. These actions as described constituted breach of contract, and Plaintiff shall be awarded the $550,000 liquidated damages as prescribed under the contract, as well as punitive damages as awarded by a jury.

## COUNT IV
## ABUSE OF PROCESS

### *(Against all Defendants)*

66. Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

67. An Abuse of Process claim in Florida exists when 1) Defendant willfully or intentionally made illegal, improper, or perverted use of process; 2) Defendant had ulterior motive or purpose in executing the process; and 3) Defendant's actions caused injury to the Plaintiff. This is a *prima facie* case and Plaintiff anticipates summary judgment on the undisputed fact that Defendants willfully violated ADR to injure Plaintiff.

68. Defendants had agreed to forego litigation and pursue mediation and/or arbitration. Despite doing so, they threatened Plaintiff for months that they would sue him, and upon information and belief, did so on multiple occasions, even publishing unnecessary notices in popular Palm Beach newspapers. There was no valid reason for these processes, and in fact, a jury cannot exempt the ADR violations under black letter law.

69. Defendants executed the processes with intent to harm plaintiff, cause him distress, and inflict expensive attorney's fees as a result. Worse, they caused pain and suffering to Plaintiff and his relatives, one of whom was attempted service on multiple occasions while undergoing chemotherapy. Defendants were informed repeatedly that their actions were in violation of the ADR provisions and caused Plaintiff harm. Defendants were told Plaintiff simply wanted them to "go away" and "didn't want their money," but if they didn't relent, he would have no choice but to demand the $550,000 liquidated damages as prescribed in the contract.

70. Defendants abuse of process not only harassed Plaintiff, but it also violated Florida law as an attempted to exploit an individual with physical disabilities. Their intent was clear when

they sarcastically mocked his hearing, which has required ongoing treatment for five years by leading experts in otorhinolaryngology throughout the country.

71. Upon information and belief, Defendants actually filed a false lawsuit claiming there was no war in the Ukraine ("there is no *force majeure* event.") This reprehensible conduct, directed towards a couple whose life has been disrupted by the Ukrainian war, is simply unconscionable and cannot be tolerated. Plaintiff seeks punitive damages and a public apology from Defendants directed to all victims of the ongoing war. There is ample precedent for awarding such damages to deniers of a war or other tragic disaster.

72. If Defendants had some plausible belief that there was no war in the Ukraine, or disruption caused to Plaintiff by the *force majeure* event, they could have followed correct procedure. Correct procedure would have been to attend mediation and or arbitration and request additional information on the war and its disruption. They could even have sought Declaratory Judgement after mediation, in the case of Defendant Equestrian Palms. But Defendants didn't do anything even close to correct procedure. They badgered a disabled Plaintiff and his ill relatives for *over six months* with abusive claims the war didn't exist, in stark violation of the ADR clauses, let alone human decency.

73. Counsel reached out determine if KW corporate counsel in Austin, Texas supported Defendants' behavior. Specifically, Keller Williams headquarters was asked if they endorse lawsuits brought in violation of ADR clauses, meant to harass and oust a couple impacted by the Ukrainian war from their home. By their inaction and lack of response, headquarters has assented to the despicable conduct described herein and is therefore liable.

## COUNT V

### PERMANENT INJUNCTION

74. The Court shall enter a permanent injunction, enjoining and restraining Defendants from further violations of the TCPA and/ or RICO. Defendants shall be enjoined from further abuse of process, including but not limited to breaches of the Arbitration Clause, Mediation Clause, and or Force Majeure Clause.

WHEREFORE, The Plaintiffs and class members respectfully request that this Honorable Court:

A. Certify this case as a class action lawsuit and that it certifies the proposed federal law classes on a nationwide basis for victims of Defendant Keller Williams' conduct. Determine Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Issue a declaratory order that Defendants' actions, as alleged, violate the statutes and civil legal claims referenced herein; Adjudge that Defendants violated 47 U.S.C. § 227; Enjoin the Defendants from any further violations of 47 U.S.C. § 227.

C. Order damages for:

   a. Willful statutory TCPA and RICO violations, with estimated damages in excess of $80 million. Damages shall include each phone call made in violation of TCPA, pursuant to 47 U.S.C. § 227(b)(3).

   b. Treble damages and punitive damages as determined by jury.

D. Issue a permanent injunction restraining Defendants from engaging again in the prohibited conduct.

E. Approve or award attorneys' fees as appropriate for representing the Plaintiff and the Classes.

F. Grant any further relief as may be fair and just.

Respectfully submitted, this 17th day of October 2023.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Attorney for Plaintiff
FL Bar No 102605
Faerman Law, P.A.
3859 NW 124th Ave
Coral Springs, FL 33065
Ph. 954-271-8484
ayelet@faerman.law

/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
Manchester, NH 03105
Ph. 603-622-8100
keith@awplegal.com

### DEMAND FOR JURY TRIAL

In accordance with FRCP 38, Plaintiff and Class Members hereby request a trial by jury.

Executed on this 17th day of October 2023.

/s/ Ayelet Faerman

/s/ Keith Mathews
Keith Mathews

## CERTIFICATE OF SERVICE

I, Ayelet Faerman & Keith Mathews, do declare as follows:

I certify that a copy of the foregoing COMPLAINT FOR DAMAGES was served upon all parties, in accordance with applicable service of process guidelines.

Executed on this 17th day of October 2023.

Ayelet Faerman

/s/ Keith Mathews
Keith Mathews