Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

Keith Mathews
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
603-622-8100
keith@awplegal.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS<br>on behalf of himself and all others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>KELLER WILLIAMS REALTY, INC.,<br>MAKAI SOUTHEAST, LLC (d/b/a<br>KELLER WILLIAMS REALTY WELLINGTON),<br>EQUESTRIAN PALMS, LLC,<br><br>Defendants. | Case No. 23-cv-81393-RLR<br><br>SHERMAN ACT & TCPA<br>CLASS ACTION<br><br><br>**FIRST AMENDED COMPLAINT<br>FOR DAMAGES AND<br>INJUNCTIVE RELIEF**<br><br><br><br>DEMAND FOR JURY TRIAL |

## PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## I.     INTRODUCTION

1. National real estate inventories are at an all-time low. This has created a dire housing situation that potentially could spill over into larger economic woes for the entire country. Florida, where Plaintiff resides, has attracted record net migration in the years following the Coronavirus outbreak. Combined, this has resulted in Florida residents like Plaintiff being the unfortunate recipients of up to thirty cold-call and text message solicitations *per month* to list their home for sale.

2. These calls are not carried out by unscrupulous rogue, independent real estate agents. Rather, they are actively encouraged and even provided technological campaign platforms to execute these violations by the largest real estate corporation in the world, Defendant Keller Williams.

3. These mass campaigns are not only an annoyance, they violate two Federal laws. First, the campaigns are carried out with an underlying aim to violate the Sherman Act and obtain a 6% bounty on the value of the homeowners' property. Two weeks ago, a federal court in Missouri ruled that Defendant Keller Williams co-conspired to monopolize MLS search listings in order to exploit their combined market power, in the form of a 6% supra-competitive "commission."  Second, the Telephone Consumer Protection Act and The Do-Not-Call Implementation Act of 2003 made it illegal to engage in any sort of unwanted telephone campaign which, collectively, cause economic harm to the nation by reducing efficiency and tying up the communications networks.

4. This is a class action brought under the Sherman Act of 1890 (15 U.S.C. §1-2) and the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227(c). It serves to remedy the

widespread breach of the FCC's do-not-call rule perpetuated by the Defendants, who seek to illicitly obtain between 6% and 12% of Florida resident's life savings. It invokes RICO Telemarketing Fraud for issues arising out of the worst possible cold call, where Keller Williams relentlessly pursued their commissions with total disregard for Federal and Florida criminal statutes that protected a couple disrupted by the Russian-Ukrainian War. Upon information and belief, at filing this is the only lawsuit to protect Florida class members from the conduct Defendant Keller Williams was found guilty of in the recent Missouri case. It is first-to-file under TCPA with Article III standing, first-to-file under RICO Telemarketing Fraud, and first-to-file for For Sale By Owner victims of the aforementioned conspiracy to restrict interstate trade.

## II.     JURISDICTION AND VENUE

5.  This Court has exclusive jurisdiction over federal antitrust claims asserted under the Sherman Act pursuant to 15 U.S.C. §§ 1-2. Plaintiff and class members are entitled to seek treble damages for any proven antitrust injury under Section 4 of the Clayton Act, codified as 15 U.S.C. § 15. The Court also has original jurisdiction over claims arising under the Fair Housing Act ("FHA") and the Telephone Consumer Protection Act ("TCPA") pursuant to 28 U.S.C. § 1331. The Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), further establishes jurisdiction due to the controversy exceeding $5,000,000 and the diversity of citizenship between class members and Defendants.

6.  Supplemental jurisdiction for accompanying state law claims is warranted under 28 U.S.C. § 1367, as they form part of the same case or controversy under Article III of the U.S.

Constitution. Defendants filed multiple Florida state court lawsuits concerning the events in this Complaint, and referred to these as "companion cases" that should be heard together.

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants do business here, and a substantial part of the events or omissions that give rise to the claims occurred within this judicial district.

### III.   PARTIES

8. Plaintiff Doctor Jeff Isaacs ("Dr. Isaacs") is a United States citizen and a permanent resident of a former USSR country impacted by the Russia-Ukraine war. He resides under Florida Homestead Laws in Homeland Equestrian Community, part of Palm Beach County.

9. Defendant Keller Williams Realty, Inc is a Texas corporation headquartered at 1221 South Mopac Expressway Suite 400, Austin, Texas 78746. Keller Williams is the world's largest real estate franchise by agent count, and has more than 1,100 offices and 191,000 agents. The Defendant is the largest real estate company in the United States as measured by units sold and total revenue volume. Per their website, Keller Williams is "a technology company." KW "provides the real estate platform that our agents' buyers and sellers prefer." Keller Williams technology offerings include tools, such as "Landvoice" that allow agents to engage in mass marketing campaigns with potential clients and homeowners. Their offerings also including training in using their proprietary platforms and compliance regulation education. These "technology" tools and training devices are well documented on their own website, and were alleged to promote TCPA violations in the *DeShay vs. Keller Williams* Class Action that settled in 2022. Both the website and the class action

docket from Indian River County Nineteenth Circuit Florida are referenced and incorporated herein for further background.

10. Defendant Makai Southeast, LLC d/b/a Keller Williams Realty Wellington, ( "Makai") is a limited liability company organized under the laws of the state of Florida with a principal address of 1400 Corporate Center Way, Second Floor, Wellington, Florida 33414 and a registered agent, Michael A. Menchise, Esq. at the same address.

11. Defendant Equestrian Palms, LLC ("Equestrian Palms") is a Florida limited liability corporation. Its principal address and place of business is improperly registered to Dr. Isaacs' aforementioned Homeland residence. Upon information and belief, Equestrian Palms sole owner, Guatemala citizen Mr. Jorge Verdugo, founded the company to convert Plaintiff's home to a commercial equestrian facility.

## IV.    FACTUAL HISTORY

12. Plaintiff's Pennsylvania area code mobile telephone has been on the National Do Not Call Registry since 2008, continuously.

13. Despite this, on August 2, 2022 Plaintiff received a text message communications from Keller Williams:

> *"Hello Jeffrey good morning, this is Nico. I have been trying to reach you, to talk about your house in homeland."*

14. The messages continued through December 14, 2022:

> *"The market is going down, and I think to get it on the market, with all of my marketing strategies that I use with my team, that are very aggressive, would be very beneficial."*

15. Agent Nico defined aggressive marketing strategies to include "listing your home in The New York Times National Real Estate section" and "blasting all over high-end databases." During this time period, Plaintiff actually listed his home himself on Zillow.com, but continued to accept calls from KW and answer questions about his home. Given the strength of the local real estate market, Plaintiff had hoped to avoid paying a 6% commission through a For Sale By Owner("FSBO") listing on Zillow.

16. Plaintiff learned that since 2021, Zillow relegated FSBO listings to a seldom viewed section of their website. Zillow has the largest market share, around 60%, of internet users searching to locate homes for sale in Florida. In light of this, Plaintiff decided that he needed to be on Zillow and MLS to sell his home. On December 14, 2022, Plaintiff and Makai entered into an "Exclusive Sale" contract in which Keller Williams was granted exclusive rights to sell his Homeland property.

17. As part of the Exclusive Sale negotiation, specifically Plaintiff's concern about a litigation clause relating to unsold property, Agent Nico promised "he never went after clients." Within minutes after stating so, Agent Nico initialed and signed an "Arbitration Provision" agreeing that he, and Makai/KW Wellington, would forego any claims to litigation for disputes arising from the contract, and instead pursue binding arbitration. The contract also had a "Mediation Provision" that mediation would be attempted prior to any formal lawsuit, or in this case, arbitration, stemming from a dispute.

18. After obtaining their exclusive agreement, KW showed Plaintiff's home on two occasions, and asked Plaintiff to accept a sale to the second entity, Equestrian Palms. The sale price, it is now uncontested by all parties, was nearly $1 million below market value. The KW agent, Nico, engaged in the practice of law by modifying the sale contract to include a

waiver that KW was a "transaction agent" to receive dual commission. This was a legal term that KW had no fiducial duty to Plaintiff. This material modification by a real estate agent – rather than a lawyer – constituted illegal practice of law. Plaintiff signed the agreement as a result of this coercion. The next day, Nico informed Plaintiff that Equestrian Palms' owner would be staying with him in Homeland that weekend, and that he stood to make "millions" from the sale. As such, Plaintiff now assumes, and asserts herein, that KW had a relationship with the buyer, and sought "transaction agent" status to evade liability.

19. Nonetheless, Plaintiff and Equestrian Palms agreed to a sale contract in February 2023. Nico had only done two showings, and never marketed the home in New York Times or other marketing databases. The sale contract had a "Mediation Provision" requiring mediation be concluded *before* filing lawsuits. It also had a liquidated damages clause for $550,000 in damages for breach of contract.

20. Within a week of the parties agreeing to a sale contract, Equestrian Palms repudiated. Through Agent Nico, they informed Plaintiff that they "could not close" on the April closing date, as "Mr. Font would be in Europe." Plaintiff, whose home constituted a significant part of his life savings, was in disbelief. It seemed KW and the buyer were pressuring an early move out, despite their knowledge that Plaintiff had medical conditions and could not move out earlier. At that point, Plaintiff considered the contract repudiated and breached through Agent Nico's actions.

21. Defendants refused to relent on their mission to oust Plaintiff from his home as quickly as possible, in what turned out to be the cold-call Plaintiff truly never should have answered. An intimidation campaign began against Plaintiff, whereby Defendants mocked his medical disabilities and filed numerous abusive lawsuits, prohibited by numerous

Mediation and Arbitration clauses, with the sole intent to exploit his medical disability and oust him from his home. Specifically, Defendant Equestrian Palms LLC filed a lawsuit before agreeing to, participating in, noticing, or scheduling any form of mediation. The KW Defendants filed a lawsuit before agreeing to, participating in, noticing, or scheduling any form of mediation. The KW Defendants refused to honor the Arbitration clause by filing said lawsuit. Liquidated damages for these material breaches was set at $500,000 in the contract.

22. Worse yet, Defendants started to harass Plaintiff's partner, when she became involved in the dispute, stating there was "no war in the Ukraine amounting to a *force majeure.*" She had immigrated to the US from the war zone region, and maintains a home there with Plaintiff.  On multiple occasions, over a six-month period, Defendants acted as if there was no *force majeure* event and sent Plaintiff threatening letters to abandon his home. Defendants made no *bona fide* effort to further clarify Plaintiff's April 2023 written notice of disruption from *force majeure*.

23. Upon information and belief, Keller Williams has avoided federal court scrutiny and discovery of TCPA violations under purported Article III defenses. In this case, Keller Williams engaged in reprehensible treatment of a TCPA victim, with resulting damages that invoke Article III jurisdiction.  As such this is the first-to-file class action that seeks redress under TCPA and RICO Telemarketing Fraud statutes.

**The Sherman Act Antitrust Matter**

24. There exist additional factors, beyond the current housing inventory shortage, motivating Keller Williams' cold-call campaign.

25. In the United States, realtors typically are allocated 6% of a transaction sale in the form of commission. This is a supra-competitive price, in terms of antitrust theory. This is particularly relevant in the Southern Florida district, where many retirees move and invest their life savings into a retirement home. In the case of retirees, a second sale often takes place when downsizing or transferring a home to family. Thus, 12% of a Florida retiree life savings is allocated, through supra-competitive commissions, to entities like the Keller Williams Defendants through as few as two thirty-minute showings.

26. In competitive foreign markets, home buyers pay their brokers, if they choose to use one, and they pay far less than half the rate paid to buyer brokers in the United States. These international markets include United Kingdom, Germany, Israel, Australia, and New Zealand. In these markets, which are not affected by any policy like the Adversary Commission Rule, buyer brokers are paid by home buyers, rather than home sellers. According to the Executive Director of the Consumer Federation of America, total commission rates in "a number of developed countries" range "between 1% and 4%" whereas in the United States the average total commission rates continue to remain between 5% and 6%, which is "no lower than it was in 2001" despite significant advances in technology. Indeed, a 2015 report, commissioned by NAR to study negative emerging trends in the real estate industry, highlighted concerns that total commissions in the United States are inflated compared to international markets, such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium. According to the report commissioned by NAR, in those countries the average total commissions ranges between 1% and 3%. In parts of the United Kingdom where valuations are similar to Southern Florida, transaction fees are as low as 0.75%.

27. In terms of antitrust injury, the economic losses from these milestone transactions appears to be precisely why the Biden administration is taking a fresh look at Defendants' commission structure. Just hours after the filing of this lawsuit on October 16, 2023, Wall Street Journal and Bloomberg reported that the Department of Justice is seeking to challenge the 6% commission through undoing a Trump-era DOJ agreement with the National Association of Realtors (Exhibit A).

28. On October 16, Counsel for Plaintiff and Class Members requested to Meet & Confer with Keller Williams regarding this planned First Amended Complaint invocation of the Sherman Act. Keller Williams has not responded to the request for nearly one-month, hence this FAC is being filed without their input.

29. On October 31, the Western Missouri United States District Court awarded a landmark class-action verdict to plaintiffs challenging the commission charged by Keller Williams and similar actors (Exhibit A). That case designated class members subjected to a 6% commission between 2015-2019 in Missouri.

30. Both the Missouri case and the recent Department of Justice news concern the so-called Adversary Commission Rule, a 6% commission from what essentially amounts to an historical relic now exploited by Realtor firms. The 'Adversary Commission Rule' requires sellers to offer a non-negotiable, inflated buyer broker commission upon listing in their local Multiple Listing Services (MLS) database. The Missouri case has now proven (Exhibit A, Complaint Paragraphs 3-28) how the Adversary Commission Rule works, and how the Keller Williams Defendants work with co-conspirators, including the NAR, to monopolize local MLS listings and obtain supra-competitive commission. These findings

are incorporated herein for the respective MLS for Southern Florida, which is known as BeachesMLS.

31. Defendants, leveraging their influence over BeachesMLS, impose this rule to maintain market control, impede competition, and systematically overcharge Florida home sellers, in a manner identical to the practices they were found guilty of in Missouri.

32. Indeed, there is no material difference in between Keller Williams proven role in conspiring with Missouri MLS between 2015 and 2019, and their role in the same conduct with BeachesMLS between 2019 and today. Hence, Keller Williams has violated Sherman Act in Southern Florida with prospective home sale transactions on BeachesMLS.

33. Upon information and belief, at time of filing this lawsuit, no class action represents South Florida residents who were subjected to supra-competitive commissions on BeachesMLS through the proven co-conspiracy with the Keller Williams Defendants during the applicable time period (2019-2023).

34. Plaintiff and class members thus hereby allege against Keller Williams Defendants for conspiring to force home sellers to pay an unreasonably inflated buyer's broker commission as conditional for listing on BeachesMLS, in violation of federal antitrust law. As a co-conspirator with specific knowledge of any apportionment of damages, Keller Williams may be found responsible for damages to the entire class in the event they waive cross-complaint in their Answer.

35. Compliance with NAR and the mandated rules among associated brokers and affiliates dictate market participation in BeachesMLS, adversely affecting the competitive landscape. Plaintiff and class members detail the sustained anticompetitive behavior perpetuated by KW Defendants, emphasizing the parallels between the manipulative

practices within the BeachesMLS and those actions previously investigated and litigated against NAR and Keller Williams. The systemic elevation of commission rates, stemming from the Keller Williams Defendants' orchestrated rules, mirrors what was previously proven in Missouri Complaint Paragraphs 37-141. KW Defendants are hereby alleged to have engaged in the respective conduct with BeachesMLS that they were determined to have engaged with Missouri MLS.

36. As alleged, Plaintiff first sought to list his home on Zillow as a For Sale By Owner (FSBO) listing to avoid paying a 6% commission. To his disbelief, since 2021 Zillow had relegated FSBO listings to a section of Zillow that was viewed by less than 1% of potential buyers. This resulted in Plaintiff being unable to sell his home on Zillow, despite a strong demand for houses in Florida. It was at this point – after numerous cold calls by the Keller Williams Defendants – that Plaintiff entered into the exclusive listing contract of adhesion.

37. As it turns out, there is an MLS rule against "co-mingling" search results, which is why Zillow won't show FSBO listings on its main page. That matter also was recently adjudicated in the Seattle federal court, where *Rex v. Zillow* was dismissed for lack of evidence that Zillow played a role in the conspiracy (Exhibit A). Indeed, it appears it is the MLS and major Realtors, like the Keller Williams Defendants, who are actively restricting home listings in order to maintain their supra-competitive commissions.

38. Put differently, internet technology has enabled all sorts of newly efficient transaction marketplace platforms, starting with eBay for the sale of used goods, and Amazon with books, and later, consumer products. Keller Williams, as a "technology company," would be ideally positioned to offer a home sales platform with competitive transactions rates perhaps as low as England's 0.75%. In contrast, it appears the main technology KW

Defendants develop are platforms to exploit and maintain their supra-competitive commissions through aggressive telemarketing campaigns. They do so by lobbying local MLS to prevent real technology startups, like Zillow, from "co-mingling" and mitigating a broken MLS system. Given their critical mass of listings, it is impossible for an innovative technology startup to democratize the industry with a "disruptive" technology such as a fair-priced real estate listing service.

39. As such, this Complaint asserts two alternative claims under the Sherman Act to redress the untenable situation South Florida residents face in selling a home. First, the Complaint asserts a novel (and first-to-file) claim under *Aspen* precedent for exclusionary conduct against competing listing services. Under this claim theory, the Keller Williams Defendants restrain trade by preventing competitors, whether it be Plaintiff, a class member, or a start-up, from offering "competing" sales services and listings.  The Complaint's second Sherman theory challenges the Adverse Commission Rule as applied to BeachesMLS listings since 2019, using verbatim relevant market and claim language from the now-proven Missouri verdict.

40. Accordingly, the relevant service market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with access to BeachesMLS. KW Defendants' control with co-conspirators and/or influence of the BeachesMLS allows KW Defendants to impose the Adversary Commission Rule and other anticompetitive NAR rules on Class members and other market participants. Access to BeachesMLS is critical for brokers or FSBO individuals to compete and to assist home buyers and sellers in the areas in which BeachesMLS operates.

41. The relevant geographic markets for the claims asserted herein are no broader than the geographic areas in which the BeachesMLS operates. Nearly all homes sold in this geographic areas are listed on the MLS by brokers that are subject to the MLS and NAR rules and standards. The residential real estate business is local in nature. Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or affiliated sales associates located reasonably near the seller's property.

42. The Keller Williams Defendants and BeachesMLS co-conspirators have market power and monopolize the relevant service market for Southern Florida. Well over 65% of homebuyers source their home through BeachesMLS listings, through fellow brokers or services like Zillow or NAR or co-conspirator managed websites. Keller Williams, as the largest national and local broker, has significant influence over BeachesMLS and local NAR policies. If the KW Defendants encouraged an open BeachesMLS to allow co-mingling, they would succeed. Moreover, as a "technology company," they could offer their own competitive listing website. As such, it is not necessary to name BeachesMLS in this Complaint, because Keller Williams independently acts to restrict interstate commerce and/or exploit the BeachesMLS listing monopoly that they participate in and conspire with. Keller Williams Defendants shall have waived damages apportionment should their Answer waive any cross-complaint.


**Putative Class Definitions**

43. Plaintiffs bring this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

44. Plaintiffs bring this action on behalf of themselves and the following nationwide classes, for monetary and injunctive relief based on violations of Sherman Act, TCPA or RICO:

> *- All persons who, from four years prior to filing of this Complaint through the present, used a listing broker affiliated with Keller Williams in the sale of a home listed on the BeachesMLS, and who paid a commission to the buyer's broker in connection with the sale of the home. (BeachesMLS class)*

> *- All persons who, from October 18, 2021 through the present, attempted to sell an FSBO home on Zillow or other court-approved platform, and received below market value pricing of their home, including failure to sell. (FSBO class)*

> *- All United States persons on the National Do-Not-Call Registry who received calls and/or text messages from Keller Williams or its agents. The relevant timeframe is four years prior to filing of this Complaint through Class Certification date. (The TCPA class)*

> *- All United States persons on the National Do-Not-Call Registry who received fraudulent telemarketing calls and/or text messages from Keller Williams or its agents, or subjected to similar racketeering predicate acts pursuant to RICO. The relevant timeframe is four years prior to filing of this Complaint through Class Certification date. (The RICO Telemarketing Fraud class)*

45. Excluded from these proposed classes is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

46. **Numerosity:** The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but a previous class action against Keller Williams for TCPA violations identified during discovery hundreds of millions of dollars of warranted TCPA fines and settled for $40 million. Nearly a year has transiped since that case settled, and similar numerosity is alleged to still exist, thus individual joinder in this case is impracticable.

47. **Commonality:** Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed classes. These include, but are not limited to: a. Defendants willful violations of TCPA directed at each class member; b. Defendants willful violations of RICO Act, including telemarketing fraud, directed at each class member, c. Defendants willful violations of Sherman Act; d. Whether plaintiffs and members of the proposed classes are otherwise entitled to any damages, including treble damages, or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and h. Whether plaintiffs and members of the proposed classes are entitled to any damages, including treble damages, or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

48. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Defendants' liability are the same and resulted in injury to plaintiffs and all of the other members of the proposed classes.

49. **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed classes both fairly and adequately. They have retained counsel able to engage, and experienced with, complex litigation. Plaintiffs have no interests that are antagonistic

to those of the proposed classes, and their interests do not conflict with the interests of the proposed class members he seeks to represent.

50. **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the defendant. Certification of plaintiffs' proposed classes would prevent these undesirable outcomes.

51. **Injunctive and declaratory relief:** By way of its conduct described in this complaint, Keller Williams has acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

52. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.


## V.     <u>VIOLATIONS ALLEGED</u>

<u>**COUNT I**</u>
**TELEPHONE CONSUMER PROTECTION ACT, U.S.C. 227(c)**

**(Defendants Keller Williams and Makai,
On Behalf of Plaintiff and the TCPA Class)**

53. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding sections (¶1-42) of this Complaint as if fully set forth herein.

54. Defendants Keller Williams and Makai sent unsolicited text messages to the Plaintiff to procure commercial business, despite him being on the Do-Not-Call list. Similarly, the KW defendants placed telephone calls of a similar nature to Plaintiff's 610 area code mobile telephone. The sole purpose of the calls and texts was solicitation of realtor agency fees. It was a telemarketing campaign directed at Plaintiff. Plaintiff had no prior business relationship with Agent Nico, and had never met him. To the extent Plaintiff had transacted with KW years prior, it was with a different agent and beyond the 18-month requirements of TCPA. Agent Nico had no rights to that agent's prior business relationships, under standard Realtor norms and protocols.

55. The Statutory language of the TCPA provides for a private right of action for violations:

> *"A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State- (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or (C) both such actions."*

> *"If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion,*

*increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph." 47 U.S.C. § 227(b)(3).*

56. "[A]n act may be 'intentional' for purposes of civil liability even if the actor lacked actual knowledge that [their] conduct violated the law." <u>Jerman v. Carlisle, McNellie, Rini, Kramer</u>, 130 S. Ct. 1605, 1612 (2010). *See also* <u>Kolstad v. American Dental Assn.</u>, 527 US 526, 549 (1999) (holding that willful violations can be found where a defendant acts with "careless" or "reckless" disregard for federally protected rights).

57. Such calls and text messages are in violation of the FCC's do-not-call list, rules that exist pursuant to the TCPA. The nature of the Defendants' conduct towards the Plaintiff implies that they have conducted these violations in a widespread manner.

58. Defendants made these calls with careless or reckless disregard that their conduct violated the law. Defendants made these calls directly, encouraged them directly, and/or were responsible under the principals of vicarious liability and *respondeat superior*.

59. A heretofore unknown number of Americans have the same or similar claims against the Defendants and are entitled to the relief provided for by Federal Law.


**<u>COUNT II</u>**

**RACKETEER INFLUENCED CORRUPT ORGANIZATION ACT  - 18 U.S.C. § 1962(c)**

**(All Defendants, on behalf of Plaintiff and RICO Telemarketing Class)**

60. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding sections (¶1-42) of this Complaint as if fully set forth herein.

61. RICO has a broad reach to prosecute civil and criminal activity that occurs within otherwise law-abiding businesses. RICO requires that 1) an enterprise 2) engage in a pattern of illegal predicate acts, 3) over a substantial period of time, 4) causing damages of an interstate nature.   The predicate acts are alleged for a time frame spanning August 2022 through October 2023, and for the Class members, over a period spanning the last four years through class certification. As a Texas corporation, Keller Williams clearly operates with franchisees on an interstate basis.

62. Defendants formed a telemarketing enterprise meant to exploit homeowners by aggressively pursuing real estate transactions in a manner that violated federal code. The enterprise specifically included all Keller Williams corporate and franchise agents who used illegal tactics to procure business. The enterprise formed as an entity that sought to achieve supra-competitive commissions on home sales, including that of Plaintiff and cass members. The enterprise sought to force the sale of Plaintiff's home, in disregard of FHA, *force majeure* contract clauses, Arbitration and Mediation provisions, and TCPA.

63. The enterprise certainly violated the TCPA in many cases, but also violated traditional RICO Telemarketing Fraud and Email Fraud regulations, including 18 U.S.C. § 2325. Under Section 2326,  "telemarketing or email marketing"

> "means a plan, program, promotion, or campaign that is conducted to induce—
> (A) purchases of goods or services; (B) participation in a contest or sweepstakes;
> or (C) a charitable contribution, donation, or gift of money or any other thing of
> value, by use of 1 or more interstate telephone calls initiated either by a person who
> is conducting the plan, program, promotion, or campaign or by a prospective
> purchaser or contest or sweepstakes participant or charitable contributor, or
> donor;"

64. Agent Nico's, and therefore Defendant Keller Williams' text messages directed towards Plaintiff meet all criteria for "telemarketing fraud" as defined and serve as specific

pleading. The messages directly promised "aggressive marketing" and "New York Times" marketing which were false. Plaintiff relied on these false promises. Moreover, the messages were sent in an illegal fashion, violating the TCPA, which further evidences an intent to deceive and win profits illegally.

65. The messages were sent interstate from Florida to a Pennsylvania exchange. The messages were conveyed on behalf of a Texas enterprise participant who profited from said messages, and actively encouraged them.

66. The enterprise engaged in predicate acts over a significant timespan exceeding six months, and violated multiple federal and Florida state laws in carrying out these predicate acts.

67. Surely Plaintiff was not the only victim of Keller Williams scheme, and others were made similar unfulfilled promises of expensive, aggressive "New York Times" marketing campaigns. Expedited discovery is hereby sought to ascertain the exact scope of the telemarketing fraud. Upon information and belief, no prior class action has studied these TCPA violations for additional telemarketing fraud infractions. The public deserves judicial investigation of the alleged widespread fraud carried out by the nation's largest realtor corporation.

68. In this case, Keller Williams actually recruited Equestrian Palms as an enterprise member to breach his contract with Plaintiff and pursue intimidation tactics to force a transaction. These tactics included abuse of process and violations of Florida state laws regarding disability.

69. Under Florida § 825.103, it is a Felony to engage in "exploitation of a disabled adult"

> "Knowingly .. endeavoring to obtain a disabled adult's assets, or property with the intent to temporarily or permanently deprive the disabled adult of the use, benefit, or possession of the assets, or property, or to benefit someone other than the

elderly person or disabled adult, by a person who has a business relationship with the disabled adult."

70. Defendants had a business relationship with a disabled adult, Plaintiff. Defendants conduct intended to Deprive a disabled adult of his primary home. In fact, Defendants attempted to oust a disabled person additionally impacted by a war, using telemarketing fraud, as well as abusive threats of litigation that was plainly forbidden by contractual terms. This conduct, the predicate acts beyond TCPA and itself seeking to exploit a disabled person, falls under RICO's jurisdiction over state law extortion and fraud crimes.

71.  Plaintiff objected to Keller Williams illegal tactics, including TCPA violations, he was met with harsh retaliatory actions by the enterprise which constitute further Obstruction of Justice predicate acts. For example, Plaintiff's physical disabilities (hearing loss) were ridiculed by the enterprise's agents. He was told despite his medical conditions, he would have to "suffer through" numerous lawsuits. He begged Defendants' counsel to stop with the illegal lawsuits, and they replied "that isn't how this works" by email.  All of this conduct was prohibited by RICO and the underlying mediation and/or arbitration provisions. There can be no doubt a jury will determine that the enterprise spent the last six months attempting to intimidate Plaintiff as a witness to federal law violations, through illicit and unethical intimidation tactics that truly evoke "racketeering" in the traditional sense of the word.

72. Upon information and belief, it is common for TCPA victims to reply to the unwanted DNC violations and ask for restitution of the $500 minimum fine. Discovery is sought to analyze such communications; it is asserted Plaintiff is not the only class member who was threatened, intimidated, and or simply ignored when he pointed out Defendants' illegal conduct.

73. Keller Williams' actions also demonstrate a disregard for the sanctity of the courts, and as such represent an ongoing obstruction of justice predicate act. As part of the *DeShay* class action settlement, Keller Williams specifically denied violations of the TCPA. That denial contributed to settling nearly $400 million in fines for pennies on the dollar, at $40 million. As part of this settlement, it was promised to that court that Keller Williams would take action to prevent further TCPA violations. But no sooner than the ink had dried on that settlement, KW engaged in TCPA violations with Plaintiff. All of these factors may render the *DeShay* settlement invalid. Clearly, Keller Williams (as observed by substantial media coverage of this matter) never learned and never intended to comply with TCPA. That, separate and apart from the reprehensible conduct towards Plaintiff, converts the prior TCPA classes into RICO classes.

## COUNT III

## BREACH OF CONTRACT

### *(Against Makai and Equestrian Palms)*

74. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding sections (¶1-42) of this Complaint as if fully set forth herein.

75. Alternate Dispute Resolution (ADR) clauses such as Mediation and Arbitration Provisions are material components of a contract. They help streamline the judicial economy, and it is black-letter law that they must be enforced. In addition to helping maintain court docket economy, ADR serves important functions for the parties. Litigation is a stressful and expensive process, and a party might only contract if he/she is assured that unwanted

litigation will be averted in the event of a dispute. In this present case, Plaintiff negotiated for such ADR protection.

76. In short, ADR is not a trivial part of a contract. A party that files lawsuit when they have agreed to mediation and/or arbitration obligations is in material breach of the contract. This cannot be exempted by a jury or an appeal as it is black-letter law.

77. Plaintiff was married in March 2011 in a ceremony in the former USSR. The couple purchased two homes, an apartment in the former USSR, and the residence in Homeland Florida. Their intent was to spend summers in Eastern Europe and reside in Florida the remainder. Upon learning of the home sale, which did not include her signature, Plaintiff's partner objected to the sale. By early 2023, the Ukrainian war was worsening more than anyone expected. The active war zone had reached within eighty miles of their home. The area where Plaintiff and his wife's marriage ceremony (see pictured) occurred has been under heavy bombing just this month. Plaintiff's partner had a recent Turkish Airlines flight to Florida, originating from Ukraine region, cancelled due to war no-fly zones.





78. Plaintiff and Wife Post-Marriage Ceremony in Odessa, Ukraine on March 5, 2011 at restaurant http://www.kobe.od.ua/en

79. Plaintiff and Defendants' sale agreement included a "*Force Majeure*" clause allowing either party to exit the contract if "disrupted" by "an act of war." Plaintiff, and his partner, have been disrupted by the Ukranian-Russian war, and do not feel safe having their only apartment within 80 miles of an active international war zone. Defendants were notified no later than April 2023 that Plaintiff had executed the "Force Majeure" clause of the contract due to said disruption.

80. Defendants were unwilling to accept the reality of the situation, namely, that 1) they had procured a contract illegally in violation of TCPA, 2) they had repudiated the contract with pressure on a disabled Plaintiff to abandon his home earlier than contracted, at a price $1m below market value, and 3) the worsening war in Russia/Ukraine disrupted the couple's life.

81. Defendants grew increasingly hostile and boasted to Plaintiff they would make his life "more disrupted" by filing lawsuits, even though they were prohibited by the Mediation

and Arbitration clauses. Plaintiff informed Defendants and their counsel in May and June 2023 that their malicious prosecution exacerbated his medical disability. Defendants and counsel responded they "didn't care" and sarcastically mocked Plaintiff's hearing loss, in violation of Florida Criminal Code Section 825.

82. Upon information and belief, Defendants filed multiple lawsuits in various jurisdictions, all prohibited by the Arbitration and Mediation clauses. They attempted service of Plaintiff's relatives in at least three different states, on multiple repeat occasions, after being told Plaintiff does not live with relatives, but, as they know, lives in Homeland Florida. In one particularly egregious instance, they attempted to serve a relative of Plaintiff multiple times while he was undergoing chemotherapy for terminal metastatic disease. Such reasons, of course, are why contract parties agree to ADR, and this unfortunate harassment could have been easily avoided had Defendants complied with the ADR obligation.

83. As such, not only did Defendants violate RICO law for witness harassment/intimidation, as alleged in the prior count, but they also breached the very contract they seek to relentlessly enforce.

84. These actions as described constituted breach of contract, and Plaintiff shall be awarded the $550,000 liquidated damages as prescribed under the contract, as well as punitive damages as awarded by a jury.

**COUNT IV**

**ABUSE OF PROCESS**

***(Against all Defendants)***

85. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding sections (¶1-42) of this Complaint as if fully set forth herein.

86. An Abuse of Process claim in Florida exists when 1) Defendant willfully or intentionally made illegal, improper, or perverted use of process; 2) Defendant had ulterior motive or purpose in executing the process; and 3) Defendant's actions caused injury to the Plaintiff. This is a *prima facie* case and Plaintiff anticipates summary judgment on the undisputed fact that Defendants willfully violated ADR to injure Plaintiff.

87. Defendants had agreed to forego litigation and pursue mediation and/or arbitration. Despite doing so, they threatened Plaintiff for six months that they would sue him, and upon information and belief, actually did so on multiple occasions, even publishing unnecessary notices in popular Palm Beach newspapers. There was no valid reason for these processes, and in fact, a jury cannot exempt the ADR violations under black letter law.

88. Defendants executed the processes with intent to harm plaintiff, cause him distress, and inflict expensive attorney's fees as a result. Worse, they caused pain and suffering to Plaintiff and his relatives, one of whom was attempted service on multiple occasions while undergoing chemotherapy. Defendants were informed repeatedly that their actions were in violation of the ADR provisions, and caused Plaintiff harm. Defendants were told Plaintiff simply wanted them to "go away" and "didn't want their money," but if they didn't relent, he would have no choice but to demand the $550,000 liquidated damages as prescribed in the contract. Plaintiff even offered to cover Defendants expenses (around $2000) they incurred for home inspection during the short period (about one week) they were under active contract before their repudiation. In short, Plaintiff did everything he could to avoid this lawsuit; Defendants did everything they could to force this lawsuit.

89. Defendants abuse of process not only harassed Plaintiff, it violated Florida law as an attempt to exploit an individual with physical disabilities. Their intent was clear when they sarcastically mocked his rare hearing condition, which has required ongoing treatment for five years and perplexed leading experts in otorhinolaryngology throughout the country.

90. Upon information and belief, Defendants actually filed a false lawsuit claiming there was no war in the Ukraine ("there is no *force majeure* event.") This reprehensible conduct, directed towards a couple whose life has been disrupted by the Ukrainian war, is simply unconscionable and cannot be tolerated. Plaintiff seeks punitive damages and a public apology from Defendants directed to all victims of the ongoing war. There is ample precedent for awarding such damages to deniers of a war or other tragic disaster.

91. If Defendants had some plausible belief that there was no war in the Ukraine, or disruption caused to Plaintiff by the *force majeure* event, they could have followed correct procedure. Correct procedure would have been to attend mediation and or arbitration and request additional information on the war and its disruption. They could even have sought Declaratory Judgement after mediation, in the case of Defendant Equestrian Palms. But Defendants didn't do anything even close to correct procedure. They badgered a disabled Plaintiff and his ill relatives for *over six months* with abusive claims the war didn't exist, in stark violation of the ADR clauses, let alone human decency.

92. Counsel reached out to determine if KW corporate counsel in Austin, Texas supported Defendants' behavior. Specifically, Keller Williams headquarters was asked if they endorse lawsuits brought in violation of ADR clauses, meant to harass and oust a couple impacted by the Ukrainian war from their home. By their inaction and lack of response,

headquarters has assented to the despicable conduct described herein and is therefore liable through vicarious liability and *respondeat superior* theory.

## COUNT V

### VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. § 3604)

#### *(Against all Defendants)*

93. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding sections of this Complaint as if fully set forth herein.

94. Defendants violated the Fair Housing Act ("FHA"), which prohibits discrimination in housing-related transactions based on race, color, religion, sex, familial status, national origin, or handicap (42 U.S.C. § 3601 et seq.).

95. At all relevant times, Plaintiff has been subject to unequal treatment on the basis of national origin and medical disability by Keller Williams, a real estate corporation engaged in residential property transactions within the jurisdiction of this Court, and Equestrian Palms, a for-profit equestrian corporation. Defendants enacted discriminatory practices based on national origin, and Defendants enacted discriminatory practices meant to exploit Plaintiff's medical disabilities.

96. The property in question, owned by Plaintiff and listed for sale, resides within the territorial jurisdiction of this Court. Plaintiff and his partner claim primary residency in Florida. In 2012, within a year of marrying, Plaintiff obtained permanent resident status in his wife's birthplace former USSR country, which is currently subject to Russian military occupation and disputed zones within 90km of active war zones. She is a natural born citizen of the former USSR country and a United States citizen.

97.  Defendants actively participated in the residential real estate market governed by FHA stipulations under 42 U.S.C. § 3605, and discriminate against individuals like Plaintiff based on their national origin, by unduly dismissing the disruption and peril caused by war events affecting those of a particular national origin. Defendants practice of choosing to disregard a foreign war, and even disputing its existence, amounts to national origin discrimination, in that it disproportionately harms and burdens individuals on the basis of their national origin.

98. Further, Defendants exploited Plaintiff's medical disabilities for leverage in real estate transactions, thereby engaging in discriminatory practices prohibited under FHA. Defendants filed multiple lawsuits, prohibited by the Arbitration and Mediation clauses, with the sole purpose of "wearing down" a disabled Plaintiff. Upon his objection to the practice, Defendants and their agents directly ridiculed Plaintiffs disabilities. When asked to cease behavior that was causing him further trauma, Defendants and their agents wrote "that's not how it works" and proceeded to taunt Plaintiff. These despicable actions were taken to exploit a disability and force a sale of a home, in violation of the FHA.

99. The actions of Defendants, as depicted, violate the FHA's provisions (42 U.S.C. § 3604), which clearly outlaw:

  a. Denial of housing or obstruction of housing transactions based on the national origin or disability of potential buyers.

  b. Differential treatment in sale conditions or provision of services due to the buyer's national origin or disability.

100.     By reason of the aforementioned acts, Plaintiff experienced deprivation of rights, emotional distress, and financial losses.

101.     Plaintiff asserts standing to initiate action under FHA, having suffered direct harm from Defendants' discriminatory conduct which is both causally connected to and redressable by the provisions of the FHA.

## COUNT VI

## VIOLATION OF THE SHERMAN AND CLAYTON ANTITRUST ACTS

### (15 U.S.C. § 1-2 & 15) *Against KW Defendants*

102.     Plaintiff restates, re-alleges, and incorporates by reference the preceding sections (¶ 1-42) of this Complaint as if fully set forth herein.

103.     Plaintiff, who sought to sell property located in Homeland, alleges that Keller Williams Defendants engaged in monopolistic and exclusionary practices in violation of Section 2 of the Sherman Act, as reflected in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

104.     Plaintiff's attempts to sell his home on the popular real estate platform Zillow were actively suppressed and effectively hidden from potential buyers by the exclusionary conduct of Keller Williams Defendants and their proven co-conspirators, signifying a concerted effort to eliminate competition and maintain monopoly power in the relevant real estate market.

105.     Defendants' conduct, specifically their efforts to suppress efficient marketplace internet tools (e.g. their manipulation and control the visibility of listings on Zillow that are not part of its own network), constitutes willful maintenance and abuse of monopoly

power with the specific intent to exclude competition from FSBO class members and Plaintiff, which mirrors the concerns recognized by the Supreme Court in *Aspen*.

106.     Defendants' actions in suppressing Plaintiff's and FSBO class members listing had no business justification other than to impose a competitive disadvantage on Plaintiff and preserve its dominance in the residential real estate market.

107.     By effectuating a decline in visibility and potential competitiveness of Plaintiff's property on Zillow, KW Defendants destroyed the chance of competition on the merits in favor of maintaining its market control, to the detriment of Plaintiff, FSBO class members, and the competitive process.

108.     Defendant Keller Williams' acts of suppressing non-affiliated listings from platforms like Zillow violate 15 U.S.C. § 2 and have directly harmed Plaintiff by limiting the exposure of their listed property to prospective buyers, thereby hindering or preventing the sale through competitive means. Zillow, and other sites run by co-conspirators to be approved after discovery, have a 65% respective national market share for persons looking to purchase homes and or home sale services, which constitutes a monopoly on these listings and the relevant market defined earlier. Nonetheless, the Supreme Court has made clear that for an *Aspen* claim, it is the exclusive conduct that is examined by a jury, rather than specific marketplace boundaries. Plaintiff and fellow FSBO Class members were competitors as defined by *Aspen* and excluded from their monopolized listings.

109.     Alternatively, this conduct violates 15 U.S.C. § 1 because the Keller Williams Defendants and their yet to be identified partners conspired to impede interstate commerce by monopolizing real estate services and listings.

110.     As a proximate result of Defendant's unlawful conduct, Plaintiff, FSBI class members, and the region as a whole suffered antitrust injury, specifically in the form of reduced property exposure,  hindered sales processes, and financial losses and inefficiencies due to a decreased ability to sell their property as anticipated within a competitive, open market. Such antitrust injury is precisely what Sherman Act seeks to redress, and has been estimated by various academic and legal journals to amount to staggering amounts, because a significant portion of national net worth is in homeownership.  As such, a the supra-competitive commission of 6% represents somewhere between a between ten and one hundred billion dollars.

111.     Unable to effectuate an FSBO listing on Zillow, Plaintiff entered into a contract of adhesion with the Keller Williams defendants, in which they had exclusive rights to sell his home for a period of approximately one year. That contract is invalid because of its status as a contract of adhesion.

**Missouri Case Section 1 Verdict Applied to BeachesMLS**

112.     Beginning more than four years before the filing of this Complaint, and continuing into the present, KW Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act,15 U.S.C § 1.

113.     The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

114.     In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

a.  Participated in the creation, maintenance, re-publication, and implementation of the Adversary Commission Rule and other anticompetitive NAR rules; b. Participated in the establishment, maintenance, and implementation of rules by local NAR and BeachesMLS that implemented the Adversary Commission Rule and other anticompetitive NAR rules in the areas in which BeachesMLS operates; and c. Requiring franchisees of the KW Defendants and others to implement the Adversary Commission Rule and other anticompetitive NAR rules in the areas in which BeachesMLS operates, which each KW Defendant does through its franchise agreements, policy manuals, and other contracts with its franchisees, affiliates, subsidiaries, and realtors.

Defendants' conspiracy has caused buyer-broker commissions and total commissions in the areas in which BeachesMLS operates to be inflated. Plaintiffs and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on BeachesMLS. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

Defendants' conspiracy is a *per se* violation under the federal antitrust laws, specifically 15 U.S.C. § 1. In the alternative, Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis. As a direct

and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs and the other Class members have been injured in their business and property and suffered damages in an amount to be determined by jury.

## PERMANENT INJUNCTION

### *(Against all Defendants)*

The Court shall enter a permanent injunction, enjoining and restraining Defendants from further violations of the Sherman Act, FHA, TCPA and/ or RICO. Defendants shall be enjoined from engaging in abuse of process, including but not limited to ongoing and/or future breaches of the Arbitration Clause, Mediation Clause, and or Force Majeure Clause.

WHEREFORE, The Plaintiffs and class members respectfully request that this Honorable Court:

A. Certify this case as a class action lawsuit and certify the proposed federal law classes on a nationwide basis for victims of Defendant Keller Williams' conduct. Determine Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Issue a declaratory order that Defendants' actions, as alleged, violate the statutes and civil legal claims referenced herein, specifically that Defendants' conduct violated the FHA, Sherman Act, TCPA, and RICO.

C. Order damages for:

    a. Sherman Act damages to be determined after discovery of pertinent BeachesMLS and Zillow home sale data.

    b.   Willful statutory TCPA and RICO violations, with estimated damages in excess of $80 million. Damages shall include each phone call made in violation of TCPA, pursuant to 47 U.S.C. § 227(b)(3).

    c.   Damages for financial loss and emotional distress suffered by Plaintiff and all class members.

    d.   Treble damages and punitive damages as determined by jury.

D.  Issue a permanent injunction restraining Defendants from engaging again in the prohibited conduct.

E.  Approve or award attorneys' fees as appropriate. Reasonable attorney's fees and costs per FHA provisions (42 U.S.C. § 3613(c)(1)).

F.  Grant any further relief as may be fair and just.


Respectfully submitted, this 15th day of November 2023.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law


/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff

*Pro Hac Vice*

NH Bar No. 20997
American Wealth Protection
Manchester, NH 03105
Ph. 603-622-8100
keith@awplegal.com

## DEMAND FOR JURY TRIAL

In accordance with FRCP 38, Plaintiff and Class Members hereby request a trial by jury.

Executed on this 15th day of November 2023.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.


/s/ Keith Mathews
Keith Mathews


## CERTIFICATE OF SERVICE

I, Ayelet Faerman & Keith Mathews, do declare as follows:

I certify that a copy of the foregoing FIRST AMENDED COMPLAINT FOR DAMAGES was served upon all parties, in accordance with applicable service of process guidelines.

Executed on this 15th day of November 2023.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.

/s/ Keith Mathews
Keith Mathews