Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law


American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
603-622-8100
keith@awplegal.com

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA


| | |
|---|---|
| DR JEFF ISAACS<br>on behalf of himself and all others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>KELLER WILLIAMS REALTY, INC.,<br>MAKAI SOUTHEAST, LLC (d/b/a<br>KELLER WILLIAMS REALTY WELLINGTON),<br>EQUESTRIAN PALMS, LLC,<br><br>Defendants. | Case No. 23-cv-81393-RLR<br><br><br>**CONSOLIDATED OPPOSITION TO<br>DEFENDANTS' MOTION TO DISMISS** |

## CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff brings forth this combined opposition to the motions due to the overlapping and inter-related legal issues raised by Defendants KWRI, Makai and Equestrian. All Defendants engage similar defenses, necessitating a unified response to promote judicial economy and to avoid duplicative legal argumentation.

In the present proceedings, the KW Defendants have introduced matters outside the pleadings – specifically, an incomplete excerpt of a text message conversation – which is directly relevant to the claims at issue. Pursuant to Federal Rule of Civil Procedure 12(d), when such materials are not excluded by the court, they must be treated as part of a motion for summary judgment under Rule 56.

When a defendant introduces part of a conversation or document that is contested and misleading in a motion to dismiss, this creates a situation where extrinsic evidence is before the court and is both disputed and potentially dispositive. In such instances, where the evidence presented cannot be considered the "undisputed facts" necessary for Rule 56 summary judgment adjudication, courts have discretion to either exclude such evidence or convert the motion to one for summary judgment.

In response to Defendants' introduction of an incomplete and potentially misleading excerpt from a text message conversation, Plaintiff asserts that while there is no dispute as to the authenticity of the material presented, the excerpt is selectively curated and does not encapsulate the full context of the communications. Such a fragmentation fails to accurately reflect the substance of the dialogue and, pertinent to the present litigation, material facts of the case. As such, this constitutes contested evidence that cannot adequately be assessed within the ambit of a Rule 12(b)(6) motion.

In light of the foregoing, it is respectfully requested this Honorable Court approve the conversion of the current Motion to Dismiss to a Motion for Summary Judgment, pending a reasonable period of thirty-five days for:

1. Certification of the proposed class, as the presence and structure of the class may have significant bearing on issues relating to the motion for summary judgment, and

2. Conducting limited discovery targeted to the issues of class certification, fulfillment of outstanding discovery requests, and procurement of Defendants' complete TCPA text message records.

Plaintiff proposes that this structured approach will permit a fair application of Rule 56, allowing for the Court's informed deliberation based on a complete factual record. As the Eleventh Circuit has held in *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997), permitting limited discovery before adjudicating a summary judgment motion may prevent a premature or improper grant of summary judgment. We respectfully assert that class certification endeavors and related discovery are integral to representing the class members before summarily defining its merits.

Therefore, Plaintiff respectfully requests that the Court acknowledge the contested nature of the evidence and convert the Defendants' motion accordingly. Notwithstanding such, Plaintiff hereby submits the following opposition pleading to Defendants' Motion to Dismiss.

## **INTRODUCTION**

This lawsuit was brought by the Defendants[1] over six months ago, seeking to oust Dr. Isaacs and his partner from their homestead property after they executed a *force majeure* provision in response to the worsening war in Ukraine. Defendants coordinated in their efforts, and in tandem ignored ADR and *force majeure* provisions, both material components of the "As-Is Sale Agreement" central to this proceeding. It is undisputed that shortly after filing their lawsuit, Defendants directed aggressive correspondence towards Dr. Isaacs, which included language ridiculing his medical disability.

While Defendant Equestrian seeks specific performance, the KW Defendants ask the Court for a 6% commission bounty. Should Plaintiff be forced to vacate this home, and purchase another, he would be forced to pay a total of 18% of home value (i.e. approximate life savings) to KW or similar entity over the course of four years. It becomes evident this case concerns predatory commission conduct at both the individual and national level. A United States District Court in Missouri recently found Keller Williams guilty of co-conspiring to inflate such commissions, which are typically 1-2% in other countries. That ruling should protect Plaintiff, and class members in Florida, as there is no material difference[2] between the *Sitzer* "RegionalMLS" and Florida's "BeachesMLS."

Plaintiff's claims are effectively counter-claims to the earlier claims Defendants filed in state circuit court. Defendants now seek to dismiss a reasonable breach of contract counter claim. They seek to dismiss a Sherman Act claim they have been found guilty of in USDC Missouri.

---

[1] A "Notice of Removal" is underway to remove the state court claims to the jurisdiction of this Honorable Court. Sherman Act renders the entire matter subject to the Exclusive Jurisdiction of the federal courts. It is unknown to the parties at this point how the Court will choose to consolidate these cases, thus explaining how "Plaintiff" brought counter-claims after "Defendants."

[2] As part of conversion to Summary Judgement, and in the interest of judicial economy, KW Defendants are requested to "show cause" in their motion reply as to any material difference between BeachesMLS and *Sitzer* RegionalMLS.

Finally, they seek to dismiss a TCPA claim pursuant to *Deshay* settlement *res judicata*. As this pleading explains, the *Deshay* settlement was based on false information KWRI provided to that court.

Therefore, Plaintiff's position is that the Motion to Dismiss is based on egregious disregard for compliance with a recent Sherman Act verdict, an improperly obtained *Deshay* settlement, and predatory legal tactics employed against those who are impacted by a war and disabled. As such, the Motion to Dismiss[3] should be denied in its entirety, and the Motion for Summary judgement should, without delay, protect Florida residents from predatory abuses of Sherman Act, TCPA, and other relevant law.

## **LEGAL STANDARD**

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), well-established principles favor a full hearing on the merits. When assessing the sufficiency of Plaintiff's complaint, this Court must adhere to the Supreme Court's directive to "accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); see also *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

Furthermore, in compliance with the principles that govern Federal Rule of Civil Procedure 8(a), the Court must "afford the plaintiff the benefit of all reasonable inferences that can be drawn from the factual allegations." *Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, 1260 (11th Cir. 2009). Documents attached to the complaint become part of the complaint and must be considered. See Fed. R. Civ. P. 10(c); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

---

[3] Substantial portions of the Motion to Dismiss concern supplemental jurisdiction. Pursuant to the Notice of Removal, those arguments have been rendered moot. Accordingly, no further rebuttal is provided in this opposition.

Notably, the Eleventh Circuit has repeatedly held that it "will not affirm a dismissal unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

Moreover, Florida law aligns with the federal standard, maintaining that motions to dismiss are viewed with disfavor and should rarely be granted. See *Milinazzo v. State Farm Ins. Co.*, 247 So. 3d 691, 693 (Fla. 4th DCA 2018). Florida's standard compels courts to accept the allegations in the Complaint as true and view them in a light most favorable to the Plaintiff. See *Hollywood Imports, Inc. v. ACE Prop. & Cas. Ins. Co.*, 761 So. 2d 366, 367 (Fla. 1st DCA 2000).

Rule 12(d) allows for a motion to dismiss to be converted to a motion for summary judgment if "matters outside the pleadings are presented to, and not excluded by, the court." When deciding if such conversion is appropriate, the court must determine whether the extrinsic material is substantial and pivotal to the disposition of the motion. In *Lawrence v. Dunbar*, 919 F.2d 1525 (11th Cir. 1990), the court identified that conversion is warranted when a party presents material outside the pleadings that is integral to the claim, and the material's authenticity is not contested.

The court must provide all parties with proper notice and a reasonable opportunity to present pertinent content, adhering to Rule 56 standards, which govern the adjudication of summary judgment motions. This procedural safeguard is necessary to prevent surprise and to ensure fairness, as outlined in the Eleventh Circuit decision in *Griffith v. Wainwright*, 772 F.2d 822 (11th Cir. 1985).

The types of evidence that could warrant treating a 12(b)(6) motion as one for summary judgment include affidavits, declarations, or other documentary evidence that contradict the allegations in the complaint or establish material facts not contained within the pleadings. When such evidence is contested—if the plaintiff disputes its completeness, accuracy, or relevance—it qualifies as "matters outside the pleadings." The Eleventh Circuit, in *Bryant v. Rich*, 530 F.3d 1368

(11th Cir. 2008), reiterated the courts' obligation to avoid relying on contested materials at the dismissal stage without providing the non-movant with a chance to challenge or supplement the record.

## **MEMORANDUM OF LAW**

### I. **THE AMENDED COMPLAINT STATES A VALID CAUSE OF ACTION PURSUANT TO TCPA**

The FAC asserts a class action TCPA cause of action. Notably, the communications in question began without Plaintiff's consent and persisted despite his initial lack of interest—material facts that Defendant conveniently overlooks. Agent Nico's first text message to Plaintiff stated:

> *"Hello Jeffrey good morning, this is Nico. I have been*
>
> *trying to reach you, to talk about your house in homeland."*

That message speaks for itself akin to *res ipsa loquitor*; it references previous phone calls evidencing multiple TCPA violations. But KW Defendants nonetheless proceed with a frivolous, dilatory motion, incredulously arguing there was only one text message or phone call, and that it wasn't to solicit business. Any Florida jury member will recognize a realtor's attempt to obtain a home sale, and this is no exception. Agent Nico was not inviting Plaintiff to a neighborhood function. There is no other plausible explanation. In any event, the FAC must be accepted as true for a 12(b)(6), and it declares:

> *"The sole purpose of the calls and texts was solicitation of realtor agency*
>
> *fees. It was a telemarketing campaign directed at Plaintiff." FAC ¶54.*

KW Defendants also raise the timing of the text messages in relation to the *Deshay* settlement, as well as the formation of a business relationship with Plaintiff. The FAC unambiguously states that on December 14, 2022, Plaintiff and Makai entered into an "Exclusive Sale" contract in which Keller Williams was granted exclusive rights to sell his Homeland property.

FAC ¶16. The *Deshay* settlement executed on December 12, 2022. Even if it were valid, which it is not, there were two days between *Deshay* and the parties' formation of a business relationship. KW Defendants conveniently omit from their Exhibit A those two days of discussion about the execution of the Exclusive Sale contract. Hence Exhibit A is a partial and misleading list of text messages from Agent Nico. Because Defendants introduced contested, misleading and partial evidence into a Rule 12 motion, the Court may convert this matter into a Motion for Summary Judgement.

The *Deshay* settlement, as stated in the FAC, was obtained improperly and should be voided by the Court. FAC ¶73. As part of the *DeShay* class action settlement, Keller Williams specifically denied violations of the TCPA. Simultaneously, KW engaged in ongoing TCPA violations towards Plaintiff. All of these factors may render the *DeShay* settlement invalid.

There exists substantial media coverage that KW "never learned its lesson" and that the *Deshay* settlement is void. *See https://tcpaworld.com/2023/01/18/the-tcpa-danger-remains-keller-williams-realty-agrees-to-massive-40mm-tcpa-settlement-but-will-it-hold-up/*

> "This settlement would DEFINITELY NOT pass muster under the First Circuit's recent ruling in *Murrary v. Grocery Delivery E-Services USA*, 2022 WL 17729630, No. 21-1931 (1st Cir. Dec. 16, 2022). The class definition includes a garbled mess of folks with different and competing claims"

The following serve as substantiated reasons this Court should deny *res judicata* application of *Deshay*:

1. <u>Inadequate Notice</u>: A fundamental prerequisite for binding class members to a settlement is a "best notice that is practicable under the circumstances," as required by Rule 23(c)(2) of the Federal Rules of Civil Procedure. Because notice of the settlement was merely posted on a website without direct mailing or any means reasonably calculated to

reach class members like Plaintiff, notice was insufficient and did not meet the due process requirements outlined in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).

2. <u>Lack of Due Process</u>: The Supreme Court held in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), that due process requires that absent class members be provided with an opportunity to opt out of a class action settlement. Because the notification process did not afford class members a realistic opportunity to opt out, having never mailed them notice, then due process was not served.

3. <u>Inadequate Representation</u>: The class was not adequately represented as required by Rule 23(a)(4) because those managing the settlement did not act in the best interests of the class, such as by cutting corners in the notification process and combing classes with different and opposing interests.

4. <u>Fraud Upon the Court</u>: KWRI outright denied allegations in the settlement when there was obvious evidence to the contrary, specifically, Agent Nico's messaging which persisted right up to and through the settlement date. This subversion of the judicial process constituted fraud upon the court. It would be one thing for KW to not admit guilt as part of a settlement, but in this case, it specifically denied the truth – that its Agents were texting class members, such as Plaintiff, as the ink was drying on the settlement.

5. <u>Settlement Fairness</u>: Rule 23(e) requires that a settlement be fair, reasonable, and adequate. Because the class was not properly notified and the defendant falsely denied all allegations while the evidence overwhelmingly suggested guilt, the fairness of the settlement is jeopardized.

6. <u>Public Policy Considerations</u>: Courts are increasingly vigilant about ensuring that class action settlements serve the public interest and protect the rights of all class members. Because the notification practices in the settlement do not align with these obligations, the *Deshay* settlement is against public policy.

Despite paying into the *Deshay* settlement, KWRI makes an additional argument that it has no vicarious liability for the actions of Agent Nico or Makai, arguing they are unrelated entities. It seems implausible that KWRI would pay $40m if it truly believed it was not liable for agents' TCPA infractions. Makai, on the other hand, argues that it is a "subsidiary" of KRWI and hence is immune to TCPA claims on the basis *res judicata* resulting from KWRI's settlement. These contradictory points cannot be reconciled[4] and warrant further discovery.

The Court can take judicial notice of a Stanford GSB Case Study[5] discussing the KW "hybrid" franchise model, where agents like Nico make direct payments to KWRI to become "Authorized Agents" of the firm, and bonuses are transferred even between franchises by KWRI HQ.

There appears to be little question that vicarious liability agency criteria is met in this instance. The USDC in Orlando already rejected this same exact argument previously raised by KWRI, holding that agency relations are a question of fact, inappropriate for Rule 12 dismissal. *St John & Luis Penuela v. Keller Williams Realty*, 2020 U.S. Dist. LEXIS 257506. The FCC has determined that vicarious liability in the TCPA context is governed by the federal common law of agency. See *Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 252 (4th Cir. 2018). Three agency theories may support vicarious liability: actual authority, apparent authority, and ratification. See *Thomas v. Taco Bell Corp., 582 F. App'x 678, 679 (9th Cir. 2014)*. The existence

---

[4] That subsidiary is a "Scrivener's Error" is uncompelling.
[5] See https://www.researchgate.net/publication/228147670_Keller_Williams_Realty_A

of an agency relationship is generally a question of fact. See *Ward v. Mgmt. Analysis Co. Emp. Disability Benefit Plan*, 135 F.3d 1276, 1283 (9th Cir. 1988). At the motion to dismiss stage, a plaintiff need only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Mauer v. Am. Intercontinental Univ., Inc.*, No. 16 C 1473, 2016 U.S. Dist. LEXIS 120451, at *2 (N.D. Ill. Sept. 7, 2016).

Finally, the KW Defendants argue that FAC language describing "Plaintiff's mobile phone" does not indicate it is a "residential line" pursuant to TCPA. That argument fails as well. Clearly Agent Nico telephoned the correct number about the home residence at the center of this dispute. It is a homestead law residence. Public filings with the state also corroborate use of this line for residential purposes.

## II. THE AMENDED COMPLAINT STATES A VALID CAUSE OF ACTION PURSUANT TO THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

The FAC identifies a coherent sequence of events in which Defendants orchestrated a telemarketing scheme aimed at obtaining supra-competitive real estate commissions, as outlined in paragraphs 60 through 73. Critically, the FAC shows a pattern of racketeering behavior, spanning from August 2022 through October 2023, that affected multiple class members and caused interstate damages, thus conforming to the requirements set forth under 18 U.S.C. § 1962(c).

Defendants KWRI and Makai's motions offer zero mention of class members, and fail to address several critical elements of Plaintiff's RICO claim outlined in the First Amended Complaint (FAC), resulting in a mischaracterization of the claim which is incomplete and erroneous. Specifically, Defendants' motions omit significant predicate acts and misrepresent the relationship between the enterprise and the RICO defendants, leading to flawed legal conclusions.

### A. The Omission of Florida § 825.103 as an Extortion Predicate Act

Defendants overlook Florida § 825.103 regarding the exploitation of a disabled adult, an egregious act which constitutes a form of extortion and is recognized as a predicate act under RICO. The FAC details exploitative conduct—ranging from openly mocking Plaintiff's disability to litigation meant to wear him down — that occurred in July 2023, well past the six-month window from the initial telemarketing fraud. This exploitation contributes to a pattern of racketeering activity.

### B. Disregard for the Sanctity of Courts Constitutes Obstruction of Justice

Defendants omit the assertion in the FAC that Keller Williams' conduct demonstrates a flagrant disregard for judicial integrity, thereby amounting to an ongoing obstruction of justice, a recognized predicate act under federal law. Specifically, the *Deshay* settlement contained representations denying TCPA violations which the Plaintiff has proven to be false. KWRI fully intended to continue violating TCPA, hence fraud existed. The inclusion of knowingly false statements in agreements related to court proceedings aligns with predicate acts under federal statutes prohibiting false statements and obstruction of justice. All of these false statements were part of the enterprise goal to obtain 6% commission bounties with disregard for governing law.

### C. Wire Fraud Predicate Acts Relating to Cross-State Communications

Additionally, Defendants assert that their actions were contained within Florida boundaries, rather than interstate. However, at the time of the fraudulent promises regarding New York Times listings, Plaintiff was located in Pennsylvania and Maine. The FAC satisfies the "who-what-when-where-why" standard of specificity required for RICO wire fraud, laying out the facts as: Who – Agent Nico, What/when – Cited in the text message, Where – Between Texas, Florida, and Pennsylvania, and various locations of class members, Why- to procure an exclusive sale agreement on false promises.

### D. Pattern of Wire Fraud Beyond a Single Plaintiff

The FAC states that Plaintiff was not the only target of the Keller Williams' scheme. Upon information and belief, the FAC asserts Defendants have also made unfounded promises of "aggressive" New York Times marketing to others, indicating a broader pattern of wire fraud affecting an untold number of class members. This information necessitates discovery to uncover the extent of the fraud and ensure adequate protection for all affected class members.

### E. Non-waiver of RICO Wire Fraud Charges by Prior TCPA Settlement

Furthermore, Defendants' argument that the TCPA settlement precludes corresponding wire fraud charges under RICO is palpably flawed. The TCPA settlement cutoff date was December 12, 2022, yet the fraudulent inducement related to Agent Nico obtaining Plaintiff's signature occurred on December 14, 2022. The settlement cannot, therefore, immunize Defendants from subsequent or distinct wire fraud RICO charges.

### F. Distinctness Between the RICO 'Person' and the 'Enterprise' Requirement

The term 'person' under RICO refers to any individual or entity capable of holding a legal or beneficial interest in property, while the 'enterprise' is defined as the group or association in which the persons engage in racketeering activity. In the FAC, the 'enterprise' encompasses the collective mechanism—including Keller Williams and its subsidiaries and agents—through which the racketeering activity was conducted. In contrast, the 'persons' are individual actors part of or utilizing this enterprise structure to commit the alleged RICO violations. This structural distinction is fundamental to a RICO claim and has been confounded in Defendants' motion. Certain agents, but not the entire enterprise, participate in the RICO violations. Even to the extent KWRI turns a blind eye to such action, the persons remain distinct, as not every KWRI agent participates in

telemarketing fraud. Hence an organization may consist of mainly innocent workers, but be subject to RICO claims.

### III.   THE AMENDED COMPLAINT CORRECTLY ASSERTS BREACH OF CONTRACT

The FAC submits a straightforward breach of contract claim against Defendants Equestrian and Makai, delineated by three distinct violations:

1. Unilateral Disregard for Alternative Dispute Resolution (ADR) Provisions: Defendants sidestepped their contractual undertaking to resolve disputes through ADR mechanisms. Plaintiff had a reasonable expectation, secured by contract, that Defendants would adhere to such mediation and arbitration provisions before resorting to litigation. Makai's attempt to seek shelter under litigation privilege (*Makai MTD p.13*) is as unavailing here as it is to Abuse of Process.  An ADR clause would be unenforceable if a party couldn't enforce it, and seek damages, through a civil breach of contract claim.

2. Repudiation of the Contractual Closing Terms: Defendants repudiated by altering the agreed-upon closing date and conditions, an act tantamount to anticipatory breach—nullifying the contractual arrangements set forth and accepted by Plaintiff at the transaction's inception.

3. Refusal to Honor the *Force Majeure* Clause: Not only does Plaintiff and his partner's proximity to a volatile war zone satisfy the contract's *force majeure* provision invoking the "act of war" disruption, but Defendants' eight month refusal (FAC ¶79-80) to acknowledge such realities constitutes unequivocal breach. As stated FAC ¶79-80:

*The sale agreement included a "Force Majeure" clause allowing either party to exit the contract if "disrupted" by "an act of war." Plaintiff, and his partner, have been disrupted by the Ukranian-Russian war, and do not feel safe having their only apartment within 80 miles of an active international war zone. Defendants were notified no later than April 2023 that Plaintiff had executed the "Force Majeure" clause of the contract due to said disruption. Defendants were unwilling to accept the reality of the situation… the worsening war in Russia/Ukraine disrupted the couple's life.*

Makai's MTD only addresses the first breach of three alleged:

*The underlying litigation brought by Makai against Plaintiff serves as the sole basis for the Breach of Contract claim. In other words, Plaintiff is suing Makai for suing him.  (Makai MTD p.13)*

Makai's contentions in their Motion to Dismiss are unfounded; they address solely the ADR clause infraction but neglect the gravity of breaching the *force majeure* terms. No measure of litigation privilege can shelter a party from the consequences of failing to uphold their contractual commitments, rendering Makai's position deficient.

Equestrian, meanwhile, asserts "Isaacs alleges a single count titled 'Breach of Contract' against both Makai and Equestrian (Count III) without identifying the agreements, the rights and responsibilities of the parties, and/or the relief sought from each of the parties." That is false. Count III seeks the contractual liquidated damages of $550,000 from Equestrian FAC ¶84 for breaching its promises in the aforementioned Sale Agreement.

Plaintiff's decision to jointly address breaches by Equestrian and Makai in a single FAC count is grounded in a logical and legal necessity. The alleged violations by both Defendants are functionally identical, constituted by flagrant and parallel breaches of critical ADR and *force majeure* contract provisions. Defendants moved in lockstep, filed "companion cases" in the state court, and refused to acknowledge the Ukrainian war. To the extent Makai and Equestrian have been "lumped together" and "Comingled" in Count III, it is because they both breached the agreement *in the same exact fashion*, namely, failing to honor ADR and force majeure clauses. The

notion that splitting the claim would result in clarifying an already clear situation is at once redundant and unnecessary. The FAC serves adequate notice on both Defendants of both the nature of the breaches and the consequences of their actions.

## IV.  THE AMENDED COMPLAINT STATES A VALID CLAIM FOR ABUSE OF PROCESS

Plaintiff refutes Defendants' contention to dismiss the abuse of process Count IV. The crux of the abuse of process claim is not merely that the Defendants initiated multiple coordinated lawsuits contrary to the parties' agreement to engage in Alternative Dispute Resolution (ADR), but that Defendants continued, with willful and reckless disregard for the contract, and the well-being of Plaintiff, to exploit the legal process to apply improper pressure on Plaintiff, causing ongoing harm.

### A. Abuse of Process Extends Beyond the Meritless Filing to Ongoing Litigation Misconduct

The contention that an abuse of process claim cannot be based on the filing of a lawsuit is a mischaracterization of both the law and Plaintiff's allegations. The essential element of abuse of process lies not solely in the initiation of the lawsuit but in the misuse of the Court's process for an ulterior or illegitimate end. "One who uses a legal process... against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." Restatement (Second) of Torts § 682.

Here, Plaintiff has alleged more than the mere filing of a lawsuit; it is the persistent perpetuation of a suit[6], in violation of clear Arbitration, Mediation, and force majeure provisions, which lies at the heart of the claim. Defendants' ongoing refusal to withdraw from baseless

---

[6] Abuse of Process streamlines many other claims waived by the FAC, such as IIED, NIED, and Negligence. No further response is dignified to MTD remarks of 'scattered' common law claims, which are straightforward counter-claims to Defendants' lawsuits in violation of mandatory ADR.

litigation runs afoul of its contractual obligation to mediate and arbitrate disputes, or even merely acknowledge the disruption of a war, flagrantly disregarding agreed-upon terms.

### B. Invocation of Litigation Privilege Does Not Immunize Defiance of ADR Clauses

Defendants wrongly assert that the litigation privilege shields them from consequences of their deliberate violation of the contract's ADR provisions. Notably, Florida courts recognize that litigation privilege does not extend to acts that are entirely outside the recognized parameters of litigation. To hold otherwise would negate the very purpose of ADR provisions, rendering them meaningless and unenforceable, contrary to Florida law, which favors and encourages arbitration and mediation. The very claim that litigation privilege could provide cover for reneging on such terms would, if accepted, create a loophole effectively abolishing the enforcement of ADR agreements—a result clearly untenable under the law.

### C. Damages for Abuse of Process are Properly Sought for Violations of Contractual ADR Clauses

Defendants' steadfast continuation of litigation in defiance of the agreed-upon ADR provisions constitutes a misuse of the judicial process, causing Plaintiff ongoing injury. The harm wrought by such behavior is judicially cognizable and actionable. As reinforced by the United States Supreme Court in *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213 (1985), there is a strong federal policy favoring arbitration, which by extension supports the enforcement of all contractual dispute resolution mechanisms, including mediation. Similarly, in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp*., 460 U.S. 1 (1983), the Supreme Court emphasized the obligation of parties to adhere to their contractual agreements concerning the resolution of disputes, as it is central to the policy objectives underpinning the Federal Arbitration Act. The principles

emanating from these landmark cases support the position that Plaintiff is entitled to seek redress for damages resulting from Defendant's flagrant breach of the contract's ADR provisions.

Based on the aforementioned, Plaintiff respectfully requests the Court deny the Motion to Dismiss the abuse of process claim. The claim predicated on Defendant's transgression of the Sales Agreement's ADR provisions is not only legally cognizable but critical to enforcing contractual rights and upholding the integrity of the litigation process. Because the abusive processes have now been removed to this Court, the Court possesses inherent authority to sanction the ADR evasion, without relying Abuse of Process common law. This may be a first instance of this particular scenario, with no defining, binding precedent. In this regard, because the conduct is intricately tied with breach of contract claims, Plaintiff submits that allowing an Abuse of Process claim to proceed is similarly appropriate.

## V.  THE AMENDED COMPLAINT STATES A VALID CAUSE OF ACTION PURSUANT TO THE FAIR HOUSING ACT

### A. The Fair Housing Act's Protections Broadly Encompass All Parties to Housing Transactions

Makai and Equestrian both seek to dismiss FHA claims on the purported basis of inapplicability to sellers, as opposed to buyers. (*Equestrian MTD p.19; Makai MTD p.15*).  Contrary to their assertions, the Fair Housing Act (FHA) unmistakably extends its anti-discrimination protections across the spectrum of housing-related activities, encompassing sellers, buyers, landlords, tenants, and other participants involved equally. This comprehensive breadth is affirmed by the statutory language of 42 U.S.C. § 3604, which outlaws discrimination *"against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of race, color, religion, sex, familial status,*

*or national origin."* The phrase "any person" in the statute is inclusive and unambiguous—Congress did not limit the Act's protections to buyers exclusively, nor can such a limitation be judicially inferred.

### B. Discrimination Based on National Origin Under the FHA Is Not Limited to Natural-Born Citizenship

Defendant Makai erroneously introduces the constitutional term "natural born Citizen" in their interpretation of the Fair Housing Act—a misapplication that is not only legally unfounded but is strikingly out of place. The term "natural born Citizen" is primarily known for its use in Article II, Section 1, Clause 5 of the United States Constitution, specifying eligibility requirements for the Presidency and Vice-Presidency of the United States. Beyond this explicit Constitutional context, the term does not appear as a criterion in federal anti-discrimination statutes, including the Fair Housing Act (FHA),

The use of this term outside of the narrow context of presidential eligibility requirements is both unprecedented and irrelevant in the context of the FHA. It is perplexing, and indeed bordering on the irresponsible, that Defendant Makai would invoke this constitutional term in an attempt to narrow the broad and inclusive safeguard provided by the FHA. It is a fundamental misreading of the statute and jurisprudence that misunderstands the bedrock anti-discrimination principles upon which our federal laws are built. This egregious misrepresentation of the law suggests a glaring oversight or deliberate misunderstanding aimed to exclude a significant category of individuals from the FHA's ambit. To be sure, the FHA makes no reference to "natural born Citizen" status in its provisions and Defendant's attempt to inject such a criterion is without any legal basis. National origin discrimination includes treating someone differently because of their birthplace, ethnicity, ancestry, culture, or language.

This Court should swiftly reject this unsupportable interpretation, uphold the inclusive and protective intent of the FHA, and allow Plaintiff's claim to proceed on the proper understanding of anti-discrimination law.

## C. The *Force Majeure* Provision in the Context of FHA Discrimination

Makai's contention that the utilization of a *force majeure* provision related to the war in Ukraine cannot constitute discrimination under the FHA is similarly misplaced. The FHA outlaws housing discrimination that is based on national origin, which can encompass adverse actions predicated on events occurring in a person's country of origin, such as war or civil unrest. Discriminatory practices are not limited to overt acts of exclusion and can include those that have a disparate impact on individuals of a certain national origin. See *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519 (2015).

Makai's so-called "determination" that the war in Ukraine does not constitute a *force majeure* event impacting Plaintiff's ability to engage in a fair housing transaction does not negate the validity of Plaintiff's FHA claim. Rather, it presents an issue for the fact-finder to determine if Defendants' actions, when viewed in totality, amount to prohibited discrimination under the Act. Such a defense could be raised at a later stage of litigation but does not warrant dismissal at the pleadings stage.

Equestrian also seeks dismissal alleging Plaintiff is not an "aggrieved person" pursuant to 42 U.S.C. §3602(i). That terminology applies to an administrative complaint filed with the Secretary. For purposes of this lawsuit, Plaintiff brings the action directly. In any case, *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), holds that "persons aggrieved" is "language to be interpreted broadly" so that individuals may bring suit under the FHA, emphasizing the Act's far-reaching aim to eradicate discriminatory practices within the housing sector.

Finally, KWRI advances the argument that because it is not a party to the state litigation filed by Makai and Equestrian, it has not violated the FHA. KWRI sets FHA policies and advertises franchise compliance with FHA. KWRI has vicarious liability, and under federal common law, is subject to *respondeat superior* claims. As detailed in the TCPA section above, there exists overwhelming precedent against waiving such liability during a 12(b)(6) motion. Additionally, the Court may take judicial notice that KWRI requires the following language on all of its franchise websites:

> *"Keller Williams Realty, Inc. is a franchise company. Each Keller Williams office is independently owned and operated. Keller Williams Realty, Inc. supports the Fair Housing Act."*

## VI. THE AMENDED COMPLAINT STATES A VALID CAUSE OF ACTION PURSUANT TO THE SHERMAN ACT OF 1890

On behalf of Plaintiff and the Class Members, the FAC invokes the Sherman Act to seek relief from practices that include "Requiring franchisees of the KW Defendants and others to implement the Adversary Commission Rule and other anticompetitive NAR rules in the areas in which BeachesMLS operates," echoing the landmark *Sitzer* case in Missouri. The language employed in detailing our claims is not coincidental but is well informed by the precedent set forth in *Sitzer*—a case that delivered a verdict resonating through the real estate industry. Though the final order in *Sitzer* remains pending and its direct applicability to Florida's BeachesMLS is undetermined, it nonetheless informs the legal landscape within which our claims are situated.

The adjudication in *Sitzer* is perceived as establishing "the law of the land," guiding subsequent litigation pertaining to similar claims. The present MTD submitted by the KW Defendants ignores the gravamen of the claim involving the Adversary Commission Rule—a misstep that forfeits and surrenders the matter.

Instead, Keller Williams asserts Plaintiff lacks standing to represent the class members, having purportedly never paid a commission to KW. However, KW Defendants brought this lawsuit over six months ago to recover a commission from Plaintiff. Either Plaintiff owes a commission, or he doesn't, KW must advance consistent arguments and can't have it both ways.

Plaintiff's standing is irrefutable on simple grounds. Keller Williams sold the home to Plaintiff in 2020, and received a commission for doing so. This results in what can be deemed "double standing" should Plaintiff be found liable for a commission on the current disputed transaction. The purchase in 2020, securely outside the timeline impacted by the *Sitzer* verdict, corroborates Plaintiff's qualification to represent the class.

Beyond the *Sitzer* equivalent claims, the FAC propounds two additional derivative claims, pointing to "efficient marketplaces" for FSBOs paralleling the circumstances of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). It alleges exclusion under Section 2 akin to *Aspen Skiing*. Alternatively, it alleges such conduct restrains interstate trade under Section 1. These claims postulate that KW Defendants' proven collusion with others impedes FSBO platforms from competing, as informed by the "other anticompetitive NAR rules" identified in Sitzer. It is anticipated that limited discovery and expert testimony will be necessary to extend the *Sitzer* verdict to Plaintiff and Class Member's FSBO theories.

KWRI's reliance on *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), is misapplied. *Trinko* does not forestall the emergence and recognition of novel market relationships, particularly those incipient within a monopolized environment—a nuance significantly relevant given KW's entanglement in conspiracy, restricting efficient market alternatives to the MLS monopoly. This contextually reflective derivative claim dismisses KWRI's

supposition of exclusivity within the market, emphasizing market singularity induced by the KW conspiracy.

Finally, Makai's solitary retort, asserting a lack of control over Zillow (*Makai MTD p. 16*), fails to grapple with the core issue—that of restrictive market behavior stifling emergent market participation. KW's proven conspiratorial conduct generates a *de facto* monopolized market environment, suffocating any nascent MLS alternative. Thus, the FAC presents a derivative claim reflective of complex market dynamics and antitrust jurisprudence. The Court may take judicial notice that yesterday, Zillow filed an antitrust lawsuit against national MLS organizations.

In conclusion, given the serious antitrust implications delineated through the FAC, coupled with the precedent set by *Sitzer*, and further substantiated by *Aspen Skiing's* interpretative framework, the Court should deny the MTD with prejudice, acknowledging the viability of the Plaintiff and Class Members' claims.

## <u>CONCLUSION</u>

Plaintiff has sufficiently set out his claims in the Amended Complaint, with factual allegations that state plausible federal and state causes of action. The motions to dismiss should be denied in their entirety, allowing Plaintiff to proceed with the claims articulated in the Amended Complaint and seek redress for the injuries inflicted by Defendants' conduct.

WHEREFORE, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss the Amended Complaint and grant Plaintiff any other relief this Court deems just and proper.

Respectfully submitted, this 2nd day of January 2024.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law


/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff

*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
Manchester, NH 03105
Ph. 603-622-8100
keith@awplegal.com


## CERTIFICATE OF SERVICE

I, Ayelet Faerman & Keith Mathews, do declare as follows:

I certify that a copy of the foregoing CONSOLIDATED OPPOSITION TO MOTION TO DISMISS was served upon all parties, in accordance with applicable service of process guidelines.

Executed on this 2nd day of January 2024.


/s/ Ayelet Faerman
Ayelet Faerman, Esq.

/s/ Keith Mathews
Keith Mathews