Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law


American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
603-622-8100
keith@awplegal.com

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS<br>on behalf of himself and all others similarly situated | Case No. 9:23-cv-81393-RLR-BER |
| Plaintiff, | |
| vs. | **PLAINTIFF'S OPPOSITION TO MOTION TO QUASH** |
| KELLER WILLIAMS REALTY, INC.,<br>MAKAI SOUTHEAST, LLC (d/b/a<br>KELLER WILLIAMS REALTY WELLINGTON),<br>EQUESTRIAN PALMS, LLC, | |
| Defendants. | |

## RESPONSE IN OPPOSITION TO MOTION TO QUASH

Plaintiff Dr. Jeff Isaacs respectfully opposes Non-Party Google LLC's ("Google") Motion to Quash Subpoena, contending that Google's 175-page motion[1] entirely fails to plead undue burden, a prerequisite for this type of motion.  The MTQ inadequately addresses substantial and relevant concerns of felony witness retaliation directly influencing Isaacs' duress in the underlying sale of his home. These facts, thoroughly briefed to Google, represent an unequivocal basis in case law affirming expansive rights to discovery, especially when movant seeks to shield, as they do here, investigation into potential misconduct as it relates to the civil litigation context.

The subpoenas seek information directly relevant to the real estate transaction at the core of this lawsuit. Google's termination of a longstanding professional partnership negatively impacted Plaintiff's financial stability, and more significantly, resulted in significant decisions regarding his ongoing residency in Florida. The subpoenas are substantiated by preliminary evidence, including documentation contained within the subpoena instructions which articulate the effects of Google's actions on Plaintiff's livelihood in Florida, income from patent royalties, and his imminent reaction to sell his Florida home shortly after Google's adverse conduct. Google's assertion of irrelevance is simply without foundation, when viewed in light of Plaintiff's lost employment, denied patent royalties, and his proximate — two weeks afterwards — decision to engage in the real estate transaction under duress. Google's MTQ disregards an entire Meet & Confer about relevance. *(See Exhibit A – Declaration of Keith Allen Mathews)*. These matters are central to the litigation and are inextricably connected to the information sought through the subpoenas.

---

[1] If there existed any exonerating explanation for Google's Thanksgiving 2022 adverse event, it is unfathomable why the movant wouldn't have produced it by now. Preferring to engage a federal court with a 175-page motion that omits the most basic prerequisite for relief, e.g. undue burden, highly suggests evasive posturing.

The subpoena instructions clearly delineate its relevance, and the MTQ conveniently omits any honest discussion of the relation between their conduct and the stated reasons for issuance of the subpoena. The indisputable relevance of the subpoenaed information to this case includes the valid patent held by Isaacs that Movants have conspicuously disregarded. *(See Exhibit B – Dr. Isaacs' Reissue Patent).* Even setting aside perceived misconduct, Google's reason for non-payment of patent royalties is beyond fair game for discovery, because a Florida resident was forced to sell his home as a result.

It would be wholly improper to deny Plaintiff – or Defendants, for that matter – critical information about events that directly impacted Isaacs' physical, mental, and financial condition, which culminated in the real estate transaction under litigation. The information requested is thus crucial for establishing the state-of-mind and alleged duress under which Isaacs operated, and how to apportion damages between Defendants, and Google, in light of this nexus.

In light of the significant issues at hand—namely, the presumed validity of Plaintiff's patent under 35 U.S.C. § 282, the abrupt termination of Plaintiff's professional relationship with Google, and the subsequent distress directly linked to these events, it becomes clear that no undue burden exists for Google to produce an explanation of what happened on Thanksgiving 2022. Adhering to the Eleventh Circuit's liberal stance on discovery, the subpoenas are entirely justified and crucial for the litigation at hand.

## LEGAL STANDARD

The overall purpose of discovery under the Federal Rules is to ensure that litigation proceeds with full transparency. In *United States v. Proctor & Gamble Co*., 356 U.S. 677, 682 (1958), the Supreme Court observed, "The purpose of discovery is to make a trial less a game of blind man's

bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." Courts have long recognized the principle that the discovery process serves as a mechanism to unveil truths and foster fairness in legal contests. In *Hickman v. Taylor*, 329 U.S. 495, 507-08 (1947), the Supreme Court underscored the vital role of discovery in ascertaining facts essential to the maintenance of justice. This precedent supports Isaacs' right to probe into the potentially unlawful practices executed by Google, which ostensibly led to serious personal and professional consequences, pivotal to the dispute at hand.

Rule 26(b) of the Federal Rules of Civil Procedure reads "Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Discovery is not limited to the issues raised by the pleadings because "discovery itself is designed to help define and clarify the issues. Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352, (1978).

The party resisting discovery has the burden to show that the requested discovery is not relevant and that the production of such discovery would be unduly burdensome. *LNV Corp. v. Branch Banking & Trust Co*., 2013 WL 12174140, at *2 (N.D. Fla. Nov. 18, 2013). "Undue burden" necessitates an examination that weighs the necessity and relevance of the information sought against the inconvenience or expense to the subpoenaed party (Fed. R. Civ. P. 45(d)(3)(A)(iv)). Furthermore, the materiality of the subpoenaed information to the resolution of key issues within the litigation firmly establishes the appropriateness of such discovery requests.

The Eleventh Circuit Court has maintained a liberal stance on discovery, acknowledging the importance of enabling litigants to obtain the necessary information for case preparation. The standard set forth by the Supreme Court in *Oppenheimer Fund, Inc. v. Sanders*, and upheld in this

Circuit, propounds that discovery should be broad and encompassing, and relevant information must be accessible to litigants unless there is a significant justification to oppose such discovery.

When a discovery request also pertains to other proceedings, it may be denied if and only if the matter has no relevance to the pending suit. Mere relevance to other proceedings does not modify normal discovery protocols. *See Mississippi Power Co. v. Peabody Coal Co.,* 69 F.R.D. 558, 565-568 (SD Miss.1976); *Econo-Car International, Inc. v. Antilles Car Rentals, Inc.,* 61 F.R.D. 8, 10 (V.I.1973), *rev'd on other grounds,* 499 F.2d 1391 (CA3 1974).

## Background Information

In 2012, during his medical residency at Dartmouth-Hitchcock Hospital in New Hampshire, Dr. Jeff Isaacs faced a life-altering challenge when he became disabled. Undeterred by this setback on his goal to be a neurosurgeon, and determined not to rely indefinitely on Dartmouth's own-occupation long-term disability benefit, Dr. Isaacs innovatively founded OkCaller.com in 2013. This initiative led to the awarding of U.S. Patent (RE48847) for the groundbreaking reverse phone search technology the website utilized. Google, recognizing the significance of Dr. Isaacs' contribution, quickly elevated OkCaller to a premier position among reverse phone search sites:



By Google's own Analytics records, OkCaller garnered 293 million new users since launch and 605 million pageviews, positioning it among the top 2000 websites on Google, comparable to established brand sites like Jeep.com.  Dr. Isaacs' site was operated by Greenflight Venture Corporation, a Florida C Corporation which he serves as CEO. Regular communications between Google, Greenflight, and Dr. Isaacs underscored a partnership marked as highlighted in a 2015 email from Google:

> "You are one of the few partners who we have invited for Enhanced Support and Optimization. Thank you for working with us! We are grateful to count you as a trusted partner, and we hope to continue improving our relationship to suit your business needs."

This "trusted partnership" transcended mere algorithmic website ranking, making OkCaller a Google success story and facilitated Dr. Isaacs' participation in workshops with senior Google personnel in their Miami office, significantly contributing to Google's AdSense revenue. Working with independent sites like OkCaller fundamentally allowed Google to reach the success it enjoys today.

Because Dr. Isaacs ran the site efficiently, he gave away his patent for free, which allowed customers to save 90% on phone searches. Dr. Isaacs' invention saved US consumers over $100 million. Phone searches are a lucrative and substantial part of search engine revenues. Historically they were an early, even perhaps the first major profit center for Google.

Unlike nearly every competitor, Greenflight never sold information about its users to third-parties. Moreover, OkCaller was a decade early to implement privacy controls that the US Marshal service now asks all phone directories to do, to protect Federal Court personnel's residence data. In short, OkCaller was a successful Florida-based internet startup that helped many people find telephone directory information. It was also a successful outcome of the disability system, allowing Dr. Isaacs to promptly get back on his feet and serve others.

<u>A Convergence of Complex Litigation Emerges</u>

OkCaller faced considerable legal obstacles in the effort to bring free caller ID to the general public. As OkCaller gained market share, competitors took note and began to infringe upon Dr. Isaacs' patent. Within six months of Apple Inc. learning that Isaacs' desired to give away his patent for free and prevent high-grossing apps like Whitepages from charging for the same information, Apple dropped OkCaller from their Top 10 ranked phone apps to an unranked position. Whitepages simultaneously commenced a lawsuit to invalidate the patent under the controversial *Alice* IP case law. The patent went back to the drawing board, and the USPTO spent several years reviewing

Federal Circuit findings while corresponding with Greenflight's MIT-trained intellectual property attorney to reissue the patent. Hence today, the reissue patent again enjoys presumption of validity, having survived double scrutiny by the USPTO and Federal Circuit Appeals Court.

Despite these obstacles, Google notably continued to support Dr. Isaacs' work, significantly aiding him in his endeavor to bring free caller ID services to the general public. As Dr. Isaacs recently stated to the Ninth Circuit Court of Appeals, he widely credited Google with "saving his life." This is because Google's recognition of his invention gave him a second career chance; Dr. Isaacs has faced nineteen years of federal litigation surrounding his medical credentials.  Google allowed Dr. Isaacs to work from home, as he dealt with the worsening health issues.

Between 2014-2022, a former Assistant United States Attorney[2] who specialized in complex health care matters worked tirelessly to help Dr. Isaacs return to active medical practice. In reviewing years of federal discovery files, AUSA Mark Josephs identified evidence that a California university was publishing false disciplinary records on national academic clearinghouses about Dr. Isaacs. The university had previously agreed, via two court-ordered federal settlement agreements, to acquit Isaacs of any controversies and seal the acquitted records. Two competent authorities, the American Academy of Medical Colleges, and a New Hampshire Employment Tribunal, both determined that the records had been expunged. Nonetheless, "leaked" records prevent Dr. Isaacs from practicing neurosurgery. Mr. Josephs sought declaratory action with the Department of Education and the California university. Both were blocked, due to statute of limitations and jurisdictional defenses raised by law firm Gibson Dunn. In 2020, The Ninth Circuit had a divided ruling with a stark dissent on the matter.

---

[2] Former AUSA Mark Josephs, who spent almost a decade on a *pro bono* effort to reinstate what he called Dr. Isaacs' promising neurosurgery career, tragically passed away last year.

Recognizing that his clinical medical career was indefinitely delayed, in February 2020 Plaintiff partnered with the inventor of the gold-standard test for heart attacks to develop a Coronavirus tracking app. Apple rejected the app, the first of its kind, in March 2020. Plaintiff subsequently became a lead witness in Apple antitrust matters concerning App censorship which are ongoing and have received considerable media attention.

On the day Dr. Isaacs tendered a Closing Brief to the Ninth Circuit in the Apple antitrust lawsuit, Google abruptly terminated the OkCaller partnership without any prior notice. Other competitors in Reverse Phone Search were unaffected, including blatant copycat sites which infringe upon the reissue patent. Plaintiff, through undersigned counsel, has spent the past year asking Google to investigate any link the aforementioned litigation, only to be stonewalled.

The day after the sudden termination of his professional affiliation with Google, Dr. Isaacs experienced significant, unexplained medical issues. As plainly stated in the subpoena instructions, "with the financial insecurity from his sudden OkCaller career termination and [Google's] ongoing subversion of his IP, Google placed Dr. Isaacs under duress, and he placed his primary home for sale with Defendant Keller Williams." Dr. Isaacs signed the exclusive sale agreement with KW just two weeks after the loss of OkCaller, believing he would never have a career again due to never-ending witness retaliation. Because Google refused to even dignify an explanation, for over a year, Dr Isaacs remains in a state of limbo and seeks clarification through the subpoena.

<u>Current Status of Complex Litigation</u>

Dr. Isaacs has been a witness to approximately twenty years of federal litigation. As he remarked in a Supreme Court petition, his "entire adult life" has been immersed in litigation. Public documents and legal pleadings surrounding this litigation approximate a hundred thousand pages. This has resulted in a "run-away train" effect where these pleadings are re-combined and

misconstrued by an ever-expanding list of entities which now includes Google[3] and the Keller Williams Defendants. The net result, as Dr. Isaacs stated to the Ninth Circuit, is that he has become a neurosurgeon forced to learn complex litigation to defend his day-to-day livelihood and health.

Of the voluminous pleadings, undersigned counsel can represent that they all pertain to two fundamental matters: 1) Dr. Isaacs' two-decade effort to obtain a uniform enforcement of a court-ordered federal settlement agreement that acquitted, annulled, and sealed a controversy[4] in 2006, and 2) a four-year effort to invoke a unique theory he developed to prohibit Apple Inc from tying iPhone devices to notary stamps and App Store usage.

Significantly, Google's MTQ improperly emphasizes "failed litigation" against Apple. Dr. Isaacs, after spending twenty years in multi-disciplinary complex litigation to enforce the acquittal, felt he could contribute his knowledge to the important public matter of Big Tech antitrust, which has also stalled enforcement for over a decade. He was the first, in 2020, to invoke the direct *per se* tying claim mentioned above involving digital notary stamps and the App Store. His tying theory – representing a pattern of a disabled person being denied valid access to the Courts – was laughed out of the Northern California District Court at Apple Inc and Gibson Dunn's request, purportedly "untethered" to economic reality.

---

[3] Through counsel, Google has notably stipulated that they do not take a position on Isaacs' medical credential litigation and have agreed to refer to him with the correct salutation, whereas the original Motion to Quash omitted his doctorate. Nonetheless, Google would not voluntarily agree to subpoena compliance limited to a twenty minute "credible explanation" about any OkCaller termination motive distinct from Isaacs' prior litigation.

[4] Dr. Isaacs' allegation in 2005 was essentially that NIH funds were misused to secure the admission of a problem student at a California medical school, and that Isaacs became entwined in an anti-Semitic bullying episode with the student and Deans, who had been awarded $40m in NIH funding from the student's father, an NIH director. He also alleged the NIH dean showed unusual interest in him and was biased in the entire matter; it is now undisputed that three USC medical deans in a row were pederasts. Realizing the improbability that someone in 2005 would believe that a major USC university permitted anti-Semitism, that NIH funds could be misused by elite Directors, or that a medical school dean had corrupt behavior, Isaacs settled the claim for a mere acquittal and annulment of his matriculation at the university.

But the reality is, Dr. Isaacs' Sherman Act theory was spot-on, and four years ahead of its time. Just this month, Apple has engaged in "malicious compliance" with European Union Digital Markets Act and an *Epic* Unfair Competition ruling, according to numerous press reports and statements by Microsoft and other entities. Their "malicious compliance" is evidence by the fact Apple is now *directly charging* for notary stamps. Isaacs alleged this conduct – indirect sales of notary stamps – four years before it became widely apparent to the general public.

Hence, Google's motion improperly references Isaacs "failed litigation" against Apple, in an effort to downplay the idea that Apple Inc or Google could have taken adverse steps in response to Isaacs' role in antitrust litigation. Indeed, at time of filing the motion, the litigation is not "failed," it is pending writ of injunction referral to the entire Supreme Court of the United States by Justice Clarence Thomas (Exhibit C – SCOTUS Application written by Isaacs). Google's inaccurate descriptor "failed litigation" therefor improperly interferes with an active, pending, and valid application to the Supreme Court, and the Motion to Quash should be stricken on that basis alone.

Whether or not Isaacs' litigation along with *Coronavirus Reporter* ultimately fails or succeed, it certainly advanced antitrust discussion in legal journals covering the matter. Dr. Isaacs justifiably fears that in December 2022 his second career as a computer developer, was again blacklisted in violation of Section 1512, the same way his neurosurgery career had been wrongfully halted. A reasonable person must conclude that a witness to twenty years of federal litigation, such as Dr. Isaacs, may have suffered duress that the sudden termination of a second career related to his prior litigation. Dr. Isaacs, with stellar medical credentials and absolutely no criminal record, has been prevented from practicing medicine, largely due to the hundred thousand pages of aforementioned legal documents being weaponized against him. That weaponization, Dr. Isaacs fears, spread to Google LLC around Thanksgiving 2022. As the subpoena instructions

unequivocally state, Dr. Isaacs was in severe distress in the days and weeks following Google's adverse termination event.

<u>Meet & Confer Discussion of Relevance</u>

Undersigned counsel Mathews and Dr. Isaacs participated in a Meet & Confer with Mr. Andrew Kramer concerning the subpoena on February 2024. The Motion to Quash and underlying declaration by Mr. Kramer completely omit all material discussion of the call. During the call, Dr. Isaacs spent over five minutes explaining the relevance of the subpoena to the underlying litigation. Dr. Isaacs explained the information is relevant on "three grounds: 1) duress of sudden termination of OkCaller as a career, 2) uncertainty from non-payment of patent royalties, and 3) decades of litigation abuse against a disabled brain surgeon that now involved Google."  Isaacs then explained all three reasons distressed him to the point he felt he needed to sell his home and vacate Florida, moving to his partner's home in Europe. That move was complicated by the fact it is no longer safe for Dr. Isaacs to move to the war region.

There is little dispute that Dr. Isaacs' state of mind – and reasonable distress – in the weeks leading up to the underlying real estate contract was the result of decades of torment in delayed or denied justice, and resulting retaliation. Undersigned counsel has asked Google to investigate this matter for nearly a year, and has never received any satisfactory answer – or any answer at all.


**<u>ARGUMENT</u>**

**I. THE SUBPOENAS SEEK INFORMATION RELEVANT TO THE CLAIMS AND DEFENSES IN THE CASE**

Federal Rules of Civil Procedure 26(b)(1) allows for broad discovery into any nonprivileged matter relevant to any party's claim or defense. The subpoenas issued to Google seek information

related directly to Plaintiff's claims - specifically, the nature of Google's actions on Isaacs and their impact on his financial stability and physical health during the real estate transaction period. Isaacs' condition in the days leading up to the exclusive sale contract was undoubtedly affected by Google's actions. Google possesses information that will confirm – or deny – the concerns that caused Isaacs' duress. Not only is this information directly relevant to Plaintiff's concerns, it would be improper to deny Defendants with all information that supports or challenges the underlying conditions leading to the real estate contract formation.

As comprehensively outlined in Attorney Mathews' letter, substantiated concerns have been raised against Google, regarding serious witness retaliation statutes, notably:

> "I write you [Google] to request an immediate investigation into our substantiated concern that this removal of a nine-year-old strategic advertising partner constituted witness tampering pursuant to 18 U.S.C. §1512... it now appears Apple and/or Gibson Dunn corruptly influenced Google and rather suspiciously terminated Dr. Isaacs' last remaining career."

Within the weeks leading up to his decision to sell his home with the KW Defendants, Isaacs was plunged into untenable circumstances, seemingly as a consequence of participation in significant antitrust proceedings. Isaacs decision to sell his property was, at least in part, hastened by Google and associated entities, and his underlying fear that he could never achieve peace from the litigation he had every right to engage. If indeed, Isaacs has been a victim of witness retaliation which caused the loss of two careers – one in neurosurgery, the other in app development, that reasonably placed him in a state of extreme duress. It is undisputed that Isaacs has been a witness in nearly two decades of complex federal litigation. Even assuming arguendo that Isaacs' fears were incorrect – and there is no evidence that any of his fears were erroneous – discovery is necessary to reveal that actual truth. It is simply not within the discretion of the Court to prevent reasonable discovery into the distressed circumstances that lead to the home sale contract.

Even setting the antitrust matters and complex litigation history aside, Google refuses to pay royalties on Dr. Isaacs' patent. The company has ignored undersigned counsel's request for their position on the patent royalties for nearly one year. Google's status as an IP infringer to Isaacs alone suffices to justify the subpoena. If a Florida corporation isn't being paid for its intellectual property, and its puts a home for sale under duress, due to non-payment of royalties, that is plain justification to compel subpoena production.

A. **Direct Impact of Google's Actions on Isaacs' Financial and Mental State**

Isaacs' financial duress and deteriorating health state in December 2022 resulted from Google's termination of their partnership, which occurred without explanation or compensation. Contacts that invited Isaacs to Google Miami Campus suddenly went silent after nine years, and Google has zero explanation. This is not merely a background story but a direct cause of the stress, confusion, and health issues influencing Isaacs' decision-making in the real estate transaction. The pertinence of these events confirms the subpoena's relevance and necessity.

B. **Google's Actions and Non-payment of Royalties Constituted Duress**

The pressures faced by Isaacs in the aftermath of his professional dealings with Google fulfill the legal criteria of duress. The sudden end of income from Google, combined with the refusal to address patent royalties, placed Isaacs in a compromised position, affecting his ability to engage in contractual obligations freely. No reasonable person would dispute that twenty years of litigation defending one's career could impair one's ability to function normally and healthily. The subpoena, and the underlying lawsuit, are part of Plaintiff's effort to investigate, prove, and put an end to this conduct, once and for all. Nobody should be permitted to torment a federal court witness, on the basis of past litigation. Such an occurrence, if proven, constitutes present-day witness harassment

and/or witness retaliation that caused a failed real estate transaction. Thus the subpoenas are not only valid, they represent a necessary component of fair and just law enforcement.

C. **Google's Actions as a Catalyst for the Real Estate Transaction**

Google's contentions that the patent dispute and termination of OkCaller.com's partnership are unrelated to the real estate litigation ignore the substantive cause-and-effect relationship between these events. The information sought through the subpoenas is materially relevant to the issues in this lawsuit, including the determination of damages and the examination of Google's motive for the partnership termination. This relevance is underscored by the accompanying instructions of the subpoena, which highlight the partnership termination and the adverse events directly affecting Plaintiff, thereby illustrating direct relevance. Google ignored all proof of relevance and filed a motion in the hinterlands regarding *force majeure*.

If the subpoena production demonstrates Google took adverse action against Plaintiff because of his role as a witness in federal litigation, this finding substantiates allegations in the FAC that Keller Williams took adverse actions for improper reasons. In all probability, Defendants ignoring the mediation and arbitration clauses because they perceived Plaintiff as a litigant.

In short, a pattern emerges where Plaintiff is mistreated after opposing counsels (Google, KW, etc) engage in lucrative analysis one hundred thousand pages of prior litigation, and formulate erroneous deductions passed on to their client. In short, this case is about a run-away federal litigation train. Notably, KWRI has already filed multiple erroneous references in this lawsuit to Isaacs' prior litigation. The simple fact is that, regrettably to all parties, Isaacs' federal litigation history is central and paramount to this case. Google needs to answer a subpoena seeking information on adverse actions that resulted from their learning of Plaintiff's prior litigation.

## II. SUBPOENA COMPLIANCE DOES NOT CAUSE UNDUE BURDEN AND GOOGLE IS JUDICIALLY ESTOPPED FROM CLAIMING UNDUE BURDEN

At the backbone of a motion to quash is the necessity to demonstrate undue burden or expense. Notably, Google's Motion to Quash offers zero mention of undue burden. Google tactfully circumnavigates this requirement by concentrating on the alleged irrelevance of the sought information. Not only does this neglect a quintessential component of Rule 45, but it also inadvertently reveals a lack of actual hinderance or impracticality resulting from compliance with the subpoena. It also reveals the fact that Google is judicially estopped from asserting an undue burden defense.

The absence of detailed exposition on how or why addressing the subpoena would translate to an undue burden is striking. This void is particularly telling as Google hints at already having conducted an internal investigation into the matters Isaacs queries. If such scrutiny exists, disclosing its outcome entails minimal additional effort or resources, undercutting any argument on undue burden substantially.

Google's motion asserts that Plaintiff's concerns surrounding §1512 are "meritless.[5]" That suggests that Google has indeed investigated the reasons for the sudden termination of OkCaller. Either Google has investigated the claims, or they have not. If they investigated, there is no burden in sharing the results of the investigation with the parties by complying with the subpoena. If they have not investigated, they have issued false, conclusory statements as to the concerns being "meritless." Simply put, Google can't have it both ways. Their failure to plead undue burden was not a mere mistake. Recognizing the judicial estoppel issue, they have not plead undue hardship to

---

[5] Prior correspondence with Mr. Kramer invoked inapt citations to Section 230 to describe Isaacs' claims as "meritless." Hence it remains doubtful whether or not Google ever investigated this matter, or is simply asserting immunity under Section 230 (which doesn't immunize against Section 1512) to describe the claims as "meritless."

pre-empt a Rule 11 violation. In light of this, undersigned counsel offered a compromise to Google for *In Camera* inspection, but Google declined. (*See Exhibit D – Faerman Law Letter to Google*). In sum, there exists little doubt that Google simply does not want to explain what happened to OkCaller.

### A. No Undue Burden Under *Zubulake* Precedent

Under the well-established precedent in *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003), parties are obligated to investigate and preserve all relevant evidence, particularly when allegations of serious misconduct are made. As articulated in *Zubulake*, "A party anticipating litigation cannot be excused from taking reasonable steps to preserve [electronic evidence] because it does not foresee precisely which [evidence] will later become relevant." This directive underscores the proactive role parties must play in retaining essential information that may bear on the litigation.

A contention that the subpoena presents an undue burden would contradict Google's existing duty under *Zubulake* to preserve relevant evidence, as serious potential allegations have been levied against it under §1512. Given the purported involvement in activities that may constitute misconduct, Google's obligation to retain and produce pertinent information is clear.

### B. Inappropriateness of Quashing Subpoenas Regarding Misconduct

Motions to quash subpoenas are deemed particularly inappropriate in such contexts, where the pursuit of truth and the prevention of potential misconduct shielding are at stake. This principle directly applies to the present case, where Google faces serious potential allegations that, if substantiated, might reveal improper conduct. Google's motion to quash not only attempts to circumvent established discovery obligations but also risks obfuscating investigation into potential conduct violations surrounding witness retaliation. Quashing the subpoena would both undermine

the discovery process and violate the judiciary's commitment to uncovering the truth amidst allegations of serious misconduct. Google's duties under *Zubulake*, combined with their overt failure to assert undue burden, affirms the necessity of denying the motion to quash. Accordingly, Plaintiff respectfully requests that this Court should deny Google LLC's Motion to Quash on these grounds alone, ensuring a thorough investigation into the matters central to this litigation.

### III. GOOGLE'S MOTION BORDERS ON SANCTIONABLE

Given the clear relevance of the subpoena to the material questions at issue and the absence of any justifiable burden that would warrant the extraordinary relief sought by Google, this motion could be construed as not merely frivolous but sanctionable. Its apparent aim to obstruct the discovery process, even shield § 1512 misconduct under the guise of unwarranted protections, calls for stringent scrutiny and justifies the consideration of sanctions to prevent the misuse of procedural defenses.

The standard in *LNV Corp. v. Branch Banking & Trust Co* is devoid of ambiguity: a party resisting discovery has the burden to show 1) the requested discovery is not relevant, and 2) the production of such discovery would be unduly burdensome. Google didn't even attempt to assert undue burden, nor could they.

The MTQ asserts that the subpoenas are somehow improper because they reference "an ongoing legal matter" between Google and OkCaller. But the next sentence concedes that "in reality, there is no such legal proceeding between Google and OkCaller." MTQ at p.2.  To be sure, Dr. Isaacs remains extremely reluctant to engage in a patent infringement lawsuit with Google, whom he credits with saving his life in an earlier time. Nonetheless, undersigned counsel has requested Google investigate and preserve all evidence, for multiple potential matters: 1) this

lawsuit, 2) any patent infringement lawsuit that may follow, 3) the Apple litigation, and 4) and criminal investigation by any law enforcement authority. Under the holding of *Mississippi Power,* Google cannot get out of this subpoena simply because it might be applicable to other litigation. Google's argument disregards the judicial economy by potentially avoiding additional litigation. If Dr. Isaacs wishes to avoid filing a related patent infringement lawsuit, but rather await Google's subpoena production, that is reasonable. If the information obtained through the subpoena additionally functions to resolve uncertainties or disputes between the parties, this aligns with the courts' broader objective to mitigate unnecessary litigation and promote resolutions based on informed positions.

The MTQ also asserts a last-ditch defense that "Dr. Isaacs's complaint does not mention OkCaller.com or Google." That argument fails. Discovery is not limited to the issues raised by the pleadings because "discovery itself is designed to help define and clarify the issues. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352, (1978). Moreover, Plaintiff is awaiting removal of a state court claim and consolidation with this lawsuit. Pending adjudication on this, Dr. Isaacs will file affirmative defenses to the state court case that do indeed mention OkCaller.com and Google.

A. **The Motion to Quash Contains Numerous Inaccuracies and Omissions**

Furthermore, and despite failing to address the basic elements of *LNV Corp*, the Motion to Quash exhausts over 170 pages of arguments and exhibits to ambush entirely valid subpoenas as "improper." A streamlined discussion explains to the Court that the service of the subpoenas was actually a reasonable and entirely justified process.

Plaintiff first served a document production subpoena and deposition subpoena on Google LLC on December 11, 2023. The MTQ incorrectly states this occurred on December 11, 2024,

which is a date in the future. MTQ at p.5. Because Plaintiff worked out of "Google Miami," and because the exact corporate structure of such is unknown, Plaintiff served corresponding deposition and document subpoenas on December 20, 2023 on Google Miami, directed at the Alphabet Inc parent company. The MTQ erroneously states this occurred on December 20, 2024.

Google objected to these subpoenas with a laundry list of false or frivolous objections, such as non-payment of witness fees, which have in fact been paid in quadruple. (See Exhibit A). Similarly, the process server's printer apparently did not print the name of this Court – FLSD – on two of the four subpoenas, due to a PDF error. Furthermore, Google objected to both remote video deposition subpoenas on the basis of there being a blank space for "Courtroom Location" on the federal template form for Trials/Hearings. But the instructions were clear that the subpoena noticed a remote video deposition, rather than a hearing in a courtroom. Hence, all necessary content was present to render these subpoenas facially valid. Mr. Kramer did not respond to repeated requests to stipulate to these simple nuances. In turn, this necessitated undersigned counsel's attempt to serve the deposition subpoenas again, using the deposition subpoena federal template form he requested. Undersigned counsel has been informed by the process server in Miami that Google Miami has refused to allow them to serve the amended deposition subpoena, for unknown reasons.

Therefore, document production and deposition appearance subpoenas were properly served to Google LLC and parent Alphabet, and witness fees have been paid. Google counsel was unwilling to agree to minor revisions that resulted from routine matters during service of process, which would have prevented the redundant efforts to serve these subpoenas. Google was not a victim of oppression or annoyance from this effort; to the contrary, it appears Google resisted service by incorrectly claiming non-payment of witness fees, and preventing process servers from completing their task at Google Miami.

Finally, the MTQ also objects to the subpoena instruction format, because it does not enumerate a list of relevant topics, but rather, provides a detailed narrative of topics to be produced. This matter is moot, because Mr. Kramer has provided the Court a reasonable enumerated list, which he derived from the subpoena instructions. This list, authored by Mr. Kramer, indeed evidences that the subpoena instructions reasonably notified Google with a list of subjects for the subpoena. Plaintiff assents to use of Mr. Kramer's list, in the context of the subpoena production.

## CONCLUSION

WHEREFORE, For the reasons provided herein, Plaintiff respectfully requests that the Court deny Google's Motion to Quash. The subpoena is a reasonable and necessary component of the discovery process, which seeks information necessary for the adjudication of central issues. Granting Google's motion would impede this process and potentially shield serious §1512 conduct, contrary to the interests of justice. The information sought from Google poses absolutely no burden on the movant, if they have actually investigated and preserved evidence, as they were required to do. Google should disclose why they terminated OkCaller and why they refuse to pay patent royalties to a Florida corporation. Google declined an offer for a twenty minute *in camera* session to reveal this information. Nothing more can be said other than Google doesn't want to explain what happened. To deny Plaintiff this knowledge, which fundamentally impacts his life, and certainly impacted his decision to sell his home, would undermine the principles of fairness and justice.

Respectfully submitted, this 25th day of February, 2024.

/s/ Ayelet Faerman

Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law


/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff

*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
Manchester, NH 03105
Ph. 603-622-8100
keith@awplegal.com




**CERTIFICATE OF SERVICE**

I, Ayelet Faerman & Keith Mathews, do declare as follows:

I certify that a copy of the foregoing OPPOSITION TO MOTION TO QUASH was served upon all parties, in accordance with applicable service of process guidelines.

Executed on this 25th day of February 2024.


/s/ Ayelet Faerman
Ayelet Faerman, Esq.

/s/ Keith Mathews
Keith Mathews