Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
603-622-8100
keith@awplegal.com

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS<br>on behalf of himself and all others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>KELLER WILLIAMS REALTY, INC.,<br>MAKAI SOUTHEAST, LLC (d/b/a<br>KELLER WILLIAMS REALTY WELLINGTON),<br>EQUESTRIAN PALMS, LLC,<br><br>Defendants. | Case No. 23-cv-81393-RLR<br><br><br>**DECLARATION OF<br>KEITH ALLEN MATHEWS** |

# Declaration of Keith Allen Mathews

I, Keith Allen Mathews, pursuant to 28 U.S.C. § 1746, do hereby affirm and declare the following under the penalty of perjury:

1. I am an attorney licensed in the State of New Hampshire. I submit this declaration in support of the Opposition to Motion to Quash. I am over the age of 18 and am competent to make this declaration. I make each of the following statements based on my own personal knowledge, and I could, if necessary, testify to the truth of them.

2. I have read Google's Motion to Quash and the accompanying 162 pages of exhibits.

3. As I interpret the Declaration of Andrew Kramer, at Paragraph 29, it affirms that during our Meet & Confer, I discussed the possibility of narrowing down the subpoena subjects, in an attempt reach a compromise. Mr. Kramer indicated that his client, Google, would almost certainly be unwilling to accept any compromise.

4. The subpoena fundamentally seeks information about "what happened to OkCaller on Thanksgiving 2022" and I believe this could be answered in a twenty-minute deposition with credible supporting documentation. Mr. Kramer stated that he would check with his client to see if they would assent to this focused topic, but he did not anticipate they would. Mr. Kramer failed to get back to me on this proposal, prior to filing his Motion to Quash.

5. Paragraphs 29 and 30 of Mr. Kramer's declaration are inaccurate in other regards. In particular, Mr. Kramer's mention of 'force majeure' is entirely out of context. Attorney Kramer appears to reference how I began the call, reminding him that Google placed

my client in considerable duress, compounding twenty years of witness retaliation, making him feel he had no other choice but to vacate his home in Florida and move to his partner's country in a war-zone, which is inherently unsafe.

6. To the extent Mr. Kramer claims "[Dr.] Isaacs and his counsel did not explain the relevance of all the information the subpoenas seek," this is inaccurate because the phone call was about relevance of the subpoena generally, and reaching a compromise to obtain Google's compliance. Mr. Kramer terminated this call without sufficient time allocated to discuss each and every subpoena topic. Most topics were not discussed due to time constraints. Therefore, it would be inaccurate to assert that the call was a comprehensive discussion of the complete subpoena topic list.

7. In fact, during each telephone call I held with Mr. Kramer, he had minimal ability or authority to engage in productive conversation on behalf of his client, which resulted in multiple delays and what he incorrectly coined an "improper excess" of six subpoenas. He refused to name any partner at his law firm overseeing this matter, when I asked to speak with his supervising partner.

8. Mr. Kramer was unable to verify or stipulate to any reasonable detail, including 1) whether or not his client received a witness fee, 2) whether a minor PDF error at the process server could be amended by mutual agreement, and 3) whether a remote video deposition notice was facially valid, when served on a federal template with a blank entry for Courtroom Trial/Hearing location. I found all three of the above objections frivolous, and reasonably believed they should have been resolved by stipulation. Unfortunately no such stipulation was achieved, resulting in Google's receipt of quadruple witness fees and two redundant subpoenas.

9. Paragraphs 29/30 completely omit at least 5 minutes of explication by my client, Dr. Isaacs, about how Google's unexplained termination impacted his life at the time of the real estate transaction and thereafter.

10. Dr. Isaacs explained that Google's sudden termination of Okcaller – his primary career – placed him in a state of duress and caused a haste decision to sell his home. Dr. Isaacs signed an exclusive sale agreement with Keller Williams two weeks after Google's termination of OkCaller, which evidences a significant temporal connection between these events.

11. Dr. Isaacs explained to Mr. Kramer that Google refused to answer one year of requests seeking explanation for their sudden termination of his career, or related requests to pay him overdue patent royalties. Google's refusal to acknowledge either the OkCaller termination, or the infringement of Isaacs' patent materially contributed to the underlying stress and uncertainty in the real estate transaction.

12. Dr. Isaacs explained that the duress transcended financial concerns. Dr. Isaacs spent significant time detailing to Mr. Kramer his bona fide belief that Google learned about his prior litigation with USC and Apple and this somehow motivated the OkCaller termination. It was evident this fear persists as a defining factor in his life, and Dr. Isaacs seeks the subpoena, at least in part, to assuage his traumatic perception of never-ending witness retaliation. Dr. Isaacs remarked he does not believe he should be forced out of his home, if indeed he was subjected to criminal conduct by Google, Apple, or any other entity that harmed him in the days leading up to the real estate transaction. It was clear during this call that Dr. Isaacs has a compelling, substantiated belief that somebody from his two-decade long, highly unusual litigation record influenced Google. Notable were

Attorney Kramer's silent pauses after Isaacs stated these concerns, with absolutely no rebuttal whatsoever.

13. Dr. Isaacs provided illustrative examples of his beliefs, remarking "it seems proven over time, people hear about a disabled brain surgeon, the accompanying lawsuits, it becomes a humorous subject between lawyers, and new adverse actions ensue each and every time." "I know my competitors, I may not be a neurosurgeon, but I am able to comprehend the phone book industry. It remains the most likely explanation of what happened to OkCaller, and why copy-cat infringers remain on Google - that somebody propagated information about me and my disability and my litigation history to Google." "If I'm wrong, that would be fantastic, your client can dispel this in a twenty minute deposition."

14. Dr. Isaacs recapped to Mr. Kramer that the subpoena was relevant on "three grounds: 1) duress of sudden termination of OkCaller as a career, 2) uncertainty from non-payment of patent royalties, and 3) decades of litigation abuse against a disabled brain surgeon that now involved Google."

15. Dr. Isaacs asked me to add anything he forgot. I remarked that the third item combined two distinct legal theories – disability discrimination and witness retaliation, but otherwise, I concurred.

16. Mr. Kramer's declaration therefore omits substantive discussion on the relevance of this subpoena. The call did not terminate about "force majeure," as Mr. Kramer suggests. Rather, the call terminated when Mr. Kramer replied that despite the relevance Dr. Isaacs elucidated, Mr. Kramer doubted his client would comply with the subpoena.

17. At that point, rightfully frustrated, Dr. Isaacs asserted to Mr. Kramer that he found it "rather suspicious" Google would not agree to a twenty-minute deposition on the relevant subjects.

18. I stated "I have to agree with Dr. Isaacs, this is beginning to sound extremely suspect."

19. The call did terminate with Mr. Kramer failing to indicate any reason why Google wouldn't comply with the narrowed down requests, or refute the relevance Dr. Isaacs and I had expounded for approximately ten minutes. This prompted Dr. Isaacs to suggest Google's untenable position was pushing everyone in the direction of unwanted and resource consuming further litigation.

I declare under penalty of perjury under the laws of the State of New Hampshire and the United States that the foregoing is true and correct to the best of my knowledge. Executed on the 25th day of February, 2024 in Manchester New Hampshire.

/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff

*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
Manchester, NH 03105
Ph. 603-622-8100
keith@awplegal.com