Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law


American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
603-622-8100
keith@awplegal.com

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS<br>on behalf of himself and all others similarly situated<br><br>Plaintiff,<br><br>*vs.*<br><br>KELLER WILLIAMS REALTY, INC.,<br>MAKAI SOUTHEAST, LLC (d/b/a<br>KELLER WILLIAMS REALTY WELLINGTON),<br>EQUESTRIAN PALMS, LLC,<br><br>Defendants. | Case No. 23-cv-81393-RLR-BER<br><br><br><br>**MOTION TO DISMISS<br>EQUESTRIAN PALMS LLC<br>COMPLAINT AND RECOGNIZE<br>FORCE MAJEURE PURSUANT TO<br>INTERNATIONAL TREATIES** |

## MOTION TO DISMISS EQUESTRIAN PALMS LLC COMPLAINT AND RECOGNIZE FORCE MAJEURE PURSUANT TO INTERNATIONAL TREATIES

COMES NOW Dr. Jeff Isaacs (the "Plaintiff"), by and through his undersigned counsel, and pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), moves this Court for an order dismissing the complaint filed by Counter-Plaintiff Equestrian Palms LLC (hereinafter referred to as the "Nevis/Guatemala Shell Corporation" for reasons set forth below) for lack of standing, failure to state a claim upon which relief can be granted, and on the grounds of unclean hands and other defenses to contract formation and enforcement.

The Equestrian Complaint was removed from state court on December 10, 2023, but has not received a unique case number in this Court as of today's filing. This may be due to the fact Plaintiff inferred in the Notice of Removal that consolidation with this case was appropriate. Other motions regarding the Equestrian Complaint (e.g. a Motion to Remand) have been accepted for filing in this docket, therefore Plaintiff respectfully requests this Honorable Court adjudicate this Motion to Dismiss in this case, or transfer it to the appropriate docket.

## BACKGROUND

Equestrian Palms LLC is an offshore Nevis based shell holding company subsidiary, which in turn is owned by a Guatemalan entity, hereafter "Nevis/Guatemala Shell Corporation." The "Equestrian Palms" Florida LLC is illegally registered to Plaintiff's Key Deer Circle Wellington Property on the Florida Secretary of State website as of today's filing, despite no title ever being conveyed and the company having no present right to assign this address as its "Principal Business Address" under Florida Corporation statutory law. In light of this improper shell structure, this Motion asserts Equestrian Palms LLC is not a legal entity that could obtain relief, and instead

considers and subsequently refers to the "Removed State Court Complaint Counter-Plaintiff" as the 'Nevis-Guatemala Shell Corporation.'

The Nevis-Guatemala Shell Corporation seeks to oust a disabled physician and his partner, who both qualify as persons impacted by the Ukraine war under accepted international treatises, from their Florida homestead residence. Counsel for the Nevis-Guatemala Shell Corporation has repeatedly affirmed to undersigned counsel that the property is "perfect" for their commercial equestrian operations facility, which presumably and typically means they plan to fill in ponds abundant with wildlife and level trees on the Everglades-adjacent five acre property.

Upon signing the "As-Is Purchase Agreement," the Nevis-Guatemala Shell Corporation asked Dr. Isaacs to vacate the property early, to align with their owner's vacation plans in Europe. Dr. Isaacs refused to do so, and received multiple calls from Agent Nico of KWRI imploring that "Equestrian needed to break ground, they stand to make millions on this deal." At the time of signing the contract, Dr. Isaacs was under significant legal duress. He had lost his employment with Google LLC, and additionally, the company refused to pay the patent royalties they owed him. Moreover, Dr. Isaacs has been under the care of numerous physicians for worsening disability, the exact underlying condition poorly understood. Dr. Isaacs suffered a 104 degree fever shortly before signing the agreement, and had impaired daily functioning scores on routine medical metrics such as GAF.

In consultation with his partner, Dr. Isaacs notified the Nevis-Guatemala Shell Corporation that the couple was invoking the *force majeure* clause, due to the disruption caused by the war in the Ukraine. Specifically, the process of vacating and moving their belongings became impractical, if not impossible in the timeframe for closing. Dr. Isaacs' partner grew up about eighty miles from the active war zone, and the couple maintain an apartment there, where they had resided for almost

half of the year. Shortly after marrying in 2011, Dr. Isaacs obtained permanent residency status in his wife's country.

The Nevis-Guatemala Shell Corporation, upon learning of the *force majeure* situation, responded by engaging threats, harassment, and abusive litigation that persists to this day. The company's lawyer, Mr. Baldor, has openly ridiculed Dr. Isaacs serious medical problems, which have considerably worsened under Baldor's abuse to include new-onset hypoglycemia diagnosed by the University of Pennsylvania. Despite knowing Dr. Isaacs' home address, which was staffed by housewatch personnel, The Nevis-Guatemala Shell Corporation sent process servers to Plaintiff's relatives around the country, including two attempts to serve a relative, on the day he was recovering from chemotherapy. The very lawsuit they sought to serve was barred by a Mediation Clause in the "As-is Sale Agreement." In short, the entity behaved in total disregard for the law, evading mediation clauses, harassing and mocking a disabled physician, and illegally registering holding companies with fictitious addresses.

## MEMORANDUM OF LAW

### LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of a complaint. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard requires more than the mere possibility of misconduct; the plaintiff must show that it is plausible that they are entitled to relief. *Id. at 679*. In determining plausibility, the Court must draw on its judicial experience and common sense. *Id*.

The Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), clarified the 12(b)(6) standard, holding that a complaint must offer more than "labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." Id. at 555. Instead, the complaint must offer plausible factual content that allows the court to draw the reasonable inference that the plaintiff is entitled to relief. *Id. at 556.*

Furthermore, the Eleventh Circuit has consistently held that a complaint must be dismissed under Rule 12(b)(6) if the allegations do not enable the court to draw a reasonable inference that the any relief is appropriate. See *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009). The Court does not accept as true unreasonable inferences or conclusory legal allegations contrary to known facts, such as the existence of and disruption caused by the Russian-Ukrainian war. *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001). Courts need not credit "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Rankin v. Bd. of Regents of Univ. Sys. of Georgia*, 2018 WL 1974995. A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

## ARGUMENT

## I. FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Under the Federal Rules of Civil Procedure 12(b)(6), a complaint must be dismissed if it fails to state a claim upon which relief can be granted. The Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), established that a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Following *Twombly*, the Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), further clarified that a claim is facially plausible when a plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged.

In the instant case, the Counter-Plaintiff Nevis/Guatemala Shell Corporation fails to meet this plausibility standard. The crux of the Equestrian Complaint is alleged breach of contract based on the Plaintiff's invocation of the *force majeure* clause. However, a careful analysis of the Equestrian Complaint reveals a critical flaw: it disputes the existence and implications of a *force majeure* event—specifically, the war in Ukraine—without substantively linking this dispute to a concrete breach of the contractual obligations.

The Equestrian Complaint assertions that the Plaintiff "failed and refused to cooperate...in connection with closing" are conclusory allegations that do not rise to the level of plausibility required under *Iqbal*. Moreover, these assertions contradict the complaint's acknowledgment that the Plaintiff invoked the *force majeure* clause—a lawful and contractually provided action, not a failure or refusal to cooperate. Reading between the lines, it is evident the Nevis/Guatemala Shell Corporation believes that anything that stands in the way of its commercial development – even a war – is "refusing to cooperate."  This fundamental inconsistency further underscores the absence of a plausible claim for breach of contract.

**Insufficient Allegations of Breach**

The Complaint details the invocation of the *force majeure* clause but does not adequately allege how this invocation constitutes a breach of contract. The *force majeure* clause, by its nature, is designed to suspend or modify parties' obligations under extraordinary circumstances beyond their control, such as acts of war. The Equestrian Complaint's questioning or attacking the existence of a *force majeure* event, without more, does not amount to a plausible claim for breach of contract.

Moreover, the allegations fail to consider the contractual provision itself, included as an exhibit to the complaint, which specifically outlines the conditions under which the *force majeure* clause can be invoked: when either party faces disruption from a war in fulfilling their contractual

obligations. Without alleging that the invocation of the clause was contrary to the contract's terms, the Counter-Plaintiff's Complaint falls short of stating a claim for breach of contract that is plausible on its face.

**Lack of Linkage Between Force Majeure and Alleged Breach**

Notably absent from the Equestrian Complaint are specific facts tying the invocation of the force majeure clause to an actionable breach. The allegations, as presented, rather suggest a disagreement with the Dr. Isaacs' assessment of the situation as warranting the invocation of *force majeure,* but do not articulate how this disagreement translates into a breach of the specific terms of the contract. The legal question of whether a *force majeure* event occurred is distinct from whether the Dr. Isaacs' actions in reliance on that clause amounted to a breach. The Equestrian Complaint conflates these issues without providing a factual basis that demonstrates a breach occurred as a direct result of invoking the *force majeure* clause.

**Amendment Would be Futile**

Even if the Equestrian Complaint could somehow be amended to purport a link between the execution of the *force majeure* clause and breach of contract, it would nonetheless be impossible for relief to be granted. The Counter-Plaintiff would have to demonstrate that 1) there was no *force majeure* event, and that 2) Plaintiff's contractual obligations, which included moving and relying on a remaining residence in a war zone, faced no disruption from the conflict. Both of these are demonstrably false based upon public records this Court may take judicial notice. *See Exhibit B - Declaration of Yanina Petrea.*

**Declaration of Yanina Petrea Supports Dismissal of the Equestrian Complaint**

In the adjudication of this Motion to Dismiss, this Court is permitted to consider uncontested evidence presented in the Declaration of Yanina Petrea, specifically the public events cited, without

necessitating the conversion of this motion into a Motion for Summary Judgment. Under FRCP 12(d), when matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. However, documents and references alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss. This exception is crucial when considering the "judicial notice" of facts that are not subject to reasonable dispute because they can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." (Fed. R. Evid. 201(b)).

The Equestrian Complaint references the Russia—Ukraine War, disruptions from which are widely recognized and reported, and thus, are capable of accurate and ready determination from indisputable sources. Given these circumstances, this Court can, and indeed should, consider these uncontested facts under the doctrine of judicial notice without converting the present motion into one for summary judgment. This approach is consistent with the principle that allows courts to consider "matters of public record" and other undisputed facts in deciding a motion to dismiss.

Given that the declaration references verifiable, public events and the direct impact of these events on the Plaintiff's ability to perform under the contract, it is pertinent to the Court's consideration of this motion. Here, the declaration serves to clarify very *force majeure* event and disruption the Equestrian Complaint denies the very existence thereof. Hence the relevant portions of the declaration clarifies disputed facts, with direct references to public knowledge, making it appropriate for consideration in this motion to dismiss.

Notably, undersigned counsel queried Mr. Baldor on at least three occasions for his client's position on 1) the existence of the Ukraine war, and 2) the disruption caused to Isaacs and his partner. While Baldor now backtracks on the Equestrian Complaint's shameful assertion that the

Ukraine war didn't constitute a *force majeure* event, he has repeatedly refused to provide his client's position on whether or not Isaacs or Petrea faced disruption. The Declaration irrefutably answers that question.

### Public Nature of the Cited Disruptions

The declaration (¶7-10) outlines specific disruptions that have a foundation in widely recognized and verifiable public events, such as cancelled flights, closed borders, and airport closures. These events, corroborated by news outlets and public records, substantiate the claim of *force majeure* due to the war's extensive impact on individuals' lives. The indisputable nature of these disruptions, as they are matters of public record and international concern, lends significant weight to the assertion that the *force majeure* clause of the contract has been rightfully invoked.

### Direct Impact on Contractual Obligations

The declaration clearly outlines (¶12-13) how the war-induced disruptions made it infeasible to vacate the residence and fulfill the contract's terms. By citing tangible effects of the war that directly influenced their ability to act, the declaration provides necessary context of the force majeure invocation. This direct linkage between the uncontested public events and the contractual obligations of the parties involved firmly supports the argument that the complaint fails to state a claim upon which relief can be granted.

The litigation pursued by Equestrian Palms LLC, in light of the verified *force majeure* circumstances, not only lacks merit but also contravenes international law, in that it seeks to burden war impacted persons to improperly obtain commercial enrichment.

### II. LACK OF STANDING

The Counter-Plaintiff, a Nevis-Guatemala Shell Corporation, improperly registered an corporate entity to represent it in the State of Florida, and therefore lacks the requisite standing to

bring forth this action. Florida Statutes § 605.0205 specifically creates liability for inaccurate information in the filed record, and declares that falsification of this information constitutes perjury.

Plaintiff had no obligation to close with a perjured offshore shell company holding, essentially a non-entity under Florida law. In light of the substantiated legal concerns surrounding Equestrian Palms LLC's corporate structure and its implications for property transactions, it becomes imperative to scrutinize the situation through the applicable legal statutes and the principles of commercial law. The core of the issue lies in Equestrian Palms LLC's deployment of a corporate structure that is not only intricate but also inherently deceptive, featuring elements such as multi-level foreign ownership, fictitious business addresses, and shell company filings. Such characteristics significantly heighten the risk of the corporation being used as a vehicle for illicit activities, including but not limited to, money laundering.

**Statutory and Regulatory Framework**

Under the Bank Secrecy Act (BSA) and its implementing regulations, financial institutions are mandated to implement effective anti-money laundering (AML) programs designed to detect and report potentially suspicious activities. This regulatory framework is underscored by the "Know Your Customer" (KYC) principles, which are not merely guidelines for financial institutions but also serve as a guidance for lawful and ethical business practices across industries. In essence, KYC standards require that businesses, including those involved in real estate transactions, take reasonable steps to verify the identity of their counterparts to prevent their operations from being used for money laundering activities.

**Implications for Property Transactions**

The application of KYC principles to real estate transactions imposes an implicit duty on sellers to conduct due diligence on the buyers with whom they engage. This duty is not just a matter

of regulatory compliance but also a safeguard against the inherent risks associated with engaging in transactions with entities that have opaque or questionable backgrounds. The fictitious corporate filing by Equestrian Palms LLC, coupled with its foreign ownership and use of shell company mechanisms, casts a shadow over the legitimacy of its operations and, by extension, any transactions it seeks to undertake.

### Legal and Ethical Considerations

To compel Dr. Isaacs to proceed with the sale of his property to Equestrian Palms LLC or the Nevis/Guatemala Shell Corporation under these circumstances would not only disregard the potential legal and ethical pitfalls associated with the transaction but also contravene the spirit of the KYC regulations. Accepting funds from an entity with false corporate credentials without adequate scrutiny could inadvertently embroil Dr. Isaacs in a web of legal liabilities and collateral damage should those funds be linked to illicit activities. Furthermore, the substantial errors and misrepresentations in Equestrian Palms LLC's corporate filing effectively render it a non-entity in the eyes of the law, thus negating any supposed obligation on Dr. Isaacs' part to finalize the sale.

### Violations of Florida Corporate Filing Requirements

Florida Statutes Title XXXVI, specifically Chapter 608.4071 for LLCs, delineate clear requirements for the filing and maintenance of corporate entities within the state. These statutes mandate accurate and transparent disclosure of essential information, including the principal address and the current management structure of the entity. Equestrian Palms LLC's failure to comply with these statutory requirements, as evidenced by its use of a fictitious business address at time of incorporation through today, and the lack of transparency in its foreign ownership structure, directly undermines its legal standing and capacity to engage in and enforce a real estate transaction.

### Florida's Real Property and Fraud Protections

Florida's extensive real property statutes are designed to safeguard transactions against fraud and deception. The state's commitment to protecting parties in real estate transactions from fraudulent practices is well-established. By attempting to enforce a contract while blatantly disregarding these statutory requirements, Equestrian Palms LLC not only exposes Dr. Isaacs to potential legal and financial harm but also contravenes the spirit and letter of Florida's property laws.

**The Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 et seq.**

FDUTPA prohibits deceptive, unfair, and unconscionable acts in trade and commerce. The act of Equestrian Palms LLC, engaging in a real estate transaction with substantial irregularities in its corporate filings and structure, can be construed as an unfair and deceptive act under FDUTPA. It is unfair because Dr. Isaacs signed an agreement with an unknown "assignee," who in turn apparently committed perjury on incorporation documents. This behavior not only jeopardizes the integrity of the transaction but also potentially subjects Dr. Isaacs to unforeseen legal liabilities and complicity in unethical practices. That makes it unfair, by any reasonable definition. The Counter-Plaintiff's conduct, as delineated, exemplifies the very malpractices that FDUTPA aims to eradicate, further diminishing their claim to any legal or equitable relief.

In light of the foregoing, the Court is urged to recognize the significant statutory violations and ethical breaches perpetrated by Equestrian Palms LLC intentionally false corporate filing[1]. The

---

[1] If Equestrian Palms LLC intended to conduct operations out of Key Deer Circle, it could have amended that address once it acquired title to the property. The problem with filing the address pre-maturely is that it suggests Equestrian Palms operated , financed a commercial facility purchase, and conducted itself at Key Deer Circle at the time it acquired the property. That is untrue, and leads to the question – where did the assignee actually obtain financing and conduct its operations at the time of closing? This is a perfect "fictitious" entity in the sense it obfuscates and assigns liability to Dr. Isaacs, by claiming his location prior to closing. Swapping the location of the purchase assets, activities, and monies prior to closing and after closing is impermissible under state and federal code, and upon information and belief represents a technique that could facilitate money laundering.

disregard for the legal frameworks governing corporate behavior and real estate transactions in Florida is manifest and egregious. Given these violations, coupled with the failure to adequately state a claim upon which relief can be granted, this Court should dismiss the complaint in its entirety. Such a dismissal not only upholds the statutory protections afforded by Florida law but also serves as a deterrent against the exploitation of the state's legal and commercial systems by entities that fail to adhere to the requisite standards of transparency, integrity, and accountability.

**Judicial Precedents and Legal Doctrine**

Courts have consistently held that transactions predicated on fraud or involving parties with dubious legal standing are subject to rescission. The principle of "unclean hands" further supports this view, suggesting that a party cannot seek equitable relief if they have engaged in legally impermissible corporate filings relevant to the real estate transaction. In this context, Equestrian Palms LLC's attempt to enforce the contract despite the glaring issues with its corporate status and the potential for violating anti-money laundering statutes constitutes a clear case of unclean hands, or at the very least, error voiding a contract.

In light of the foregoing, it is evident that proceeding with a real estate transaction under the shadow of potential malfeasance and regulatory non-compliance is not only imprudent but also legally indefensible. The substantial errors in Equestrian Palms LLC's corporate filing, coupled with the broader implications of engaging in a transaction with an entity of questionable legitimacy, justify Dr. Isaacs' reservations and decision to refrain from closing the contract. It should be noted that the improper corporate filing was just one of myriad red flags Dr. Isaacs observed during the attempted transaction – others being lawyers who abused him and mocked his disability, disregard for displaced war persons, etc. It is incumbent upon the judicial system to recognize the gravity of

these concerns and to uphold the principles of law and equity by acknowledging the validity of Dr. Isaacs' hesitancy to sell under such dubious circumstances.

### III. THE DOCTRINE OF UNCLEAN HANDS APPLIES

The Counter-Plaintiff's willful disregard for the mediation clause in the "As-Is Sale Contract" and its subsequent engagement in litigation abuse and harassment against the Defendant embody the doctrine of unclean hands. This equitable doctrine bars relief for anyone engaging in fraudulent, illegal, or unconscionable conduct related to the matter in litigation. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814 (1945). The Counter-Plaintiff's actions, including threats and harassment, directly contravene the spirit of equitable relief and demonstrate a blatant disregard for the contractual obligation to mediate disputes.

### Abuse and Exploitation under Sections 825.102 and 825.103

The Nevis/Guatemala Shell Corporation's litigious and exploitative actions target Dr. Isaacs, who was determined legally disabled in 2012, and whose condition has progressively worsened. The offshore corporation's behavior, including its initiation of a lawsuit in violation of a mandated mediation clause and its direct harassment related to Dr. Isaacs' oto-neurological disease, falls squarely within the prohibitions outlined in Florida Statutes Sections 825.102 and 825.103.

Section 825.102's provisions against the psychological and physical abuse of a disabled adult become particularly relevant given the offshore corporation's actions. Their lawsuit and subsequent conduct, including derogatory remarks about Dr. Isaacs' disability, can reasonably be construed as acts intended to inflict psychological injury, which indeed, they achieved.

Furthermore, Section 825.103's definition of exploitation, which includes actions taken to deprive a disabled adult of property or to benefit from the disabled adult's property unjustly, is directly applicable. The Shell Corporation's relentless conduct to grab Dr. Isaacs' property, well aware of his vulnerable condition and in contravention of the contractual mediation clause, epitomizes exploitation. Their knowledge of Dr. Isaacs' disability prior to initiating legal action underscores the willfulness of their exploitative intent. There is no doubt a judicial review of Mr. Baldor's litigation correspondence with Dr. Isaacs reveals a counsel that seemed to bask in causing distress to Isaacs, with sarcastic comments and other strategic efforts to wear down a disabled individual.

### Legal Implications and the Doctrine of Unclean Hands

The doctrine of unclean hands posits that a party seeking relief cannot have engaged in unethical, illegal, or inequitable behavior related to the subject matter of the claim. The egregious conduct of the Nevis/Guatemala Shell Corporation, in light of Sections 825.102 and 825.103, exemplifies such behavior, rendering their legal standing and the integrity of their claim questionable.

The exploitation and abuse of Dr. Isaacs, given his disabled status, not only constitute violations of Florida law but also materially breach the foundational principles of fairness and equity that embody the United States District Court. This conduct disqualifies the Shell Corporation from seeking or obtaining equitable relief from this Court.

### Precedent and Argument for Dismissal

The Nevis/Guatemala Shell Corporation's actions against Dr. Isaacs, characterized by abuse, exploitation, and direct harassment, fundamentally violate Florida's protective statutes for disabled adults and the equitable principles governing judicial proceedings. Their behavior,

indicative of unclean hands, precludes them from obtaining relief in this matter. Therefore, it is respectfully requested that this Court dismiss the Shell Corporation's complaint.

### Unclean Hands Doctrine Applies Equally to Keller Williams' Conduct

This Court docket also includes the removed state court complaint of Keller Williams Wellington, and a respective Motion to Remand. This motion to dismiss is predicated on the fundamental principle that equity must not aid the wrongful party. The actions leading to and subsequent behaviors of KW Wellington surrounding the "Exclusive Sale Agreement," and by extension, the "As-Is Sale Contract," exemplify conduct that disentitles either Counter-Plaintiff from seeking or obtaining any relief from this Court.

### Violation of the Telephone Consumer Protection Act (TCPA)

First, the "Exclusive Sale Agreement" was procured through egregious violations of the Telephone Consumer Protection Act (TCPA), wherein Dr. Isaacs, despite being duly registered on the Do Not Call list, received unsolicited communications from KW Wellington. Egregiously, this conduct happened as the ink was drying on a KW settlement in state court denying any violation of TCPA. This violation of federal law at the inception of their contractual relationship taints the entire proceedings with impropriety. The TCPA (47 U.S.C. § 227) serves to protect consumers from such unsolicited intrusions, thereby rendering any contract arising from such unlawful conduct unenforceable under the equitable doctrine of unclean hands. Put simply, the real estate contracts began with a TCPA violation; they are unenforceable as a result.

### Sherman Act Violation and Commission Structure

Secondly, the "As-Is Sale Contract" sought dual commissions for KW as dual buyer's and seller's agents. Both of these commissions were recently adjudicated to constitute Sherman Act violations, in the landmark "Sitzer verdict." This adjudication unequivocally establishes that such

commission structures constitute a violation of antitrust laws, thereby implicating KW Wellington in felonious conduct. Engaging in practices that have been found to contravene the Sherman Act (15 U.S.C. §§ 1–7) not only undermines the legality of the "Exclusive Sale Agreement" but also further establishes the unclean hands of KW Wellington, rendering any derived contracts, including the "As-Is Sale Contract," unenforceable.

### Unauthorized Legal Advice and Refusal to Cancel Listing

Thirdly, Dr. Isaacs' requests for cancellation of the MLS listing were met with refusal and unsolicited legal advice from Agent Nico of KW Wellington, who lacked the authority and licensure to provide such counsel. This behavior constitutes a breach of fiduciary duty and an unauthorized practice of law, violating Florida Statutes governing real estate and legal professions. The refusal to adhere to the client's explicit instructions and the provision of legal advice without licensure are indicative of KW Wellington's disregard for legal boundaries and ethical standards, further cementing their unclean hands in this matter.

### Derivative Nature of the "As-Is Sale Contract"

The "As-Is Sale Contract," though not formally involving KW Wellington as a signatory, is inextricably linked to the "Exclusive Sale Agreement" through the commission structure and the active involvement of Agent Nico. This linkage establishes the "As-Is Sale Contract" as a derivative contract, tainted by the misconduct associated with the "Exclusive Sale Agreement." The unauthorized alteration of contractual terms by Agent Nico, specifically the inclusion of "KW shall receive transaction agent fees 5%," constitutes a material and unlawful modification of the contract. This act not only represents an unauthorized practice of law, as it materially injected complex modifications into both contracts, but it also effectively merges KW Wellington's interests as a third-party joinder into the "As-Is Sale Contract," contaminating it with their unclean hands.

Given the foregoing violations and misconduct by KW Wellington, including TCPA violations, Sherman Act contraventions, unauthorized legal practices, and the derivative contamination of the "As-Is Sale Contract," it is appropriate for this Court to dismiss the Equestrian Complaint and all related actions with prejudice. With such numerous violations supporting the application of the unclean hands doctrine, it is clear that allowing the Equestrian Complaint to fester in either this Court or a state court would be against judicial economy.

## IV. ADDITIONAL CONTRACT DEFENSES

### Illegality and Unethical Practices in Contract Formation

The principles of contract law unequivocally hold that a contract formed under illegal or unethical circumstances is void *ab initio*. In the case at hand, the formation of the "Exclusive Sale Agreement" and the subsequent "As-Is Sale Contract" were marred by actions that violate both the spirit and letter of the law. Specifically, the initial procurement of the "Exclusive Sale Agreement" through a TCPA violation—unsolicited communications despite Dr. Isaacs's explicit listing on the Do Not Call registry—constitutes an illegal act that taints the inception of the contractual relationship. The TCPA violations are documented under the Court's TCPA Order, and hence the Court may take judicial notice of this uncontested evidence in adjudicating the Motion to Dismiss.

Further compounding this illegality, KW Wellington's imposition of a dual commission structure, recently adjudicated under the "Sitzer Missouri verdict" as a Sherman Act violation, embeds an element of illegality directly into the contract itself. This not only substantiates challenges to the contract's validity but also implicates KW Wellington in engaging in practices that are fundamentally opposed to the principles of fair competition and consumer protection.

The misconduct by the Nevis/Guatemala Shell Corporation and KW Wellington therefore directly impacts the enforceability of both contracts for several reasons: 1) Void Ab Initio:

Contracts formed under duress, through illegal means, or based on unethical practices are considered void from the outset. The involvement of both entities in such practices renders the contracts unenforceable. 2) Violation of Public Policy: Enforcing these contracts would contravene public policy aimed at protecting consumers and ensuring ethical business practices. It is against public interest to uphold contracts that are the product of coercion, deception, and legal violations. 3) Lack of Mutual Consent/Meeting of the Minds: The essence of contract law is the mutual consent of the parties involved. The tactics employed by the Nevis/Guatemala Shell Corporation and KW Wellington clearly are a departure from the contract signed by Dr. Isaacs. Specifically, Dr. Isaacs never agreed to convey title to an improperly formed offshore shell corporation, he never agreed to be sued for a year in violation of a Mediation Clause, and he never agreed to waive enforcement of felonious Sherman Act conduct. This undermines the very basis of contract formation and enforceability. This contract, and the underlying conduct by the Counter-Plaintiffs, renders the contracts unenforceable.

In light of the direct linkage between the misconduct of the Nevis/Guatemala Shell Corporation and KW Wellington and the enforceability of the contracts in question, this Court is urged to dismiss the complaint. Upholding contracts tainted by such egregious behavior would fail to serve justice. By dismissing the complaint, this Court will affirm that contracts born out of and tainted by illegal and unethical practices are not worthy of enforcement.

### V. FURTHER REASONS FOR IMMEDIATE DISMISSAL

**Immediate Dismissal is in the Interest of Judicial Economy**

Granting this motion would render moot the Counter-Plaintiff's pending motions to remand and dismiss the underlying complaint. This Court should not dedicate resources to the Motion to Remand, because the Nevis/Guatemala Shell Corporation has unclean hands and absolutely no

standing in either court. Remanding this case back to state court would serve only to further delay resolution of a matter that is ripe for dismissal, subjecting Dr. Isaacs and his partner to even more prolonged abusive litigation. Should the Equestrian Complaint not be dismissed and work its way back to a state court, it could significantly impede the application and enforcement of international treaties and law concerning war-affected persons, such as Dr. Isaacs and his partner. The invocation of the *force majeure* clause in this context is not merely a contractual technicality but a substantive legal mechanism that addresses the reality that international treaties recognize and seek to ameliorate. The federal court system, with its inherent capacity to interpret and apply international law, stands as the most appropriate forum to adjudicate matters entwined with such global considerations. A denial of this motion and potential subsequent remand to state court risks sidelining crucial international legal application.

Federal courts are vested with the responsibility to efficiently manage their dockets and to avoid unnecessary expenditures of judicial resources. Continuing the litigation of a case that clearly lacks merit due to the valid invocation of a contractual *force majeure* clause contradicts this responsibility. It is in the interest of judicial economy to dismiss the case now, rather than engage in further procedural formalities that do not alter the case's inherent deficiencies.

To further promote judicial economy, Plaintiff hereby notices the Court that upon granting this motion and dismissing the Equestrian Complaint with prejudice, the Court may subsequently dismiss the entirety of his underlying claims against Equestrian pursuant to FRCP 41(a)(1). Evidencing the year of abuse he suffered at the behest of the controllers of the Nevis/Gautamala Shell Corporation, Dr. Isaacs wants nothing to do with these individuals ever again. Even if this means forsaking substantial civil claims, Dr. Isaacs regards the Offshore Shell Company controllers as careless or dangerous individuals, and believes Rule 41 invocation would be appropriate.

**The Court May Issue a Declaratory Judgement on Liquidated Damages and Attorney's Fees**

In adjudicating the dismissal of the Equestrian Complaint, this Court is positioned to render a declaratory judgment concerning the stipulations for liquidated damages and attorney's fees as delineated within the "As-Is Sale Contract" attached to Equestrian's Complaint. According to the contract, a sum of $550,000 in liquidated damages is designated to the seller in the event of a contractual breach, in addition to a reimbursement for attorney's fees, which have accrued to exceed $86,000 to date.

The breach by the Nevis/Guatemala Shell Corporation is manifest and scarcely open to contention. Notably, the Counter-Plaintiff initiated legal action against Dr. Isaacs in state court prior to the expiration of the *force majeure* clause's mandatory thirty-day waiting period, thereby contravening the contract's Mediation Clause. It follows that the application of $550,000 in liquidated damages is both reasonable and justified in light of the prolonged, one-year duration of litigious actions that preempted the contractual mandate for mediation.

Furthermore, the intricate shell corporate structure employed by Equestrian, characterized by multi-level foreign ownership, fictitious business addresses, and shell company filings, rightfully aroused suspicion of potential malfeasance, including international money laundering or other illicit endeavors. This scenario undeniably justifies any seller's hesitancy to proceed with property transactions under such dubious circumstances. In the context of Know-Your-Customer regulations, the submission of a fictitious corporation filing alone constitutes adequate grounds for refraining from contract closure.

Consequently, based on the clear and unambiguous terms of the contract, the Nevis/Guatemala Shell Corporation is indebted to Dr. Isaacs for liquidated damages and attorney's fees totaling $636,000. Underscoring Dr. Isaacs' resolve to sever all ties with this illegitimately

filed corporate non-entity and its unprincipled legal representatives, and expressing a preference for finality and resolution over prolonged litigation, Plaintiff is willing to abide by any damage award determined by this Court within the sum of zero to $636,000. By doing so, Dr. Isaacs thereby consents to the full discretion of this Court.

Therefore, it is respectfully requested that this Honorable Court employ its judicial discretion to adjudicate the assignment of damages and fees within the aforementioned range. Such a determination will not only affirm the contractual agreements between the parties but also serve to rectify the injustices endured by Dr. Isaacs and his partner due to the Nevis/Guatemala Shell Corporation's breach of contract and subsequent unethical litigious conduct.

### Rights of War Impacted Persons/Displaced Persons/Refugees to Timely Justice

Dr. Isaacs and his partner, as persons affected by war and invoking a *force majeure* clause as a direct consequence of these events, have a right to timely justice. The United States is party to countless treaties and obligations, too numerous to list, that require a United States District Court to promptly uphold relief such as *force majeure* invocation. This is a case of justice delayed being justice denied. The Plaintiff has already endured a year of abusive litigation at the behest of a lawyer for a corporation that doesn't properly exist under Florida law. The protracted delays and the Offshore Shell Corporation's attempt to remand the case only exacerbates the Plaintiff's distressing situation, effectively denying timely and fair resolution. Such delays are particularly egregious when considering Dr. Isaacs' status as unemployed and disabled, and the urgent need for resolution in cases involving individuals impacted by conflict. Dismissing the case now, rather than entertaining dilatory tactics to remand it, upholds the principles of timely justice and prevents further abuse of the judicial process.

## CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that the Court dismiss the Equestrian Complaint for lack of standing, on the grounds of unclean hands and other defenses to contract formation and enforcement, and for failure to state a claim upon which relief can be granted. Given the deficiencies in the allegations, the Equestrian Complaint does not provide sufficient factual matter that, even if accepted as true, would provide any relief to Counter-Plaintiff, an offshore shell corporation. Because amendment would be futile, this Court should dismiss the Equestrian Complaint with prejudice, in the interests of judicial economy.

Respectfully submitted, this 4th day of March 2024.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff

*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
Manchester, NH 03105
Ph. 603-622-8100
keith@awplegal.com

**CERTIFICATION UNDER LOCAL RULE 7.1(a)(3)**

Pursuant to Local Rule 7.1(a)(3), on March 1, 2024 counsel for Equestrian Palms LLC declined to assent to this motion despite multiple attempts to resolve the matter in lieu of filing this motion.

**CERTIFICATE OF SERVICE**

I, Ayelet Faerman & Keith Mathews, do declare as follows:

I certify that a copy of the foregoing MOTION TO DISMISS was served upon all parties by ECF, in accordance with applicable FRCP and Local Rules.

Executed on this 4th day of March 2024.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.

/s/ Keith Mathews
Keith Mathews