Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

Keith Mathews
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
603-622-8100
keith@awplegal.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS<br>on behalf of himself and all others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>KELLER WILLIAMS REALTY, INC.,<br>MAKAI SOUTHEAST, LLC,<br>KCK DEVELOPMENT, L.L.C.,<br><br>Defendants. | Case No. 23-cv-81393-DSL-BER<br><br>SHERMAN ACT & TCPA<br>CLASS ACTION<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF**<br><br><br>DEMAND FOR JURY TRIAL |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

## FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF

### I.      INTRODUCTION

1. This case concerns events surrounding a Florida resident's real estate interactions with Defendant Keller Williams Realty, Inc. and their local subsidiary, Defendant Makai/KW Wellington. In September 2020, Plaintiff hired KW Wellington as the buyer's agent to purchase his home. About two years later, a different agent at KW Wellington cold-called Plaintiff, seeking to serve as the seller's agent for the potential sale of his home.

2. Florida has attracted record net migration in recent years, resulting in Florida residents being the unfortunate recipients of up to thirty cold-call and text message solicitations *per month* to list their homes for sale. Rogue, independent real estate agents do not carry out these calls. Instead, they are actively encouraged and even provided technological campaign platforms to execute these violations by the largest real estate corporation in the world, Defendant KWRI, and its local franchise subsidiaries.

3. These mass campaigns are not only annoying; they violate two Federal laws. First, the campaigns are carried out with an underlying aim to violate the Sherman Act and obtain a 6% bounty on the value of the homeowners' property. Second, the Telephone Consumer Protection Act and The Do-Not-Call Implementation Act of 2003 made it illegal to engage in any unwanted telephone campaign that collectively caused economic harm to the nation by reducing efficiency and tying up the communications networks.

4. In December 2023, KWRI settled a Missouri *Sitzer* Sherman Act class action before any judgment after a guilty jury verdict. Similarly, it settled the *Deshay* TCPA class action in Florida, preventing a ruling on its merits. These partial settlements left many individuals,

like the Plaintiff and the class members of this case, who seek redress and corrective measures under the Sherman Act and TCPA.

5. This class action is brought under the Sherman Act of 1890 (15 U.S.C. §1-2) and the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227(c). It serves to remedy the widespread breach of the FCC's do-not-call rule perpetuated by the Defendants, whose continued conduct seeks to illicitly obtain between 6% and 12% of Florida resident's life savings when they buy and later sell their primary home.

## II.   **JURISDICTION AND VENUE**

6. This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, which provide the legal basis for addressing violations of the United States antitrust laws. Additionally, jurisdiction is asserted under 28 U.S.C. § 1331, granting the Court original jurisdiction over actions arising under the laws of the United States, including the Telephone Consumer Protection Act ("TCPA"), and under 28 U.S.C. § 1337, concerning federal laws regulating commerce against restraints and monopolies. The Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), supports jurisdiction due to the controversy exceeding $5,000,000 and the diversity of citizenship between class members and Defendants.

7. Diversity jurisdiction applies pursuant to 28 U.S.C. § 1332 because damages exceed $75,000 and KCK Development LLC is a Maryland corporation.

8. Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants do business in this District, and a substantial part of the events or omissions that give rise to the claims occurred within this judicial district.

### III.    **PARTIES**

9.   Plaintiff Doctor Jeff Isaacs ("Dr. Isaacs") resides under Florida Homestead Laws in the Homeland Equestrian Community, part of Palm Beach County.

10.  Defendant Keller Williams Realty, Inc. ("KWRI" or "Keller Williams") is a Texas corporation headquartered at 1221 South Mopac Expressway Suite 400, Austin, Texas 78746. Keller Williams is the world's largest real estate franchise by agent count and has more than 1,100 offices and 191,000 agents. Defendant is the largest real estate company in the United States as measured by units sold and total revenue volume. Per their website, KWRI is "a technology company." KWRI "provides the real estate platform that our agents' buyers and sellers prefer." Keller Williams technology offerings include tools like "Landvoice," allowing agents to engage in mass marketing campaigns with potential clients and homeowners. Their offerings also include training using their proprietary platforms and compliance regulation education. These "technology" tools and training devices are well documented on their website. They were alleged to promote TCPA violations in the *DeShay vs. Keller Williams* Class Action that settled in 2022. The website and the class action docket from Indian River County Nineteenth Circuit Florida are referenced and incorporated herein for further background.

11.  Defendant Makai Southeast, LLC ("Makai" or "KW Wellington") is a limited liability company organized under the laws of the state of Florida with a principal address of 1400 Corporate Center Way, Second Floor, Wellington, Florida 33414 and a registered agent, Michael A. Menchise, Esq. at the same address. Makai also has a d/b/a/ Keller Williams Realty Wellington. Makai and KWRI are collectively referred to as "KW Defendants" in this Complaint for clarity and brevity, when applicable.

12. Defendant KCK Development, L.L.C. ("KCK") is a Maryland limited liability corporation. Its principal address and place of business is 2305 Philadelphia Ave, Ocean City, Maryland 21842. It operates equestrian facilities at 11491 Key Deer Circle, adjacent to Plaintiff's residence. Based on information and belief, the LLC structure is an estate inheritance tax structure to benefit an LLC member's daughter, a Florida resident active in the equestrian community.

## IV.   FACTUAL HISTORY

13. The plaintiff's Pennsylvania area code mobile telephone has continuously been on the National Do Not Call Registry since 2008. The mobile phone is his phone and qualifies as a residential line pursuant to TCPA.

14. Despite this, on August 2, 2022, Plaintiff received a text message communication from a previously unknown Keller Williams agent:

> *"Hello Jeffrey good morning, this is Nico. I have been trying to reach you to talk about your house in your homeland."*

15. The messages continued through December 14, 2022:

> *"The market is going down, and I think to get it on the market, with all of my marketing strategies that I use with my team, that are very aggressive, would be very beneficial."*

16. Agent Nico engaged in aggressive marketing language and strategy, including "listing your home in The New York Times National Real Estate section" and "blasting all over high-end databases." During this period, Plaintiff actively listed his home on Zillow.com but continued to accept calls from KW and answer questions about his home. Given the

strength of the local real estate market, Plaintiff had hoped to avoid paying a 6% commission through a For Sale By Owner("FSBO") listing on Zillow.

17. Plaintiff had been testing the waters of the FSBO market, partially because of an emerging dispute with Defendant KCK. Having never met or spoken, KCK's representative telephoned Plaintiff in March 2022 and unilaterally informed him of KCK's plans to demolish Plaintiff's fence, claiming about one-half acre of his land.

18. The fence KCK wished to move had been installed about forty years prior. An industrial-grade sprinkler system, now operated by Plaintiff, had been irrigating the disputed land for at least thirty years. That is because a large tree, at least thirty years old, was planted there by Plaintiff's predecessor. The MLS listing published when Plaintiff purchased the property delineated this land as part of the property. Moreover, the photos in the MLS listing of KCK's property, purchased in 2019, had no pictures or evidence of this disputed zone being part of that property. Interviews with neighbors and follow-up emails from the prior owners, the Eisen family, confirm that the fence and enclosed ½ acre of property were openly regarded as belonging to the Eisens for forty years.

19. The plaintiff informed KCK that destroying his longstanding fence would be vandalism and theft of property. Moreover, Plaintiff notified KCK that he was undergoing severe medical tests and was disabled and requested he defer the matter in light of his worsening health. KCK refused. In April 2022, Plaintiff sent KCK applicable case law and requested KCK seek declaratory judgment and "proper legal channels" before proceeding with any "land grab."

20. Plaintiff never heard back from KCK and hoped they had abandoned plans to annex his property.

21. On Thanksgiving 2022, Google LLC suddenly terminated OkCaller.com, a website Plaintiff developed and operated. The website had been a top-ten Google phone search provider, serving over three hundred million people. This was Dr. Isaacs' primary career and source of income because his medical career has been indefinitely delayed due to inconsistent legal proceedings concerning an acquittal he received in 2007 and inter-related medical disability. The matter is thoroughly documented in a pending subpoena quash motion incorporated herein.

22. There exists reasonable and legitimate concern that both events, the improper annexation, and the Google termination, stem from the same source. Plaintiff was involved in over a decade of complex litigation regarding a federal settlement agreement that acquitted, annulled, and sealed/expunged a prior allegation and controversy. Diverging competent authorities has resulted, typically quoting outdated legal pleadings and perpetually re-opening the settled and acquitted controversy. This has caused severe, long-term consequences for the Plaintiff, including real and perceived federal witness retaliation. Former AUSA Mark Josephs spent years seeking a declaratory judgment that would prevent such occurrences.

23. In this case, KCK had owned the property for over two years, co-existing with their neighbors, the Eisen Family. Only after Plaintiff moved in did KCK claim rights to this land. Therefore, it seems plausible and likely that KCK obtained disputed information about Plaintiff and felt they could engage in a land grab. Similarly, Google has no explanation for its sudden action against Plaintiff. The link may be something that, oddly, KWRI raised in their Motion to Stay: well-publicized antitrust litigation that discussed the acquitted allegations. KWRI has refused to retract inaccurate, scandalous information in

the filing, vehemently arguing that it is somehow relevant to this lawsuit. During the first Status Conference, KWRI summarized this case by only mentioning the acquitted allegations; KWRI Attorney Stelter claimed that it provided a necessary "taste" of the Plaintiff's case.

24. Having lost his second promising career, the plaintiff reasonably entered a state of duress after Google's adverse action. It became apparent to Plaintiff that the decades-old dispute effectively and wrongly precluded him from having almost any career and prevented him from constructing a planned aviary on now-annexed land.

25. On December 14, 2022, Plaintiff agreed with Agent Nico's request to list his home, and Makai entered into an Exclusive Sale contract to sell his Homeland property. Selling an FSBO home on Zillow had proven futile, as FSBO listings were relegated to a seldom viewed section of their website.

26. Just two weeks after signing the Exclusive Sale agreement, around January 1, 2023, Plaintiff arrived home to the shocking scene of his fence town down and a half-acre of his property annexed by KCK. Plaintiff telephoned the Lake Worth Police Department and the Palm Beach Zoning Department. KCK had obtained a county permit to move the fence but omitted any disclosure that they did not own or have rights to the fence being moved. Moreover, KCK failed to display the permit prominently, as required by law. Hence, the Plaintiff's shock and surprise caused a police officer to ask him if he needed transport to a hospital. Both the police and county deferred the matter to this civil litigation.

27. Plaintiff promptly informed Agent Nico of the KCK matter and asked him to remove the MLS listing because he felt it was improper to sell a home with a disputed boundary. Agent Nico, evidently interested in a fast sell, advised Plaintiff that there was no genuine dispute

and that KCK owned the fence and annexed land. This advice constituted unauthorized legal counsel.

28. Plaintiff asked Agent Nico to refer the matter to Makai and KW legal because they had changed their position: In 2020, as the Buyer's Agent, they endorsed the MLS listing and fence boundary diagrams as part of Plaintiff's lot when they sold Plaintiff their home.

29. Agent Nico clearly understood the conflicting positions and advised Plaintiff that KW was "sloppy" and negligent during the 2020 purchase of his home. However, he asserted that KW/Makai had no liability per waivers signed during the home purchase. The plaintiff's best bet was to "sell the property quickly," according to Agent Nico. At that point, Plaintiff began to wonder what exactly merited KW Defendants to a 12% commission when they didn't locate the buyer (Plaintiff found it online) and waived all due diligence liability.

30. Makai correctly advised the 2020 transaction. There was no mistake in the Seller's MLS listings; therefore, there was no negligence on Makai's behalf. Agent Nico's assertion that Makai was negligent during the 2020 sale was incorrect legal advice.

31. An obvious tension transpired between KW Defendants and Plaintiff at that point, and Plaintiff asked Agent Nico to remove the listing on no less than three occasions. It seemed Makai legal had advised Nico and pushed him to sell the home. About two weeks later, Agent Nico secured an offer from Equestrian Palms LLC, which Plaintiff accepted under duress. The sale price, uncontested by all parties, was nearly $1 million below market value. The KW agent engaged in the practice of law by modifying the sale contract to include a waiver that KW was a "transaction agent" to receive dual commission and by offering advice on the fence dispute. This material modification by a real estate agent – rather than a lawyer – constituted an illegal practice of law. The plaintiff signed the

agreement due to this coercion and underlying duress. The next day, Nico informed Plaintiff that Equestrian Palms' owner would be staying with him in Homeland that weekend and that they stood to make "millions" from the sale.

32. When Plaintiff's partner learned of the sale, she objected. A natural-born citizen of a former USSR state, she and Plaintiff maintain an apartment in her home country, about eighty miles from an active war zone. Because the war was escalating in severity, Plaintiff's partner felt unsafe vacating their Florida home.  As a result, Plaintiff executed the *force majeure* clause of the sale contract with Equestrian.

33. The sale contract had a "Mediation Provision" requiring mediation to be concluded *before* filing lawsuits and an "Arbitration Clause" requiring arbitration for commission disputes. Ignoring contractual obligations for mediation and arbitration outlined in the Exclusive Sale Contract, Makai prematurely filed a lawsuit demanding a 5% commission. This legal action was initiated despite the Plaintiff's activation of a force majeure clause due to escalating military conflicts impacting his family. On multiple occasions, over a six-month period, KW Wellington acted as if there was no force majeure event and sent Plaintiff threatening communications to abandon his home.

34. KW Defendants made no *bona fide* effort to further clarify Plaintiff's April 2023 written notice of disruption from *force majeure*. Plaintiff and Equestrian Palms have subsequently settled their dispute via an Addendum to the Sale Contract (Exhibit B). Therefore, at the time of filing this Complaint, Makai has refused to drop a commission lawsuit for over one year despite there being *no buyer.* While an abuse of process claim is not pled in this SAC, Plaintiff nonetheless asserts Makai's actions are abusive and in violation of the spirit of their Exclusive Sale contract.

**The Sherman Act Antitrust Matter**

35. There exist additional factors, beyond the current housing inventory shortage, motivating Keller Williams' nationwide cold-call campaign, effected through their agents, like Agent Nico, and subsidiaries like KW Wellington.

36. In the United States, realtors typically are allocated 6% of a transaction sale in the form of commission. This is a supra-competitive price, in terms of antitrust theory. This is particularly relevant in the Southern Florida district, where many retirees move and invest their life savings into a retirement home. In the case of retirees, a second sale often takes place when downsizing or transferring a home to family. Thus, 12% of a Florida retiree life savings is allocated, through supra-competitive commissions, to entities like the KW Defendants through as few as two thirty-minute showings.

37. In competitive foreign markets, home buyers pay their brokers, if they choose to use one, and they pay far less than half the rate paid to buyer brokers in the United States. These international markets include United Kingdom, Germany, Israel, Australia, and New Zealand. In these markets, which are not affected by any policy like the Adversary Commission Rule, buyer brokers are paid by home buyers, rather than home sellers. According to the Executive Director of the Consumer Federation of America, total commission rates in "a number of developed countries" range "between 1% and 4%" whereas in the United States the average total commission rates continue to remain between 5% and 6%, which is "no lower than it was in 2001" despite significant advances in technology. Indeed, a 2015 report, commissioned by NAR to study negative emerging trends in the real estate industry, highlighted concerns that total commissions in the United States are inflated compared to international markets, such as the United Kingdom,

Singapore, the Netherlands, Australia, and Belgium. According to the report commissioned by NAR, in those countries the average total commissions ranges between 1% and 3%. In parts of the United Kingdom where valuations are similar to Southern Florida, transaction fees are as low as 0.75%.

38. In terms of antitrust injury, the economic losses from these milestone transactions appears to be precisely why the Biden administration is taking a fresh look at KW Defendants' commission structure. Just hours after the filing of this lawsuit on October 16, 2023, Wall Street Journal and Bloomberg reported that the Department of Justice is seeking to challenge the 6% commission through undoing a Trump-era DOJ agreement with the National Association of Realtors (Exhibit A).

39. On October 31, 2023 the Western Missouri United States District Court reached a landmark class-action verdict to plaintiffs challenging the commission charged by Keller Williams and similar actors (Exhibit A). That case designated class members subjected to a 6% commission between 2015-2019 in Missouri.

40. Both the Missouri case and the recent Department of Justice news concern the so-called Adversary Commission Rule, a 6% commission from what essentially amounts to an historical relic now exploited by Realtor firms. The 'Adversary Commission Rule' requires sellers to offer a non-negotiable, inflated buyer broker commission upon listing in their local Multiple Listing Services (MLS) database. The Missouri case has now proven (Exhibit A, Complaint Paragraphs 3-28) how the Adversary Commission Rule works, and how the Keller Williams Defendants work with co-conspirators, including the NAR, to monopolize local MLS listings and obtain supra-competitive commission. These findings

are incorporated herein for the respective MLS for Southern Florida, which is known as BeachesMLS.

41. KW Defendants, leveraging their influence over BeachesMLS, impose this rule to maintain market control, impede competition, and systematically overcharge Florida home sellers, in a manner identical to the practices they were found guilty of in Missouri.

42. Indeed, there is no material difference in between Keller Williams proven role in conspiring with Missouri MLS between 2015 and 2019, and their role in the same conduct with BeachesMLS between 2019 and today. Hence, Keller Williams has violated Sherman Act in Southern Florida with prospective home sale transactions on BeachesMLS.

43. Upon information and belief, at time of filing this lawsuit, no class action represents South Florida residents who were subjected to supra-competitive commissions on BeachesMLS through the proven co-conspiracy with the Keller Williams Defendants during the applicable time period (2019-2023).

44. Plaintiff and class members thus hereby allege against Keller Williams Defendants for conspiring to force home sellers to pay an unreasonably inflated buyer's broker commission as conditional for listing on BeachesMLS, in violation of federal antitrust law. As a co-conspirator with specific knowledge of any apportionment of damages, Keller Williams may be found responsible for damages to the entire class in the event they waive cross-complaint in their Answer.

45. Compliance with NAR and the mandated rules among associated brokers and affiliates dictate market participation in BeachesMLS, adversely affecting the competitive landscape. Plaintiff and class members detail the sustained anticompetitive behavior perpetuated by KW Defendants, emphasizing the parallels between the manipulative

practices within the BeachesMLS and those actions previously investigated and litigated against NAR and Keller Williams. The systemic elevation of commission rates, stemming from the Keller Williams Defendants' orchestrated rules, mirrors what was previously proven in Missouri Complaint Paragraphs 37-141. KW Defendants are hereby alleged to have engaged in the respective conduct with BeachesMLS that they were determined to have engaged with Missouri MLS.

46. As alleged, Plaintiff first sought to list his home on Zillow as a For Sale By Owner (FSBO) listing to avoid paying a 6% commission. To his dismay, since 2021 Zillow had relegated FSBO listings to a section of Zillow that was viewed by less than 1% of potential buyers. This resulted in Plaintiff being unable to sell his home on Zillow, despite a strong demand for houses in Florida. It was at this point – after numerous cold calls by the Keller Williams Defendants – that Plaintiff entered into the exclusive listing contract of adhesion.

47. Zillow's policy of segregating FSBO listings significantly limited Plaintiff's ability to independently sell his property. This segregation policy was upheld in the Rex v. Zillow case, where the court found no sufficient evidence of Zillow's conspiratorial involvement in listing restrictions.

48. Put differently, internet technology has enabled all sorts of newly efficient transaction marketplace platforms, starting with eBay for the sale of used goods, and Amazon with books, and later, consumer products. Keller Williams, as a "technology company," would be ideally positioned to offer a home sales platform with competitive transactions rates perhaps as low as England's 0.75%. In contrast, it appears the main technology KW Defendants develop are platforms to exploit and maintain their supra-competitive commissions through aggressive telemarketing campaigns. They do so by lobbying local

MLS to prevent real technology startups, like Zillow, from "co-mingling" and mitigating a broken MLS system. Given their critical mass of listings, it is impossible for an innovative technology startup to democratize the industry with a "disruptive" technology such as a fair-priced real estate listing service.

49. As such, this Complaint asserts two alternative claims under the Sherman Act to redress the untenable situation South Florida residents face in selling a home. First, the Complaint asserts a novel (and first-to-file) claim under *Aspen* precedent for exclusionary conduct against competing listing services. Under this claim theory, the Keller Williams Defendants restrain trade by preventing competitors, whether it be Plaintiff, a class member, or a start-up, from offering "competing" sales services and listings.   The Complaint's second Sherman theory challenges the Adverse Commission Rule as applied to BeachesMLS listings since 2019, using verbatim relevant market and claim language from the now-proven Missouri *Sitzer* verdict.

50. Accordingly, the relevant service market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with access to BeachesMLS. KW Defendants' control with co-conspirators and/or influence of the BeachesMLS allows KW Defendants to impose the Adversary Commission Rule and other anticompetitive NAR rules on Class members and other market participants. Access to BeachesMLS is critical for brokers or FSBO individuals to compete and to assist home buyers and sellers in the areas in which BeachesMLS operates.

51. The relevant geographic markets for the claims asserted herein are no broader than the geographic areas in which the BeachesMLS operates. Nearly all homes sold in this geographic areas are listed on the MLS by brokers that are subject to the MLS and NAR

rules and standards. The residential real estate business is local in nature. Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or affiliated sales associates located reasonably near the seller's property.

52. The Keller Williams Defendants and BeachesMLS co-conspirators have market power and monopolize the relevant service market for Southern Florida. Well over 65% of homebuyers source their home through BeachesMLS listings, through fellow brokers or services like Zillow or NAR or co-conspirator managed websites. Keller Williams, as the largest national and local broker, has significant influence over BeachesMLS and local NAR policies. If the KW Defendants encouraged an open BeachesMLS to allow co-mingling, they would succeed. Moreover, as a "technology company," they could offer their own competitive listing website. As such, it is not necessary to name BeachesMLS in this Complaint, because Keller Williams independently acts to restrict interstate commerce and/or exploit the BeachesMLS listing monopoly that they participate in and conspire with. Keller Williams Defendants shall have waived damages apportionment should their Answer waive any cross-complaint.

53. KWRI, as the franchisor, maintains comprehensive control over its franchisees, including Makai, dictating operational practices, marketing strategies, and compliance protocols, which includes the enforcement of TCPA regulations among others. This control extends to the training and actions of agents like Nico, whose conduct in sending the unsolicited text messages was governed by protocols established by KWRI.

54. Upon information and belief, Keller Williams operates a "hybrid" franchise model, where agents like Nico make direct payments to KWRI to become "Authorized Agents" of the

firm. Agent benefit from the brand recognition of KWRI more so than the local franchise itself, and hence are willing to pay a significant fee to KWRI for affiliation.1 Referral bonuses are even coordinated and transferred between franchises by KWRI HQ.

55. KWRI has entered into numerous settlement agreements, such as *Deshay* and *Sitzer*, where vicarious liability was alleged. KWRI has actual and/or apparent authority over its agents and franchisees, as it reserves the right to revoke affiliation or otherwise enforce its rules to protect its brand. KWRI's lax enforcement of TCPA policies, and its anticompetitive conduct under Sherman both invoke vicarious liability for this class action. The exact mechanisms the firm employs, contractual or otherwise, for agency control shall be elucidated during discovery.

## **Putative Class Definitions**

56. Plaintiff brings this proposed class action pursuant to Fed. Civ. P. 23(b)(1), (2), and (3).

57. Plaintiff brings this action on behalf of himself and the following nationwide classes, for monetary and injunctive relief based on violations of Sherman Act or TCPA :

> *- All persons who, from four years prior to filing of this Complaint through the present, used a listing broker affiliated with Keller Williams Realty Inc during the sale of a home listed on BeachesMLS, and who paid a commission to the buyer's broker in connection with the sale of the home. (BeachesMLS class)*

---

1 See Stanford GSB Case Study discussing the KWRI model,
https://www.researchgate.net/publication/228147670_Keller_Williams_Realty_A

> *- All persons who, from October 18, 2021 through the present, attempted to sell an FSBO home on Zillow or other court-approved MLS platform, and received below market value pricing of their home, or failed to sell. (FSBO class)*
>
> *- All United States persons on the National Do-Not-Call Registry who received calls and/or text messages from Keller Williams Realty Inc or its agents. The relevant timeframe is four years prior to filing of this Complaint through Class Certification date. (The TCPA class)*

58. Excluded from these proposed classes are the KW defendants; KW defendants' affiliates and subsidiaries; KW defendants' current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

59. **Numerosity:** The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but a previous class action against Keller Williams for TCPA violations identified during discovery hundreds of millions of dollars of warranted TCPA fines and settled for $40 million. Over a year has transpired since that case settled, and similar numerosity is alleged to still exist, thus individual joinder in this case is impracticable.

60. **Commonality:** Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed classes. These include, but are not limited to: a. KW Defendants willful violations of TCPA directed at each class member; b. KW Defendants willful violations of Sherman Act; c. Whether plaintiff and members of the proposed classes are otherwise entitled to any damages, including treble damages, or restitution, and to their attorney fees, costs, and expenses related to any recovery of such

monetary relief; and h. Whether plaintiff and members of the proposed classes are entitled to any damages, including treble damages, or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

61. **Typicality:** Plaintiff's claims are typical of the claims of the members of the proposed classes. The factual and legal bases of KW Defendants' liability are the same and resulted in injury to plaintiff and all of the other members of the proposed classes.

62. **Adequate representation:** Plaintiff will represent and protect the interests of the proposed classes both fairly and adequately. Plaintiff retained counsel able to engage, and experienced with, complex litigation and class actions. Plaintiff has no interests that are antagonistic to those of the proposed classes, and do not conflict with the interests of the proposed class members.

63. **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the defendant. Certification of Plaintiff's proposed classes would prevent these undesirable outcomes.

64. **Injunctive and declaratory relief:** By way of its conduct described in this complaint, KW Defendants have acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

65. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available

methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

### V.   VIOLATIONS ALLEGED

#### COUNT I
**TELEPHONE CONSUMER PROTECTION ACT, U.S.C. 227(c)**

**(Defendants Keller Williams and Makai,
On Behalf of Plaintiff and the TCPA Class)**

66. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the common introductory sections (¶1-64) of this Complaint as if fully set forth herein.

67. Defendants Keller Williams and Makai sent unsolicited text messages to the Plaintiff to procure commercial business, despite him being on the Do-Not-Call list. Similarly, the KW defendants placed telephone calls of a similar nature to Plaintiff's 610 area code mobile telephone. The sole purpose of the calls and texts was solicitation of realtor agency fees. It was a telemarketing campaign directed at Plaintiff. Plaintiff had no prior business relationship with Agent Nico, and had never met him. To the extent Plaintiff had transacted with KW years prior, it was with a different agent and beyond the 18-month requirements of TCPA. Agent Nico had no rights to that agent's prior business relationships, under

standard KWRI norms and protocols, where each Agent is considered an "Independent Office."

68. During the timespan of August through December 2022, Agent Nico sent at least thirty SMS messages in an attempt to win an Exclusive Sale Contract, and ultimately, a commission. During this timeframe, a business relationship between the parties was not possible, because Plaintiff was listing his home for sale on Zillow, without a realtor.  KW rules do not allow a seller to list FSBO while retained in a business relationship with an agent. Even if they did, it would be exceedingly rare, and that was not the case here.

69. The Statutory language of the TCPA provides for a private right of action for violations:

> "A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State- (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or (C) both such actions."

> "If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph." 47 U.S.C. § 227(b)(3).

70. "[A]n act may be 'intentional' for purposes of civil liability even if the actor lacked actual knowledge that [their] conduct violated the law." *Jerman v. Carlisle, McNellie, Rini, Kramer*, 130 S. Ct. 1605, 1612 (2010). *See also Kolstad v. American Dental Assn.*, 527 US

526, 549 (1999) (holding that willful violations can be found where a defendant acts with "careless" or "reckless" disregard for federally protected rights).

71. Such calls and text messages are in violation of the FCC's do-not-call list, rules that exist pursuant to the TCPA. The nature of the KW Defendants' conduct towards the Plaintiff implies that they have conducted these violations in a widespread manner.

72. Defendant KWRI, through its operational control and oversight of its franchisee, Defendant Makai, is vicariously liable for the unauthorized solicitations. The actions of Agent Nico, employed by Makai but operating under the policies, procedures, and direct influence of KWRI, directly resulted in violations of the TCPA. This relationship and the control exercised by KWRI over its franchisee's business practices, including compliance with federal regulations, render KWRI vicariously liable for the TCPA violations alleged herein.

73. The KW Defendants made these calls with careless or reckless disregard that their conduct violated the law. KW Defendants made these calls directly, encouraged them directly, and/or were responsible under the principals of vicarious liability and *respondeat superior*. Most importantly, the KW Defendents *benefit immensely* from ongoing violation of the TCPA. Prior TCPA settlements, such as *Deshay*, are routinely violated by KW Defendants within minutes of the ink drying. KWRI as an institution has no genuine intent to comply with TCPA, unless absolutely required to with lawsuits such as the present.

74. A heretofore unknown number of Americans have the same or similar claims against the KW Defendants and are entitled to the relief provided for by Federal Law.

## COUNT II

### BREACH OF CONTRACT

*(Against Defendant Makai/KW Wellington)*

75. Plaintiff restates, re-alleges, and incorporates by reference the common introductory sections (¶1-64) of this Complaint as if fully set forth herein.

76. Alternate Dispute Resolution (ADR) clauses such as Mediation and Arbitration Provisions are material components of a contract. They help streamline the judicial economy, and it is black-letter law that they must be enforced. In addition to helping maintain court docket economy, ADR serves important functions for the parties. Litigation is a stressful and expensive process, and a party might only contract if he/she is assured that unwanted litigation will be averted in the event of a dispute. In this present case, Plaintiff specifically negotiated for such ADR protection with Agent Nico.

77. Plaintiff has spent much of the past two years in litigation regarding matters that were required to be mediated. This resulted in significant monetary damages to be determined at trial. Plaintiff's health has suffered, and he has developed new-onset hypoglycemia immediately following the events in early 2023.  In fact, had mediation and or ADR taken place with any of the Defendants, likely two years of stressful litigation would have been averted.

78. ADR is not a trivial part of a contract. A party that files lawsuit when they have agreed to mediation and/or arbitration obligations is in material breach of the contract. This cannot be exempted by a jury or an appeal as it is black-letter law.

79. The Sale Agreement included a "*Force Majeure*" clause terminating the contractual duties if any party is "disrupted" by "an act of war." Plaintiff, and his partner, have been disrupted by the Ukranian-Russian war, and did not feel safe having their only apartment within 80 miles of an active international war zone. Makai was notified no later than April 2023 that Plaintiff had invoked the "Force Majeure" clause of the contract due to said disruption.

80. Makai was unwilling to accept the reality of the situation, namely, that 1) they had procured a contract illegally in violation of TCPA, 2) they had obtained the contract with pressure on a disabled Plaintiff to abandon his home and disregard a valid fence dispute, at a price $1m below market value, and 3) the worsening war in Russia/Ukraine disrupted the couple's life.

81. Makai was aware of Plaintiff's medical condition and litigation history, and attempted to leverage these matters, in violation of Florida Criminal Code Section 825. Such conduct also constitutes breach of contract via related covenants of good faith dealing.

82. Makai engaged in vexatious litigation, in breach of the contract's ADR and mediation clauses.

83. Defendant Makai filed lawsuits prohibited by the Arbitration and Mediation clauses. They attempted service of Plaintiff's relatives in at least three different states, on multiple repeat occasions, after being told Plaintiff does not live with relatives, but, as they know, lives in Homeland Florida. In one particularly egregious instance, they attempted to serve a relative of Plaintiff multiple times while he was undergoing chemotherapy. Such reasons, of course, are why contract parties agree to ADR, and this unfortunate harassment could have been easily avoided had Defendant Makai complied with the ADR obligation.

84. As such, Defendant Makai breached the very contract they seek to relentlessly enforce, through an ongoing state lawsuit they continue to prosecute, despite the buyer walking away months ago.

85. The contract itself was one of adhesion, and has numerous terms favorable to Makai, that Plaintiff was unable to negotiate. These include, for example, lack of liability for negligence, in the event Count IV (Adverse Position) does not succeed. Those terms of

adhesion must be stricken by a jury, and Plaintiff awarded for breach/negligence regarding the fence matter, should he not prevail in stopping the annex of his land.

86. Makai's actions, including their disregard for the contract's mediation and arbitration provisions and their aggressive litigation strategy, constituted a breach of contract. These actions failed to honor the fundamental principles of good faith and fair dealing required by Florida law.

## COUNT III

### VIOLATION OF THE SHERMAN AND CLAYTON ANTITRUST ACTS

### (15 U.S.C. § 1-2 & 15)

### *Against KW Defendants*

87. Plaintiff restates, re-alleges, and incorporates by reference the preceding common sections (¶ 1-64) of this Complaint as if fully set forth herein.

88. Plaintiff paid a buyer's agent commission of approximately 3% to Makai when he purchased his Florida residence in 2020. According the Makai, Plaintiff also owes a 5% dual commission for the failed sale of his home in 2023. Makai has been suing Plaintiff for this commission for over one year, despite the fact the transaction was terminated under force majeure and was an inaccurate listing due to the fence dispute.  Upon information and belief, KWRI receives direct and or indirect benefit and compensation from both buyer's and seller's agent fees. Accordingly, Plaintiff has standing and may represent the class for both fee types.

89. Plaintiff alleges that Keller Williams/KWRI and Makai engaged in monopolistic and exclusionary practices in violation of Section 2 of the Sherman Act, as reflected in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

90. Plaintiff's attempts to sell his home on the popular real estate platform Zillow were actively suppressed and effectively hidden from potential buyers by the exclusionary conduct of Keller Williams Defendants and their proven co-conspirators, signifying a concerted effort to eliminate competition and maintain monopoly power in the relevant real estate market.

91. KW Defendants' conduct, specifically their efforts to suppress efficient marketplace internet tools (e.g. their manipulation and control the visibility of listings on Zillow that are not part of its own network), constitutes willful maintenance and abuse of monopoly power with the specific intent to exclude competition from FSBO class members and Plaintiff, which mirrors the concerns recognized by the Supreme Court in *Aspen*.

92. KW Defendants' actions in suppressing Plaintiff's and FSBO class members listing had no business justification other than to impose a competitive disadvantage on Plaintiff and preserve its dominance in the residential real estate market.

93. By effectuating a decline in visibility and potential competitiveness of Plaintiff's property on Zillow, KW Defendants destroyed the chance of competition on the merits in favor of maintaining its market control, to the detriment of Plaintiff, FSBO class members, and the competitive process.

94. Similarly, an antitrust injury occurs from such conduct in the form of 1) higher transaction fees paid after failed FSBO listings convert to realtor listings, 2) delays and other inefficiencies in selling homes, and/or 3) inability to sell homes, for failed FSBO listings

that do not convert to realtor listings. Such injuries are of the nature protected by Sherman Act.

95. Defendant KWRI's acts of suppressing non-affiliated listings from platforms like Zillow violate 15 U.S.C. § 2 and have directly harmed Plaintiff by limiting the exposure of their listed property to prospective buyers, thereby hindering or preventing the sale through competitive means. Zillow, and other MLS sites run by co-conspirators, have a 65% respective national market share for persons looking to purchase homes and or home sale services, which constitutes a monopoly on these listings and the relevant market defined earlier. Nonetheless, the Supreme Court has made clear that for an *Aspen* claim, it is the exclusive conduct that is examined by a jury, rather than specific marketplace boundaries. Plaintiff and fellow FSBO Class members are competitors as defined by *Aspen* and excluded from their monopolized listings.

96. Alternatively, this conduct violates 15 U.S.C. § 1 because the Keller Williams Defendants and their yet to be identified partners conspired to impede interstate commerce by monopolizing real estate services and listings.

97. As a proximate result of KW Defendant's unlawful conduct, Plaintiff, FSBO class members, and the economy as a whole suffered antitrust injury, specifically in the form of reduced property exposure, hindered sales processes, and financial losses and inefficiencies due to a decreased ability to sell their property as anticipated within a competitive, open market. Such antitrust injury is precisely what Sherman Act seeks to redress, and has been estimated by various academic and legal journals to amount to staggering amounts, because a significant portion of national net worth is in homeownership.

98. Unable to effectuate an FSBO listing on Zillow, Plaintiff entered into a contract of adhesion with the Makai and/or the Keller Williams defendants, in which they had exclusive rights to sell his home for a period of approximately one year. That contract is invalid because of its status as a contract of adhesion.

99. Defendant KWRI's policies directly led to the suppression of competitive practices in the real estate market by enforcing rules that limit visibility of non-affiliated real estate listings, such as those on Zillow. This policy is enforced across all franchises, including Defendant Makai, significantly limiting competition and harming consumers by maintaining elevated commission rates as part of a broader strategy to monopolize the real estate market in violation of Sherman and Clayton Antitrust Acts.

**Missouri *Sitzer* Section 1 Verdict Applied to BeachesMLS**

100.    Beginning more than four years before the filing of this Complaint, and continuing into the present, KW Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act,15 U.S.C § 1.

101.    The conspiracy alleged herein consists of a continuing agreement among KW Defendants and their co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

102.    In furtherance of the contract, combination, or conspiracy, KW Defendants and their co-conspirators have committed one or more of the following overt acts:

    a. Participated in the creation, maintenance, re-publication, and implementation of the Adversary Commission Rule and other anticompetitive NAR rules; b. Participated

in the establishment, maintenance, and implementation of rules by local NAR and BeachesMLS that implemented the Adversary Commission Rule and other anticompetitive NAR rules in the areas in which BeachesMLS operates; and c. Requiring franchisees of the KW Defendants and others to implement the Adversary Commission Rule and other anticompetitive NAR rules in the areas in which BeachesMLS operates, which each KW Defendant does through its franchise agreements, policy manuals, and other contracts with its franchisees, affiliates, subsidiaries, and realtors.

103.     KW Defendants' conspiracy has caused buyer-broker commissions and total commissions in the areas in which BeachesMLS operates to be inflated. Plaintiff and the members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on BeachesMLS. Absent KW Defendants' conspiracy, Plaintiff and the Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

104.     KW Defendants' conspiracy is a *per se* violation under the federal antitrust laws, specifically 15 U.S.C. § 1. In the alternative, KW Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis. As a direct and proximate result of KW Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiff and the Class members have been injured in their business and property and suffered damages in an amount to be determined by jury.

## COUNT IV

### Quiet Title / Adverse Possession / Easement by Prescription

### (*Against KCK*)

105.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the common introductory sections (¶1-64) of this Complaint as if fully set forth herein.

106.     Plaintiff is the record owner of real property located within the Homeland Equestrian Community, Palm Beach County, Florida, described in official records as Homeland Lot 106, Homeland is in Sec 35 Twn 44S Rng 41E, Property Tax ID: 00-41-44-35-01-000-1060.

107.     A disputed boundary exists with adjacent Lot 108, owned and operated by KCK. The Tax ID for KCK's facility is 00-41-44-35-01-0000-1080.

108.     When KW Defendants represented the sale of this land to Plaintiff, they engaged in professional due diligence and represented to Plaintiff that the MLS listing was accurate. They had a duty to advise and notify Plaintiff of any reasonably obvious boundary line disputes or errors. The property was purchased site-unseen at the peak of the pandemic, and Plaintiff specifically relied upon accurate MLS listings to make an informed purchase. The following photo was prominent on the MLS listing, showing an aerial view of the property (True North is on the Left side of photo)

NORTH                                                                     SOUTH



109.     The precise region under dispute is a triangular shaped area of approximately ½

acre on the Northwest corner of Lot 106, and Southwest corner of Lot 108, respectively.

Prior to the annexation, Lot 108's southern boundary terminated with a hedge row and

white fence that continued at a straight-angle from the street cul-de-sac and FPL utility

pole. The property had an open horse access trail leading to a canal on the western side of

the properties. A brown fence ran adjacent the canal and ultimately met KCK's white fence

at the south-western boundary.

110.     Approximately thirty feet of Plaintiff's brown fence, adjacent to the canal, was

taken down by KCK. The horse trail was covered up, the large tree damaged and the area

beneath its canopy bisected by a new diagonal black fence.  The diagonal black fence now

dangerously abuts and blocks access to the FPL pole and runs thirty feet closer to the pond

bank than the previous white fence.

111.    A current Google Maps photo still shows the pre-annexed situation, and is oriented

to true north:



112.     Defendant KCK Development, L.L.C. ("KCK"), has asserted claims over a portion
of Plaintiff's property, specifically, an approximately ½ portion which has been fenced and
utilized by Plaintiff and his predecessors in title for over forty years.

113.     A rendered image of the ½ acre annexed area claimed by KCK is provided below.
A dotted line represents the thirty foot span of Plaintiff's fence demolished without consent
or judge's order:



114.    The subject property was acquired by Plaintiff on September 24, 2020, from the

previous owners, the Eisen Family, who had openly, continuously, and notoriously

possessed and maintained the property, including the disputed territory, as their own for a

period exceeding the statutory requirement of seven years under Florida law, thus

establishing a claim for adverse possession under Florida Statutes § 95.18.

115.    KCK has recently attempted to assert ownership over this portion of the property

by demolishing fences and claiming the land as their own without any legal or factual basis

for such a claim.

116.    On January 6, 2023, Plaintiff notified KCK of his adverse possession claim and

requested that KCK desist from altering physical boundaries or asserting ownership. KCK

has ignored this notice and continues to assert an unfounded claim. KCK has refused

multiple requests for mediation.

117.    KCK's actions have created a cloud on Plaintiff's title to the property, necessitating

this action to quiet title in order to affirm Plaintiff's full and exclusive ownership.

118.    Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, and

Florida Statutes § 65.081, declaring that Plaintiff is the sole owner of the disputed property,

free and clear of any claims by KCK.

119.    Plaintiff also seeks an order of this Court pursuant to Florida Statutes § 65.081,

perpetually enjoining KCK from asserting any ownership claims or rights over the disputed

property.

120.    Plaintiff has been forced to retain the services of counsel to protect his property

rights due to KCK's unwarranted claims and actions, and as such, is entitled to recover

reasonable attorney's fees and costs incurred in this action pursuant to Florida Statutes § 57.105.

121.     Plaintiff respectfully requests that this Honorable Court enter quiet title order: a. Declaring that Plaintiff is the sole and exclusive owner of the property described herein; b. Permanently enjoining Defendant KCK from asserting any ownership claims over the property; c. Awarding Plaintiff damages for trespass and any other compensatory damages proven at trial; d. Awarding Plaintiff his costs and attorney's fees incurred in this action; e. Granting such other and further relief as the Court deems just and proper.

*In the alternative only, an easement by prescription is warranted:*

122.     For over forty years, Plaintiff and his predecessors in title, the Eisen Family, have continuously, openly, and notoriously used a portion of the adjacent land owned by Defendant KCK Development, L.L.C. ("KCK"). This use includes the operation of an industrial-grade sprinkler system that irrigates a significant portion of Plaintiff's property, including a large, mature tree approximately 35 years old, under which Plaintiff had planned to construct an aviary for the enjoyment of planned agriculture and the natural habitat provided by the tree.

123.     The use of the sprinkler system and the related portion of KCK's property by Plaintiff and his predecessors has been characterized by:

a. Actual: Physical use of the land for the operation of the sprinkler system and the care of the mature tree and planned aviary.

b. Open and Notorious: The use of the land and its improvements has been visible and apparent to anyone, not hidden.

c. Continuous: The use has been ongoing without interruption for at least thirty years.

d. Exclusive: The use has been conducted by Plaintiff and his predecessors without any shared control or permission from KCK.

e. Adverse: The use has been without KCK's permission and contrary to KCK's interest in the property.

124.    Evidence includes the following photo of the annexation, which shows a perplexing situation where Plaintiff's sprinkler system waters his neighbor's purported land. The horse trail appears mostly covered now, and the newly installed fence is shown improperly touching FPL lines and continuing beneath the large tree planted by Eisen:



125.     Additional evidence exists through witness statements by neighbors. One individual, who was present and aware of Homeland's development in the 1980s, stated that the annex "defies plain history – those FPL lines split the lots like a T-bone. There are no other diagonal boundaries like this crossing the power lines. It's criminal theft of $200,000 of property."

126.     By virtue of these facts, Plaintiff asserts that an easement by prescription has been established under Florida law, permitting the continued use of the portion of KCK's property necessary for the operation of the sprinkler system and the enjoyment of the mature tree and the planned aviary.

127.     Recent actions by KCK, including the alteration of boundary fences, now pose a significant safety hazard. The new fence placement encroaches dangerously close to the slope/bank of a pond on Plaintiff's property, which had previously had adequate space to walk around and was intended as part of the site for the planned aviary. This alteration significantly impacts the safe usage and enjoyment of Plaintiff's property.

128.     Plaintiff seeks a declaratory judgment that an easement by prescription exists over the portion of KCK's property used for the sprinkler system and the enjoyment of the mature tree and planned aviary, affirming Plaintiff's right to continue using this area as historically intended.

129.     Plaintiff also seeks an injunction preventing KCK from interfering with Plaintiff's use of the easement area and from taking any actions that would threaten the safety, functionality, and enjoyment of the sprinkler system, mature tree, and the planned aviary.

130.     The plaintiff has been forced to retain the services of counsel to protect his rights due to KCK's actions and is entitled to recover reasonable attorney's fees and costs incurred in this action pursuant to Florida Statutes § 57.105.

Plaintiff respectfully requests that this Honorable Court enter an order: a. Declaring that an easement by prescription exists in favor of Plaintiff over the necessary portion of KCK's property; b. Enjoining KCK from interfering with Plaintiff's use of the easement area; c. Awarding Plaintiff damages for any interference that has occurred; d. Awarding Plaintiff his costs and attorney's fees incurred in this action; e. Granting such other and further relief as the Court deems just and proper.

## DECLARATORY JUDGMENT

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court can issue a declaratory judgment where there is a substantial controversy of sufficient immediacy and reality between parties with adverse legal interests. Should the evidence demonstrate that Defendants and/or third parties have taken repeated and independent adverse actions against Plaintiff based on long-acquitted and expunged allegations, the Court may issue a declaratory judgment to prevent the perpetual recurrence of this manifest injustice. Such a judgment would serve to clarify and settle the legal rights and obligations of the parties, thereby preventing future legal disputes over the same issues. Former AUSA Mark Josephs drafted and filed proposed declaratory judgments of this nature in 2017 and 2019, which are incorporated herein by reference. The declaration sought affords "factual innocence" to Plaintiff concerning the acquitted, annulled, and sealed allegations, thereby preventing Defendants or other third parties from alleging otherwise and adversely impacting Plaintiff's reputation and legal status.

WHEREFORE, The Plaintiff and class members respectfully request that this Honorable Court:

A. Certify this case as a class action lawsuit and certify the proposed federal law classes on a nationwide basis for victims of Keller Williams (KWRI) and subsidiaries' (e.g. Makai) conduct. Determine Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Issue an order that KW Defendants' alleged actions violate the statutes and civil legal claims referenced herein, specifically that KW Defendants' conduct violated the Sherman Act and TCPA.

C. Order damages for:

    a. Sherman Act damages to be determined after discovery of pertinent BeachesMLS and Zillow home sale data.

    b. Willful statutory TCPA violations, with estimated damages in excess of $80 million. Damages shall include each phone call made in violation of TCPA, pursuant to 47 U.S.C. § 227(b)(3).

    c. Damages for financial loss and other damages suffered by Plaintiff and all class members.

    d. Treble damages and punitive damages as determined by jury.

D. Issue a permanent injunction restraining KW Defendants from engaging again in the prohibited conduct.

E. Approve or award attorneys' fees as appropriate. Reasonable attorney's fees and costs per FHA provisions (42 U.S.C. § 3613(c)(1)).

F. Grant any further relief as may be fair and just, including the aforementioned Declaratory Judgment and Quiet Title orders.

Respectfully submitted, this 3rd day of June 2024.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law


/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
Manchester, NH 03105
Ph. 603-622-8100
keith@awplegal.com

## DEMAND FOR JURY TRIAL

In accordance with FRCP 38, Plaintiff and Class Members hereby request a trial by jury.

Executed on this 3rd day of June 2024.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.


/s/ Keith Mathews
Keith Mathews

## CERTIFICATE OF SERVICE

I, Ayelet Faerman & Keith Mathews, do declare as follows:

I certify that a copy of the foregoing SECOND AMENDED COMPLAINT was served upon all parties in accordance with applicable service of process guidelines.

Executed on this 3rd day of June 2024.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.

/s/ Keith Mathews
Keith Mathews